1    BRIAN D. HENRI (State Bar No. 200205)
     *bhenri@twtlaw.com*
2    MATTHEW W. MESKELL (State Bar No. 208263)
     *mmeskell@twtlaw.com*
3    W. PAUL SCHUCK (State Bar No. 203717)
     *pschuck@twtlaw.com*
4    **THOMAS WHITELAW & TYLER LLP**
     Three Embarcadero Center, Suite 1350
5    San Francisco, California 94111-4037
     Telephone:    (415) 820-0400
6    Facsimile:    (415) 820-0405

7    JOSEPH E. THOMAS (State Bar No. 101443)
     *jthomas@twtlaw.com*
8    MICHAEL I. KATZ (State Bar No. 181728)
     *mkatz@twtlaw.com*
9    **THOMAS WHITELAW & TYLER LLP**
     18101 Von Karman Avenue, Suite 230
10   Irvine, California 92612
     Telephone:    (949) 679-6400
11   Facsimile:    (949) 679-6405

12   AUSTIN TIGHE *(admitted* pro hac vice*)*
     *austin@feazell-tighe.com*
13   **FEAZELL & TIGHE LLP**
     6618 Sitio Del Rio Boulevard
14   Building C-101
     Austin, Texas 78730
15   Telephone:    (512) 372-8100
     Facsimile:    (512) 372-8140
16
     Attorneys for Plaintiffs
17

18                  UNITED STATES DISTRICT COURT

19             NORTHERN DISTRICT OF CALIFORNIA

20                 SAN FRANCISCO DIVISION

| | |
|---|---|
| 21   MICHAEL E. DAVIS, aka TONY DAVIS, VINCE FERRAGAMO, and BILLY JOE DUPREE, on behalf of themselves and all others similarly situated, | CASE NO. 10-cv-3328 RS |
| 22 | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| 23 | |
|           Plaintiff, | **DEMAND FOR JURY TRIAL** |
| 24 | |
|     vs. | |
| 25 | |
| ELECTRONIC ARTS, INC., | |
| 26 | |
|         Defendant. | |
| 27 | |
| 28 | |

1   Plaintiffs, by and through their attorneys, based on their individual experiences, the

2   investigation of counsel, and upon information and belief allege as follows:

3   **I.     INTRODUCTION**

4   1.      This is a class action lawsuit brought by Michael E. Davis, aka Tony Davis, Vince

5   Ferragamo, and Billy Joe Dupree on behalf of themselves and on behalf of all other similarly

6   situated retired National Football League ("NFL") players against Electronic Arts, Inc. ("EA")

7   arising out of the unlawful use of retired NFL players' likenesses in the Madden NFL video games

8   created, marketed, and sold by EA.  Specifically, EA's production and sale of video games

9   including the unauthorized likenesses of retired NFL players violates retired NFL players'

10  statutory and common law rights of publicity under California law.  Furthermore, EA's practice of

11  appropriating the likenesses of retired NFL players without prior authorization and permission is

12  unlawful and/or wrongful and has caused it to be unjustly enriched.

13  2.      Rather than obtain authorization to use the likenesses of retired NFL players in its

14  Madden NFL video game franchise and properly compensate this group of individuals for use of

15  their likenesses, EA without authorization used and continues to use their likenesses in "historic

16  teams" in various versions and editions of EA's Madden NFL video games.

17  3.      EA has earned and continues to earn substantial revenue by creating, marketing,

18  and selling video games featuring the likenesses of retired NFL players.  In just one fiscal year

19  (2009), EA posted net revenues of $4.212 billion.  EA trades on the popularity of historic NFL

20  teams and the likenesses of the players who comprised the rosters of those teams to enhance the

21  revenue and popularity of EA's Madden NFL video game franchise.

22  4.      EA's commercial exploitation of retired NFL players is both blatant and prolific.

23  For example, the 2009 edition of the Madden NFL video game included 146 "historic teams" and

24  31 additional "all [time]" historic teams containing likenesses of thousands of retired NFL players.

25  EA was and is fully aware that its use of the retired players' likenesses is without authorization

26  and that a license is needed.  EA purposefully chose to include the unauthorized likenesses of

27  retired NFL players in EA's popular Madden NFL video game franchise.

28  5.      EA's conduct has violated and continues to violate Plaintiffs' rights of publicity

1   and the rights of publicity of all similarly situated class members.  This is a proposed class action

2   on behalf of retired NFL players whose likenesses have been used without their authorization,

3   permission, or consent in various versions and editions of EA's Madden NFL video game

4   franchise in violation of applicable laws.  Compensation is sought against EA for the unauthorized

5   use of the likenesses of retired NFL football players.

6                                              **II.      PARTIES**

7          6.      Plaintiff Tony Davis, an individual, is a resident of Colorado and is a retired NFL

8   player.  Mr. Davis played six seasons in the NFL as a running back for the Cincinnati Bengals

9   (1976-1978) and Tampa Bay Buccaneers (1979-1981).  Mr. Davis is a widely recognized advocate

10  for the rights of retired NFL players.  EA has used and continues to use Mr. Davis' likeness for its

11  own commercial benefit and profit without Mr. Davis' authorization or permission.

12         7.      Plaintiff Vince Ferragamo, an individual, is a resident of California and is a retired

13  NFL player.  Mr. Ferragamo played nine seasons in the NFL as a quarterback for the Los Angeles

14  Rams (1977-80 and 1982-84), Buffalo Bills (1985), and Green Bay Packers (1986).  Mr.

15  Ferragamo led the 1979 Los Angeles Rams to the Super Bowl where he started as quarterback.

16  Mr. Ferragamo was twice featured on the cover of Sports Illustrated and was twice named most

17  valuable player for the Rams.  Mr. Ferragamo is, among other things, the chairman of the Vince

18  Ferragamo Foundation which raises money for children's causes such as the Special Olympics.

19  EA has used and continues to use Mr. Ferragamo's likeness for its own commercial benefit and

20  profit without Mr. Ferragamo's authorization or permission.

21         8.      Plaintiff Billy Joe Dupree, an individual, is a resident of Texas and a retired NFL

22  player.  Mr. Dupree played eleven seasons in the NFL as a tight end for the Dallas Cowboys from

23  1973 through the 1983 season.  Mr. Dupree was selected to the Pro Bowl on three occasions.  He

24  played a key role in the Dallas Cowboys' victory in Super Bowl XII in 1978.  Mr. Dupree is also a

25  recognized advocate of retired NFL players' rights.  Mr. Dupree, along with Spencer Kopf,

26  authored the book "The Unbroken Line:  The Untold Story of Gridiron Greats and Their Struggle

27  to Save Professional Football."  EA has used and continues to use Mr. Dupree's likeness for its

28  own commercial benefit and profit without Mr. Dupree's authorization or permission.

9.      Defendant EA, a Delaware corporation, with its principal place of business located in Redwood City, California, is an interactive entertainment software company that produces, publishes, and distributes the Madden NFL video game franchise, along with other video games. It is self-described as the "world's leading interactive entertainment software company."

### III.      JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and some Plaintiffs and other putative Class members are citizens of different states than the Defendant.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this District, and has sufficient minimum contacts for the exercise of personal jurisdiction in this District.  Defendant has purposefully availed itself of the privilege of conducting business activities within the State of California by employing workers within California and selling its goods and services within the State and within the District.  Furthermore, on information and belief, the wrongful conduct occurred at EA's principal place of business located in Redwood City, California which is located within this Judicial District.

12.      Intradistrict Assignment:  Assignment to the San Francisco or Oakland Division of this Court is appropriate because Defendant EA's headquarters and principal place of business are in Redwood City, California.  Because this action arises in the County of San Mateo, pursuant to Northern District of California, Local Rule 3-2(d), assignment to either the San Francisco Division or the Oakland Division is proper.

### IV.      FACTUAL ALLEGATIONS

**A.      EA and the Madden NFL Video Game Franchise**

13.      EA is the number one publisher of video games in North America, with revenues of approximately $4.2 billion for fiscal year 2009.

14.      EA produces the Madden NFL video game franchise.  Video games within the Madden franchise simulate football games between current and historic NFL teams.

15.      EA releases different editions of the Madden NFL video game franchise for different video game platforms and in different languages.  For example, EA publishes separate

1   platform editions of the Madden NFL 09 video game for the Microsoft Xbox, Microsoft Xbox360,

2   Sony PlayStation2 ("PS2"), Sony PlayStation3 ("PS3"), Sony PlayStation Portable ("PSP"),

3   Nintendo Wii, Nintendo DS, and a mobile telephone edition.

4         16.     EA sells and distributes these different editions of the Madden NFL video game in

5   different countries and regions including, without limitation, the United States, Canada, the United

6   Kingdom, and Australia.

7         17.     Although each platform edition of the Madden NFL video game shares some

8   similarities, there is also variation between the different platform editions of the video game.

9         18.     For example, there are variations in the media in which the different editions of the

10  Madden NFL video games are published.  Some editions are published on a DVD.  The PSP

11  edition is published on a small disc (known as a Universal Medium Disc or "UMD") that is only

12  60 millimeters in diameter.  The Nintendo DS edition is published on a solid state mask ROM that

13  is similar to a flash memory stick.  The PS3 edition is published on a Blu-ray disc.  Moreover, a

14  DVD, small disc, Blu-ray disc, or ROM containing the video game for one platform cannot be

15  played on another platform (*i.e.*, a PS2 edition of the Madden video game will not work on the

16  Xbox).

17        19.     There is also variation in the features between the different platform editions of the

18  Madden video game.  For example, not all platform editions of the Madden NFL 09 video game

19  contained "historic teams" made up of unauthorized uses of retired player' likenesses.

20        20.     Each separate platform edition of the Madden NFL video game is targeted for a

21  different set of consumers.  For example, the PlayStation2 edition of the Madden NFL 09 video

22  game is targeted towards owners of PlayStation2 systems while the Xbox edition of that game is

23  targeted towards owners of an Xbox.

24        21.     In addition, each separate platform edition of the Madden NFL video game has a

25  user's manual unique to that platform edition that accompanies the game.

26        22.     Furthermore, through at least the 2009 Madden NFL video game, EA registered

27  separate copyrights for each separate platform edition for both the medium in which the game was

28  published (*i.e.*, DVD, Blu-ray disc, UMD, or ROM) and for the unique user's manual that

1    accompanied the video game.  For example, EA registered separate copyrights for the following

2    editions of the Madden NFL 2009 video game: Xbox, Xbox360, PS2, PS3, PSP, Wii, and

3    Nintendo DS.

4           23.    The Madden NFL video game franchise is one of the top-selling video game

5    franchises of all time and has contributed significantly to EA's annual revenue.

6           24.    Upon information and belief, sales of all of the versions of the 2009 edition of the

7    Madden NFL video game accounted for at least 10% of EA's fiscal year 2009 revenue, totaling

8    approximately $400 million in that year alone.

9           25.    EA releases new Madden NFL video games every year.  The Madden NFL video

10   games simulate football games in the most realistic manner possible, as EA spends millions of

11   dollars to ensure the realism of these NFL games, and advertises this realism in the promotion of

12   its products.

13          26.    Indeed, the very realism of the Madden NFL video game franchise is where the

14   franchise's value lies.  EA replicates the skill levels of NFL players through a ranking system and

15   gives the likenesses of NFL players in the Madden NFL games the very attributes that the NFL

16   players have in real life—including the same teams, positions, height, weight, years of experience,

17   and "skin tone" among other characteristics.

18          27.    EA's promotion of the Madden NFL video game franchise trumpets this realism.

19   In fact, EA proclaims that:

20              . . . We are all 100% focused on creating the most true-to life NFL
                simulation experience as possible - and that's always been the goal
21              (a goal set forth by John Madden himself 20+ years ago). We set a
                clear vision statement last year and it still holds true for us -
22              "Everything you see on Sundays, see it in Madden NFL".  We want
                to accurately deliver an amazing NFL experience in our game,
23              whether it's through simulating the feel of a broadcast, re-creating
                the immersion you feel sitting at the 50 yard line at your favorite
24              team's stadium, or making you feel like you're suiting up and
                putting on your pads again . . .
25

26   See http://maddennfl.easports.com/blog.action?blogId=superbowlblog.

27          28.    EA's adoption of realism as the hallmark of its Madden NFL video games is further

28   reflected by the fact that since 2004, EA has run a simulation of the Super Bowl prior to the game

97084

FIRST AMENDED CLASS ACTION COMPLAINT

1   being played and announced the simulated winner and score.  EA's simulated Super Bowl has

2   accurately predicted the winner in six of the last seven Super Bowls.

3          29.     EA's company slogan is, "It's in the game."  The meaning of this slogan is that if a

4   characteristic or attribute is in a real life sport or activity, then that characteristic or attribute is also

5   in the EA video game portraying that sport or activity.  In fact, the current company slogan is a

6   shortened version from its earlier slogan, "If it's in the game, it's in the game."

7          30.      EA widely publishes its slogan in a variety of forms of media including radio,

8   television, and the Internet.  Moreover, this slogan is announced when the Madden NFL video

9   game is booted.

10          31.     Even after EA releases a new Madden NFL video game, it knowingly continues to

11   publish and sell its older editions of Madden NFL video games despite its knowledge that some

12   editions of these games contain unauthorized uses of retired players' likenesses.

13          32.     Furthermore, at the time that EA releases a new Madden NFL video game, or

14   thereafter, EA lowers the price of the prior years' Madden NFL video games in order to market the

15   game to a different group of consumers who are more cost-sensitive.

16   **B.       Background on EA's Unauthorized Use of Retired Players' Likenesses**

17          33.     In addition to including the likenesses of then-active NFL players, through the 2009

18   Madden NFL game, many editions of the game include "historic teams."

19          34.     EA misappropriated the likenesses of retired NFL players on these historic teams

20   by describing in each player's profile *inter alia* the player's position, years in the NFL, height,

21   weight, "skin tone," as well as each player's relative skill level in different aspects of the game,

22   among other characteristics.  These characteristics are consistently identical or so close to the

23   actual player's characteristics that the consumers of the game can readily discern which player is

24   being represented.

25          35.     The retired player's likenesses have commercial value.  The value of retired NFL

26   player's likenesses is particularly apparent with respect to the video game industry.  Indeed, the

27   value of the "historic teams" to consumers of Madden NFL video games depends on the

28   composition of the teams being true to actual historical fact.  For example, consumers of the

1    Madden NFL video game cannot enjoy pitting one historical team against another (or one

2    historical team against a current team) if the rosters of those teams do not represent the actual

3    players of the teams that the consumers know and love.

4         36.    NFL players' likenesses and publicity rights are extremely valuable intangible

5    property to EA and other video game manufacturers.  For example, it has been publicly reported

6    that EA pays the NFL Players Union, through their licensing arm, nearly thirty-five million dollars

7    each year for the use of active players' likenesses.  Moreover, EA selected only the most popular

8    and successful historic teams to include in the Madden NFL video game.

9         37.    Although EA obtained licenses and pays for the use of active players' likenesses in

10   the Madden NFL video games, EA did not obtain required licenses or authorizations for the use of

11   the Class members' likenesses.  Rather, EA tried to circumvent its legal obligation to pay retired

12   players for the use of their likenesses in its games.  EA attempted to avoid license fees for use of

13   retired players' likenesses by placing on the "avatar" of each retired player a different uniform

14   number than that worn by the player when he was actually on that historic team.  These trivial

15   changes reflect a calculated and underhanded attempt to avoid having to pay any license or

16   royalty—but nonetheless readily invoke the likeness of the player in the mind of the consumer.  In

17   this way, EA has exploited the retired players by using their valuable likenesses and publicity

18   rights without authorization or compensation.

19        38.    In the case of named plaintiff Tony Davis, for example, in 1979 Mr. Davis played

20   for the Tampa Bay Buccaneers in the position of running back.  He was 26 years old, 5'11" tall,

21   weighed 215 pounds, and was in his fourth NFL year.  He is Caucasian.  In the Madden NFL 09

22   video game, he appears as a full back (the term running back commonly refers to either the half

23   back or full back positions) for the 1979 Tampa Bay Buccaneers, is 26 years old, 5'11", weighs

24   215 pounds, has four years of "pro" experience, and his skin tone is light.

25        39.    EA used the likenesses of the other players on the 1979 Buccaneers in a similar

26   fashion.  Attached hereto as Exhibit "A" is a chart of the 1979 Tampa Bay Buccaneers, with the

27   player statistics for that year as set forth in the team's media guide, compared to those players'

28   statistics as they appear in the Madden NFL 09 video game.  As can be seen from a cursory review

1  of this chart, it is easy to discern the identities of the retired NFL player class members in the

2  game.

3         40.     For example, the starting quarterback for the 1979 Tampa Bay Buccaneers was

4  Doug Williams.  Among other things, Mr. Williams was one of only four African American

5  quarterbacks in the NFL in 1979, and was listed at 6'4" and 215 lbs.  He was 24 years old and was

6  in his third year in the NFL.  In the Madden NFL 09 video game Mr. Williams appears as the

7  highest rated and starting quarterback for the 1979 Tampa Bay Buccaneers, is 6'4", weighs 215

8  lbs, is 24 years old, is in his third year in the NFL, and his skin tone is dark.

9         41.     EA's use of retired player's likenesses to create a realistic simulation of past teams

10  was so pervasive that when a given retired NFL player appeared on more than one historic team

11  featured in the game, EA made changes to that historic player's characteristics as they appeared on

12  each of those historic teams to ensure that the player's likeness on those separate teams was

13  accurately reflected.

14         42.     For example, plaintiff Vince Ferragamo's likeness appears in two historic teams in

15  the 2009 Madden NFL video games: the 1979 Los Angeles Rams and the 1984 Los Angeles

16  Rams.  Mr. Ferragamo's age, weight, and years pro in the game changed between those years.

17  Consistent with its practice of accurately depicting the game and the athletes who played it, EA

18  altered Mr. Ferragamo's characteristics as he appears on those separate historical teams in the

19  game to accurately match the differences in Mr. Ferragamo's actual physique and experience on

20  those separate teams.

21         43.     Specifically, in 1979 Mr. Ferragamo played quarterback for the Los Angeles Rams.

22  He was listed at 6'3" tall and weighed 207 lbs.  He was 26 years old and in his third year in the

23  NFL.  Mr. Ferragamo is Caucasian.  In the Madden NFL 09 video game he is depicted as a

24  quarterback for the 1979 Los Angeles Rams, at 6'3", 207 lbs, 26 years old, in his third year as a

25  pro, and with a light skin tone.

26         44.     In 1984, Vince Ferragamo again played quarterback for the Los Angeles Rams and

27  was listed at 6'3", 212 lbs (five pounds heavier than in 1979), and 30 years old.  In the Madden

28  NFL '09 video game he appears as a quarterback for the Los Angeles Rams, is 6'3", weighs 212

1   lbs (five pounds heavier than in 1979), is 30 years old, in his seventh year as a pro, and with a

2   light skin tone.  Thus, the Madden video game adjusted the likeness of Mr. Ferragamo in the game

3   to accurately reflect changes between 1979 and 1984, including his weight, age, and years in the

4   league.  EA even took into account the fact that Mr. Ferragamo did not play in the NFL in 1981 in

5   calculating and representing his professional experience.

6       45.    Plaintiff Billy Joe Dupree played tight end for the Dallas Cowboys from the 1973

7   season through the 1983 season.  He is represented as a tight end for the Dallas Cowboys in no

8   less than five teams in the Madden NFL 09 video game: the 1975, 1977, 1978, 1979, and 1981

9   teams.  In each of these "historic" Cowboys teams in the Madden NFL video game Mr. Dupree's

10  likeness is easily identifiable.

11      46.    For example, in 1975 Mr. Dupree was 6'4", 228 lbs, 25 years old and in his third

12  year in the NFL.  Mr. Dupree is African American.  In the Madden NFL 09 video game he appears

13  for the 1975 Dallas Cowboys as a tight end, 6'4", 228 lbs, 25 years old, in his third year in the

14  NFL, and with a dark skin tone.  Furthermore, the other tight end on this team was Jean Fogett

15  who in 1975 was listed as 6'3", 226 lbs, 23 years old, in his fourth year in the NFL and is African

16  American.  Mr. Fogett also appears in the Madden video game as the other tight end for the 1975

17  Cowboys at 6'3", 226 lbs, 23 years old, in his fourth year in the NFL, and with a dark skin tone.

18      47.    In 1977 Mr. Dupree was the starting tight end for the Dallas Cowboys and is again

19  accurately identified in the Madden NFL 09 video game for this year including adjustments for his

20  age (27 years old) and year in the NFL (fifth).  In addition, the other tight end for the Cowboys in

21  1977, Jay Saldi, is accurately identified in the video game.  In 1977 Mr. Saldi was 6'3", 224 lbs,

22  23 years old, in his second year in the NFL and is Caucasian.  In the Madden NFL 09 video game

23  Mr. Saldi appears as a tight end for the 1977 Cowboys, is 6'3", 224 lbs, 23 years old, in his second

24  year in the NFL, and with a light skin tone.

25      48.    In 1978 Mr. Dupree was again the starting tight end for the Dallas Cowboys and

26  again is accurately identified in the Madden NFL 09 video game for this year including

27  adjustments for his age (28 years old) and year in the NFL (sixth).  In fact, 1978 was a banner year

28  for Mr. Dupree and he was named to the Pro Bowl.  Mr. Dupree's stellar performance that year is

1  reflected in the Madden NFL video game.  Specifically, he is the highest rated tight end for 1978

2  in the video game (with an overall rating of 99).

3       49.     Furthermore, in 1978 the Cowboys signed veteran Jackie Smith to be their other

4  tight end due to an injury to Jay Saldi.  This change in personnel at the tight end position for the

5  1978 Cowboys is also reflected in the Madden NFL video game.  Specifically, in 1978 Jackie

6  Smith, who is Caucasian, was listed at 6'4", 230 lbs, 38 years old, and was in his *sixteenth year in*

7  *the NFL*.  Mr. Smith appears as the other tight end for the 1978 Cowboys in the Madden NFL 09

8  video game, is 6'4", 230 lbs, 38 years old, in his *sixteenth year in the NFL*, and with a light skin

9  tone.

10       50.     In 1979 Mr. Dupree again was the starting tight end for the Dallas Cowboys and

11  accurately identified in the Madden NFL 09 video game for this year.  Likewise, the other tight

12  end for that year, Jay Saldi, is again accurately identified in the video game.

13       51.     Finally, in 1981 Mr. Dupree was again the starting tight end for the Dallas

14  Cowboys and again is accurately identified in the Madden NFL 09 video game for this year

15  including adjustments for his age (31 years old) and year in the NFL (ninth).

16       52.     These are not unique examples.  EA deliberately and systematically

17  misappropriated the retired players' likenesses to increase the value of the Madden NFL video

18  game franchise at the expense of those players.  EA uses "historic teams" to enable consumers to

19  assume the identities of retired players and to compete in simulated NFL games.

20       53.     The only player characteristic that EA changes from the real-life retired NFL

21  players is the jersey number.  Despite EA's "scrambling" of the retired NFL players' numbers, the

22  games are designed so that consumers of the Madden NFL video game franchise will have no

23  difficulty identifying who the actual "historic" players are.  Again, if the historic teams in the

24  Madden NFL video game were not accurate representations of the retired players' characteristics,

25  then the game playing experience would be quite unsatisfactory.

26       54.     The omission of players' names and scrambling of the numbers has little

27  consequence because Electronic Arts includes a player customization feature that allows users to

28  edit the rosters of historical teams to include players' real names and numbers.  In fact, consumers

1    may access online services to download team rosters with the retired players' names and numbers,

2    and upload them into the games.

3         55.    EA further encouraged users of the Madden NFL video game to use the historic

4    rosters by, among other things, in some games allowing users to achieve certain milestones in the

5    game to unlock and use historic rosters as a reward for playing and excelling at the game.

6    **C.    EA's Awareness of Its Unauthorized Use**

7         56.    Neither Plaintiffs nor any other member of the Class has ever authorized EA to use

8    their rights of publicity or likeness in the Madden NFL video game.

9         57.    EA was and is aware of its need to obtain authorization or permission from retired

10   NFL players in order to use their likenesses in EA's Madden NFL video game franchise.  Indeed,

11   in a brief recently filed before the United States Supreme Court, EA wrote as follows:

12       EA produces high-quality sports video games such as *Madden NFL Football* under
         intellectual property licenses from sports leagues such as Respondent National Football
13       League ("NFL"). In 2004 EA competed for and won licenses from the NFL's licensing
         arm, Respondent National Football League Properties, Inc. ("NFL Properties"), and the
14       licensing arm of the National Football League Players' Association, PLAYERS INC,
         in certain categories. These licenses allow EA to use the marks, colors, and logos of all
15       32 NFL member clubs, as well as the names and likenesses of nearly all NFL players.

16       EA relies on these licenses to create lifelike, interactive simulations of the NFL
17       experience. The Madden titles are successful in part because they allow consumers to
         simulate play involving any of the 32 NFL teams, using real NFL players and real NFL
18       coaches. The simulations capture the nuances of NFL contests to the fullest extent
         technology allows, including not only on-field play but also the teams' logos and
19       colors, the players' uniforms, the teams' tendencies and capabilities, and even the
         players' celebrations and the crowds' chants. The success of Madden NFL Football
20       vividly demonstrates how associating game play with attractive intellectual property
         can create and satisfy consumer demand and allow one to succeed in an intensely
21       competitive industry. The degree of authentic sports experience helps differentiate
         sports simulations in much the same way that a license to *Harry Potter* or *Spiderman*
22       intellectual property helps differentiate video games built around fantasy themes.
         Authentic simulation is an important part of competition in the video game market.
23

24       EA licenses many trademarks and other intellectual property rights for its video games
25       . . .

26   (See "Brief For Electronic Arts, Inc. As Amicus Curiae Supporting The NFL Respondents" filed

27   in American Needle, Inc. v. National Football League, et al. (Case No. 08-661 before the Supreme

28   Court of the United States) at pp. 1-2) (emphasis added).

1      58.     On information and belief, EA and representatives of the National Football League

2 Player's Association (the "NFLPA") entered into discussions regarding the use of retired NFL

3 players' likenesses in the Madden NFL video games.

4      59.     On information and belief, the NFLPA made it clear to EA that it could not use the

5 likenesses of retired NFL players in the Madden NFL video game franchise.

6      60.     EA did not acquire the rights to use the likenesses of retired NFL players but,

7 instead, it misappropriated the likenesses of retired NFL players in EA's Madden NFL video game

8 franchise by incorporating their elements, characteristics, and identities.

9      61.     Notably, after this scheme came to light, EA discontinued its misappropriation of

10 retired NFL players' likenesses in the 2010 editions of the Madden NFL video game, although it

11 continued to market and sell prior infringing editions of the Madden NFL video game.

12                            **V.      CLASS ACTION ALLEGATIONS**

13      62.     Plaintiffs bring this class action on their own behalf and on behalf of a class of

14 persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The

15 putative Class is defined as:

16            All former NFL players whose likenesses were included without
              permission or authorization in the "historic teams" or "all [time]
17            teams" in various versions and editions of the Madden NFL video
              game.
18

19      63.     Excluded from the Class are EA, its directors, officers, and employees.

20      64.     The Class meets the numerosity standard in Rule 23(a)(1) because it consists of

21 approximately 6,000 retired NFL players who are geographically dispersed throughout the United

22 States and perhaps elsewhere.

23      65.     Although the precise number of such persons is unknown, the exact size of the

24 Class is easily ascertainable, as each class member can be identified by using readily available and

25 widely published historic player information.  For example, the names and addresses of class

26 members can be obtained from the NFL Alumni Association, the NFLPA, and the NFL's Player

27 Database.  The joinder of each of these approximately 6,000 players is impracticable.

28      66.     The disposition of Class members' claims through this class action will provide

1    substantial benefits to both the parties and the Court.

2        67.      Members of the Class may be notified of the pendency of this action by techniques

3 and forms commonly used in class actions, such as by published notice, e-mail notice, website

4 notice, first class mail, or combinations thereof, or by other methods suitable to this class and

5 deemed necessary and/or appropriate by the Court.

6        68.      There are common questions of law and fact that predominate over any questions

7 affecting only individual members and include, but are not limited to, the following:

8            (a)      Whether EA utilized retired NFL players' likenesses in its Madden NFL video

9                  game franchise;

10            (b)      Whether EA used retired NFL players' likenesses for its advantage or economic

11                  gain;

12            (c)      Whether such use is unlawful;

13            (d)      Whether EA's conduct violates California Civil Code Section 3344;

14            (e)      Whether EA's conduct violates California's common law right of publicity;

15            (f)      Whether class members have been damaged by EA's conduct and the amount

16                  of such damages;

17            (g)      Whether class members are entitled to punitive damages and whether costs and

18                  attorneys' fees are appropriate and the amount of such damages;

19            (h)      Whether statutory damages are appropriate and the amount of such damages;

20                  and,

21            (i)      Whether EA should disgorge their unlawful profits and the amount of such

22                  profits.

23        69.      Plaintiffs' claims are typical of the Class members' claims, as they arise out of the

24 same course of conduct and the same legal theories as the rest of the Class, and Plaintiffs

25 challenge the practices and course of conduct engaged in by EA with respect to the Class as a

26 whole.

27        70.      Plaintiffs are adequate representatives of the Class because their interests do not

28 conflict with the interests of the Class members that they seek to represent, and, in fact, they are

1   similarly situated with the members of the Class.  Plaintiffs will fairly and adequately represent

2   and protect the interests of the Class.  Plaintiffs have retained counsel who are competent and

3   experienced in the prosecution of class action litigation.

4        71.     Resolution of this action on a class-wide basis is superior to other available

5   methods.  Although the aggregate damages which may be awarded to Plaintiffs and the Class are

6   likely to be in the tens of millions dollars or more, the actual damages suffered by an individual

7   class member could be small in comparison.  Thus, the expense and burden of individual litigation

8   makes it economically infeasible and procedurally impracticable for each retired NFL player

9   member of the Class to seek legal action.

10        72.     Moreover, separate actions by individual class members would also create a risk of

11   inconsistent or varying judgments, which could establish incompatible standards of conduct for

12   EA and substantially impede or impair the ability of class members to pursue their claims.

13   Allowing this matter to proceed as a class action presents fewer management difficulties,

14   conserves the resources of the parties and the court system, and is the only method whereby

15   Plaintiffs and the Class can efficiently seek redress and obtain a uniform adjudication of their

16   claims.  Plaintiffs do not anticipate difficulties with the management of this action.

17                          **VI.     CAUSES OF ACTION**

18                          **FIRST CAUSE OF ACTION**

19   **(Deprivation of Rights of Publicity in Violation of California Civil Code §3344)**

20        73.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 72 as

21   though set forth fully herein.

22        74.     The Class consists of former professional athletes whose likenesses were used in

23   "historic teams" in the Madden NFL video game franchise.  In utilizing "historic teams," EA

24   selected popular and successful teams from NFL history.  As former professional athletes in an

25   extremely popular sport and on popular historic teams, the likenesses of the Class have

26   commercial value.

27        75.     EA knowingly, and without authorization, used the likenesses of the Class

28   members in numerous editions of its Madden NFL video game, including but not limited to, the

1  following editions of Madden NFL 09: Xbox edition, PS2 edition, PSP edition, Nintendo Wii

2  edition, Nintendo DS edition.  These infringing editions of the Madden 09 video game were first

3  sold to the public in the United States on August 12, 2008.

4  76.     Furthermore, on or after July 30, 2008, EA continued to publish and/or republish

5  editions of prior years' Madden NFL video games that contained "historic teams" based upon

6  unauthorized uses of the likenesses of the Class.  At the time of these publications, EA knew it

7  was publishing these games and knew that the games contained unauthorized uses of the

8  likenesses of the Class.

9  77.     In addition, on or about the time of the release of the various editions of the

10  Madden NFL 09 video game on August 12, 2008, or thereafter, EA made a conscious and

11  deliberate choice to continue and/or renew its publication of infringing editions of prior years'

12  Madden NFL video games including, but not limited to, the Madden NFL 08 video game.

13  78.     In fact, EA made a conscious and deliberate choice to expand its unauthorized use

14  of retired players' likenesses by lowering the price of infringing editions of the prior years' video

15  games.  By republishing prior year editions of the Madden NFL video games, EA sought to reach

16  new groups of video game consumers who are more cost conscious or price restricted.

17  79.     For example, within two years of the filing of this lawsuit, EA knowingly

18  continued publication and/or republished infringing editions of its Madden NFL 08 video game,

19  including but not limited to, the following editions:  Madden NFL 08 Xbox edition, Madden NFL

20  08 PS2 edition, Madden NFL 08 PSP edition, Madden NFL 08 Nintendo Wii edition, Madden

21  NFL 08 Nintendo DS edition, Madden NFL 08 PC edition, Madden NFL 08 MAC.

22  80.     As a direct and proximate result of aforesaid wrongful acts of EA, each member of

23  the Class has been damaged in an amount that is not less than $750 per use of their likeness in

24  each infringing edition of the video game.  When Plaintiffs have ascertained the full amount of

25  damages, they may seek leave of court to amend the complaint accordingly.

26  81.     As a direct and proximate result of the aforesaid mentioned wrongful acts of EA,

27  Plaintiffs and the Class have incurred, and will continue to incur, substantial attorney's fees and

28  costs.  Plaintiffs and the Class are entitled to an award of their attorneys' fees and costs incurred in

1  connection with this matter pursuant to California Civil Code section 3344(a).

2         82.     By reason of the aforesaid wrongful acts of EA, in addition to the relief sought

3  above, Plaintiffs and the Class are entitled to an accounting of all gross revenue and profits

4  received, directly and indirectly, by EA as a result of the unauthorized use of the likenesses of

5  Plaintiffs and the Class, and to an award of all such sums. By reasons of EA's wrongful acts as

6  alleged above, EA is an involuntary trustee holding all such sums in its possession under a

7  constructive trust for the benefit of Plaintiffs and the Class with a duty to transfer the same to

8  Plaintiffs and the Class forthwith.

9         83.     EA's actions, as described herein, were committed maliciously, intentionally,

10 fraudulently and with a willful and conscious disregard of Plaintiffs' and Class members' rights,

11 making an award of punitive damages appropriate in order to punish and deter EA from engaging

12 in the conduct alleged herein.

13                               **SECOND CAUSE OF ACTION**

14              **(Violation of Rights of Publicity under California Common Law)**

15        84.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 83 as

16 though set forth fully herein.

17        85.     EA has utilized and continues to utilize the likenesses of Plaintiffs and Class

18 members in numerous versions and editions of its Madden NFL video game franchise.

19        86.     EA has intentionally utilized and continues to utilize Plaintiffs' and Class

20 members' likenesses with full and complete knowledge that its use of such likenesses is

21 unauthorized and without permission of Plaintiffs and Class members.

22        87.     EA has utilized and continues to utilize Plaintiffs' and Class members' likenesses

23 for its own commercial advantage as a means of generating interest and profits for its Madden

24 NFL video game franchise.

25        88.     As a result of EA's misappropriation of their publicity rights, EA has injured

26 Plaintiffs and Class members.

27        89.     EA's actions, as described herein, were committed maliciously, intentionally,

28 fraudulently and with a willful and conscious disregard of Plaintiffs' and Class members' rights,

1  making an award of punitive damages appropriate in order to punish and deter EA from engaging

2  in the conduct alleged herein.

3  **THIRD CAUSE OF ACTION**

4  **(Conversion)**

5  90.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 89 as

6  though set forth fully herein.

7  91.     The property rights in the likenesses of Plaintiffs and Class members are owned by

8  Plaintiffs and Class members and have substantial commercial value.

9  92.     EA intentionally and willfully took Plaintiffs' and Class member's likenesses and

10  incorporated them into various versions and editions of the Madden NFL video game franchise

11  which were distributed to EA's consumers.

12  93.     Plaintiffs and Class members did not consent, expressly or impliedly, to EA's use

13  or distribution of such property.

14  94.     EA knew that its possession and distribution of Plaintiffs' and Class members'

15  property was without authorization and permission.

16  95.     EA obtained substantial benefit from its unauthorized use of Plaintiffs' and Class

17  members' property through its sale and distribution of said property in its Madden NFL video

18  game franchise.

19  96.     As a direct and proximate result of EA's actions, Plaintiffs and Class members

20  have lost, and will continue to lose, damages in the form of unpaid licensing fees and diminution

21  in the value of their likenesses, in an amount to be determined at trial.

22  97.     Plaintiffs and Class members are entitled to an award of the value of the property

23  taken, in an amount to be proven at trial.  In addition, or in the alternative, Plaintiffs and the Class

24  are entitled to restitution of EA's ill-gotten gains.

25  98.     EA's actions, as described herein, were committed maliciously, intentionally,

26  fraudulently and with a willful and conscious disregard of Plaintiffs' and Class members' property

27  rights, making an award of punitive damages appropriate in order to punish and deter EA from

28  engaging in the conduct alleged herein.

**FOURTH CAUSE OF ACTION**

**(Trespass to Chattels)**

99.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 98 as though set forth fully herein.

100.    At all times mentioned in this First Amended Complaint, Plaintiffs and the Class members owned the property rights in their likenesses.

101.    EA intentionally trespassed upon and interfered with Plaintiffs' and Class members' possession of the property rights in their likenesses by incorporating the likenesses of Plaintiffs and Class members into certain editions of the Madden NFL video game franchise.

102.    Plaintiffs and the Class members did not consent to EA's trespass upon the property rights in their likenesses.

103.    EA's trespass and interference proximately caused damage to Plaintiffs and Class members, including, but not limited to unpaid licensing fees and diminution in the value of their likenesses, in an amount to be determined at trial.

104.    EA's actions, as described herein, were committed maliciously, intentionally, fraudulently and with a willful and conscious disregard of Plaintiffs' and Class members' property rights, making an award of punitive damages appropriate in order to punish and deter EA from engaging in the conduct alleged herein.

**FIFTH CAUSE OF ACTION**

**(Unjust Enrichment)**

105.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 104 as though set forth fully herein.

106.    To the detriment of Plaintiffs and Class members, EA has been and continues to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein.  EA has been unjustly benefited through the sale of various editions of its Madden NFL video game franchise that utilize the likenesses of Plaintiffs and Class members.

107.    Plaintiffs' and Class members' likenesses have considerable commercial value based on their participation on legendary and immensely popular NFL teams from years past.

108.   EA has intentionally utilized and continues to utilize Plaintiffs and Class members' likenesses without their consent.  EA has therefore benefited from the use of Plaintiffs' and Class members' likenesses while simultaneously denying Plaintiffs and Class members the compensation that they would expect to be paid for the use of their likenesses.

109.   Between Defendant EA and Plaintiffs/Class members, it would be unjust for EA to retain the benefits attained by its wrongful actions.  Accordingly, Plaintiffs and Class members seek full restitution of EA's unjust enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated pray for judgment against Defendant EA as follows:

A.   Certification of the action as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and appointment of Plaintiffs as the Class Representatives and their counsel of record as Class Counsel;

B.   That Plaintiffs and each and every member of the Class recover: damages determined to have been sustained by each of them, including actual damages, statutory damages, punitive damages, and such other relief as provided by the statutes and common law cited herein;

C.   Disgorgement of all profits attributable to the use of Class Members' likenesses earned by EA from the sale of all editions and versions of the Madden NFL video games containing the likenesses of Plaintiffs and Class members between July 29, 2007 and the present through an accounting performed by accountants of Plaintiffs' choice under terms and conditions ordered by this Court at the expense of Defendant EA;

D.   Prejudgment and post-judgment interest on such monetary relief;

E.   The costs of bringing this suit, including reasonable attorneys' fees; and

///

FIRST AMENDED CLASS ACTION COMPLAINT

F.   All other relief to which Plaintiffs and Class members may be entitled at law or in equity.

DATED: November 8, 2010            THOMAS WHITELAW & TYLER LLP


                                   By: /S/ BRIAN D. HENRI _____
                                        BRIAN D. HENRI
                                        Attorneys for Plaintiffs




## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.


DATED: November 8, 2010            THOMAS WHITELAW & TYLER LLP


                                   By: /S/ BRIAN D. HENRI _____
                                        BRIAN D. HENRI
                                        Attorneys for Plaintiffs