KEKER & VAN NEST LLP
R. JAMES SLAUGHTER - #192813
rslaughter@kvn.com
R. ADAM LAURIDSEN - #243780
alauridsen@kvn.com
710 Sansome Street
San Francisco, CA  94111-1704
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188

Attorneys for Defendant
ELECTRONIC ARTS INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MICHAEL E. DAVIS, aka TONY DAVIS, VINCE FERRAGAMO, and BILLY JOE DUPREE, on behalf of themselves and all other similarly situated,<br><br>                              Plaintiffs,<br><br>       v.<br><br>ELECTRONIC ARTS INC.,<br><br>                              Defendant. | Case No. 10-CV-3328-RS<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS OR, IN THE ALTERNATIVE, SPECIAL MOTION TO STRIKE PURSUANT TO C.C.P. §425.16; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        February 24, 2011<br>Time:       1:30 p.m.<br>Dept:       Courtroom 3, 17th Floor<br>Judge:      Hon. Richard Seeborg<br><br>Date Comp. Filed:      July 29, 2010<br><br>Trial Date: None |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................... 1

II.   BACKGROUND ................................................................................................. 3

    A.   EA's Works ................................................................................................ 3

    B.   Procedural History ..................................................................................... 5

III.  ARGUMENT ...................................................................................................... 7

    A.   Plaintiffs' Claims Should be Decided on a Motion to Dismiss ................. 7

    B.   Plaintiff's Claims Fall Within the Scope of the Anti-SLAPP Statute ....... 9

        1.   *Madden NFL* is an expressive work protected by the First
            Amendment. ........................................................................................ 10

        2.   EA's games relate to an "issue of public interest." ........................... 11

    C.   Plaintiffs' Claims Fail as a Matter of Law. ............................................. 13

        1.   Plaintiffs' claims are barred by the First Amendment. .................... 13

            a.   The transformative-use test. ................................................... 15

            b.   The *Rogers* test. ..................................................................... 18

            c.   The public-interest test. .......................................................... 21

            d.   Meritorious misappropriation claims target
               advertisements. ....................................................................... 23

        2.   Section 3344(d)'s public-affairs exception bars Plaintiffs'
            statutory claim. .................................................................................. 23

        3.   Plaintiffs' ancillary claims also must be dismissed. ......................... 24

IV.   CONCLUSION .................................................................................................. 25

DEFENDANT'S MOTION TO DISMISS/SPECIAL MOTION TO STRIKE PURSUANT TO C.C.P. §425.16
CASE NO. 10-CV-3328-RS

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Abdul-Jabbar v. Gen. Motors Corp.*
   85 F.3d 407 (9th Cir. 1996) .......................................................................................23

*Abrego Abrego v. The Dow Chem. Co.*
   443 F.3d 676 (9th Cir. 2006) ........................................................................................7

*Ashcroft v. Iqbal*
   129 S.Ct. 1937 (2009) ..................................................................................................7

*Barnett v. Evans*
   No. C 06-0193 CW (PR), 2009 WL 799402 (N.D. Cal. Mar. 24, 2009)........................7

*Beilstein-Institut Zur Forderung Der Chemischen Wissenschaften et al. v.*
   *MDL Information Sys., Inc.*
   No. C. 04-5368 SI, 2006 WL 3218719 (N.D. Cal. Nov. 7, 2006) ..............................25

*Bell Atl. Corp. v. Twombly*
   550 U.S. 544 (2007)......................................................................................................7

*Brown v. Electronic Arts Inc.*
   No. 2:09-cv-01598-FMC-RZx (C.D. Cal. Sept. 23, 2009)....................................6, 20

*Burnett v. Twentieth Century Fox Film Corp.*
   491 F. Supp. 2d 962 (C.D. Cal. 2007) ..........................................................................8

*C.B.C. Distrib. & Mktg. Inc. v. Major League Baseball Advanced Media,*
   *L.P.*, 505 F.3d 818 (8th Cir. 2007)..................................................................2, 22, 23

*Cairns v. Franklin Mint Co.*
   24 F. Supp. 2d 1013 (C.D. Cal. 1998) ...........................................................................6

*Capcom Co. v. MKR Group, Inc.*
   No. C. 08-0904 RS, 2008 WL 4661479 (N.D. Cal. Oct. 20, 2008).........................8, 18

*Cher v. Forum Int'l*
   692 F.2d 634 (9th Cir. 1982) ......................................................................................14

*Chuy v. Phil. Eagles Football Club*
   431 F. Supp. 254 (E.D. Penn. 1977) ............................................................................13

*Cochran v. NYP Holdings, Inc.*
   58 F. Supp. 2d 1113 (C.D. Cal. 1998) ............................................................................8

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*
   444 F. Supp. 2d 1012 (C.D. Cal. 2006) ..........................................11, 18, 21, 24

*ETW Corp. v. Jireh Publ'g*
   332 F.3d 915 (6th Cir. 2003) ......................................................................................16

*GNI Waterman LLC v. A/M Valve Co. LLC*
   No. CV F 07-0863, 2007 WL 2669503 (E.D. Cal. Sept. 7, 2007)..............................25

*Gooding v. Wilson*
   405 U.S. 518 (1972)....................................................................................................24

*Hilton v. Hallmark Cards*
   580 F.3d 874 (9th Cir. 2009) .................................................................................17, 18

ii

532739.06

1

**TABLE OF AUTHORITIES**
(cont'd)

2

**Page(s)**

3
*Hilton v. Hallmark Cards*
599 F.3d 894 (9th Cir. 2010) ................................................................18

4
*Interactive Digital Software Ass'n v. St. Louis Cnty.*
329 F.3d 954 (8th Cir. 2003) ................................................................10

5

6
*Keller v. Electronic Arts Inc., et al.*
No. C. 09-1967 CW, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010) ..............6, 7, 13, 17

7
*Kent v. Universal Studios*
Case No. CV 08-2704 GAF (C.D. Cal. Aug. 15. 2008) ........................8

8
*Mattel Inc. v. MCA Records, Inc.*
296 F.3d 894 (9th Cir. 2002) ................................................................18, 21

9

10
*MGIC Indem. Corp. v. Weisman*
803 F.2d 500 (9th Cir. 1986) ................................................................7

11
*Midler v. Ford Motor Co.*
849 F.2d 460 (9th Cir. 1988) ................................................................23

12
*Midler v. Ford Motor Co.*
849 F.2d 460 (9th Cir. 1988) ................................................................6

13
*Motschenbacher v. R.J. Reynolds Tobacco Co.*
498 F.2d 821 (9th Cir. 1974) ................................................................6, 23

14
*Newcombe v. Adolf Coors Co.*
157 F.3d 686 (9th Cir. 1998) ................................................................23

15

16
*Page v. Something Weird Videos*
908 F. Supp. 714 (C.D. Cal. 1995) ................................................................6

17
*Parrino v. FHP Inc.*
146 F.3d 699 (9th Cir. 1998) ................................................................7

18
*Rogers v. Grimaldi*
875 F.2d 994 (2d Cir. 1989) ................................................................*passim*

19
*Romantics v. Activision Publ'g, Inc.*
574 F. Supp. 2d 758 (E.D. Mich. 2008) ........................10, 11, 20, 21

20

21
*Roots Ready Made Garments v. Gap Inc.*
No. C. 07-3363 CRB, 2008 WL 239254 (N.D. Cal. Jan. 28, 2008) ........25

22
*Thomas v. L.A. Times Commc'ns LLC*
189 F. Supp. 2d 1005 (C.D. Cal. 2002) ................................................................10

23
*Thomas v. Walt Disney Co.*
No. C-07-4392 CW, 2008 WL 425647 (N.D. Cal. Feb 14, 2008) ........8

24
*Troy Group, Inc. v. Tilson*
364 F. Supp. 2d 1149 (C.D. Cal. 2002) ................................................................10

25

26
*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*
190 F.3d 963 (9th Cir. 1999) ................................................................9

27
*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Counsel, Inc.*
425 U.S. 748 (1976) ................................................................23

28

**TABLE OF AUTHORITIES**
(cont'd)

Page(s)

*Video Software Dealers Ass'n v. Schwarzenegger*
556 F.3d 950 (9th Cir. 2009) ...................................................................10

*Wendt v. Host Int'l, Inc.*
125 F.3d 806 (9th Cir. 1997) ...................................................................23

*White v. Samsung Elecs. Am., Inc.*
971 F.2d 1395 (9th Cir. 1992) .................................................................23

*Zacchini v. Scripps-Howard*
433 U.S. 562 (1977) .................................................................................14

**State Cases**

*Braun v. Chronicle Publ'g Co.*
52 Cal. App. 4th 1036 (1997) ....................................................................9

*Briggs v. Eden Council for Hope & Opportunity*
19 Cal. 4th 1106 (1999) ...........................................................................10

*Christoff v. Nestle USA, INC.*
47 Cal. 4th 468 (2009) ...............................................................................3

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*
25 Cal. 4th 387 (2001) .......................................................13, 14, 15, 17, 18

*Damon v. Ocean Hills Journalism Club*
85 Cal. App. 4th 468 (2000) ....................................................................12

*Dora v. Frontline Video, Inc.*
15 Cal. App. 4th 536 (1993) ....................................................................24

*Equilon Enter. v. Consumer Cause, Inc.*
29 Cal. 4th 53 (2002) .................................................................................9

*Gionfriddo v. Major League Baseball*
94 Cal. App. 4th 400 (2001) .............................................2, 12, 21, 22, 24

*Guglielmi v. Spelling-Goldberg Prods.*
25 Cal. 3d 860 (1979) ................................................................................8

*Hall v. Time Warner, Inc.*
153 Cal. App. 4th 1337 (2007) ...........................................................10, 12

*Ingels v. Westwood One Broad. Serv.*
129 Cal. App. 4th 1050 (2005) ......................................................10, 12, 15

*Kirby v. Sega of Am., Inc.*
144 Cal. App. 4th 47 (2006) ............................................1, 10, 16, 18

*Kronemyer v. Internet Movie Data Base, Inc.*
150 Cal. App. 4th 941 (2007) ...........................................................10, 12

*McKell v. Washington Mut., Inc.*
142 Cal. App. 4th 1457 (2006) .................................................................25

*Montana v. San Jose Mercury News, Inc.*
34 Cal. App. 4th 790 (1995) ..........................................................12, 22, 24

*Nygard, Inc. v. Uusi-Kerttula*
159 Cal. App. 4th 1027 (2008) ...........................................................11, 12

iv

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

*Seelig v. Infinity Broad. Corp.*
  97 Cal. App. 4th 798 (2002) ....................................................................10, 12

*Thrifty-Tel, Inc. v. Bezenek*
  46 Cal. App. 4th 1559 (1996) ...........................................................................25

*Winter v. DC Comics*
  30 Cal. 4th 881 (2003) ....................................................................... *passim*

### State Statutes

Cal. Civ. Code § 946 ...........................................................................................6

Cal. Civ. Code § 3344(d) ..............................................................................23, 24

Cal. Civ. Proc. Code § 425.16 ............................................................... *passim*

### Federal Rules

Federal Rule of Civil Procedure 12(b)(6) .............................................. *passim*

### Treatises

*Restatement (Third) of Unfair Competition*, § 46 ......................................13, 14

*Restatement (Third) Of Unfair Competition* § 47, comment ...........................23

### Constitutional Provisions

First Amendment ..................................................................................... *passim*

### Other Authorities

E. Volokh, *Freedom of Speech and the Right of Publicity*, 40 Hous. L.
  Rev. 903 ............................................................................................................14

DEFENDANT'S MOTION TO DISMISS/SPECIAL MOTION TO STRIKE PURSUANT TO C.C.P. §425.16
CASE NO. 10-CV-3328-RS

## NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT

PLEASE TAKE NOTICE that on February 24, 2011 at 1:30 p.m. before the Honorable Richard Seeborg, United States District Court, 450 Golden Gate Ave., San Francisco, CA 94102, Courtroom 3, 17th Floor, defendant Electronic Arts Inc. ("EA") will, and hereby does, move the Court for an order dismissing pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, striking pursuant to California Code of Civil Procedure § 425.16, all causes of action in Plaintiffs' complaint.

EA moves to dismiss or strike all of Plaintiffs' causes of action because they are barred by the First Amendment. First, under the test applied by California state courts, EA's expressive works are "transformative." Second, under the two-part *Rogers* test, EA's alleged use of Plaintiffs' likenesses in its expressive works is not "wholly unrelated" to the works or "simply a disguised commercial advertisement for the sale of goods or services." Third, under the public-interest test, EA's expressive works are due constitutional protection because information about professional football players commands a substantial public interest.

EA also moves to dismiss or strike Plaintiffs' individual causes of actions for numerous additional reasons. Plaintiffs' first cause of action for violation of California Civil Code § 3344 is barred by the statute's "public affairs" exception. Plaintiffs' third cause of action for conversion fails because Plaintiffs do not allege that EA dispossessed them of their interests in tangible personal property. Plaintiffs' fourth cause of action for trespass to chattel similarly fails because Plaintiffs do not allege interference with tangible personal property. Finally, Plaintiffs' fifth cause of action for unjust enrichment is not recognized under California law.

For each of these reasons, EA respectfully requests that the Court grant this Motion and dismiss or strike Plaintiffs' causes of action against EA with prejudice.

This Motion is based on this Notice; on the attached Memorandum of Points and Authorities; on the concurrently-filed Request for Judicial Notice, Declaration of Jeremy Strauser, and Declaration of Adam Lauridsen; on the concurrently-lodged editions of *Madden NFL 09* and *Madden NFL 08*, PlayStation 2 console, and two controllers; all pleadings, files and records in this action; and on such other argument as may be received by this Court at the

1    hearing on this Motion.

2

3    Dated:  January 6, 2011                          KEKER & VAN NEST LLP

4

5

6                                              By:  /s/ R. James Slaughter

7                                                    R. JAMES SLAUGHTER
                                                    Attorneys for Defendant
                                                    ELECTRONIC ARTS INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

532739.06

## I.   INTRODUCTION

"Video games are expressive works entitled to as much First Amendment protection as the most profound literature." *Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47, 58 (2006).  In this case, individuals seek to restrict the ability of content providers like Electronic Arts Inc. ("EA") to exercise their First Amendment right to free expression by dramatically expanding economic rights protected by right-of-publicity laws.  Here, former National Football League ("NFL") players allege that EA violated their statutory and common law rights of publicity by using their likenesses as a few of the thousands of virtual athletes in its *Madden NFL* video game.  If Plaintiffs had sued a filmmaker who used their photographs in a documentary about football, or a screenwriter who depicted them as characters in a fictional movie about their teams, the First Amendment would defeat any right-of-publicity claim.  That result does not change simply because EA's highly creative works are embodied in a different medium.

Plaintiffs fail to state any viable claim under Federal Rule of Civil Procedure 12(b)(6).  Alternatively, since Plaintiffs' complaint challenges EA's right to free expression regarding an issue of public interest, Plaintiff's claims are subject to a Special Motion to Strike pursuant to California's anti-SLAPP statute.  *See* Cal. Civ. Proc. Code § 425.16.  Because EA shows that the alleged conduct was "in furtherance" of its free speech rights regarding a matter of public interest, the burden rests with Plaintiffs to demonstrate that they have a "probability" of success on the merits.  *Id*. at (b)(1).  Plaintiffs cannot meet their burden here because all of Plaintiffs claims fail as a matter of law.

Accepting, for the purposes of this motion only, the allegation that EA used some protectable element of Plaintiffs' likenesses, Plaintiffs' misappropriation claims are barred by the First Amendment.  To prevent the stifling of free expression, courts have narrowly circumscribed statutory and common law misappropriation claims that target video games and other protected works.  *See, e.g., Winter v. DC Comics*, 30 Cal. 4th 881, 888 (2003); *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).  Court have applied various tests to ensure that right-of-publicity claims do not chill speech, including the transformative-use test, the *Rogers* relatedness test, and the public interest test.  Under any of these tests, EA's motion to dismiss and anti-SLAPP motion to

1    strike must be granted.

2        Under the transformative-use test, an expressive work that incorporates an individual's

3    likeness is constitutionally protected if the use is "transformative." *Winter*, 30 Cal. 4th at 888.

4    The relevant inquiry "is whether the celebrity likeness is one of the 'raw materials' from which

5    an original work is synthesized," in which case it is protected, "or whether the depiction ... of

6    the celebrity is the very sum and substance of the work in question." *Id.*  The accompanying

7    editions of *Madden NFL* show that the games are much more than a "mere celebrity likeness[]."

8    Because any purported use of Plaintiffs' likenesses is transformative, the First Amendment

9    defeats their misappropriation claims. *Id.* at 885-86.

10       Under *Rogers*, the First Amendment bars right-of-publicity claims arising from the use of

11   a plaintiff's name or likeness in an expressive work, unless the use is "wholly unrelated" to the

12   work or is "simply a disguised commercial advertisement for the sale of good or services."

13   *Rogers*, 875 F.2d at 1004.  EA's alleged use of former NFL players' likenesses clearly is not

14   "wholly unrelated" to the content of a video game about professional football.  Nor could EA's

15   use be characterized as "a disguised commercial advertisement" for the sale of that work.

16   Consequently, under the *Rogers* test, the court should grant EA's motion to dismiss or,

17   alternatively, strike Plaintiffs' claims under California's anti-SLAPP statute.

18       Separately, courts repeatedly have held that the public's interest in information about

19   sports and athletes "far outweighs" the athletes' right of publicity.  *Gionfriddo v. Major League*

20   *Baseball*, 94 Cal. App. 4th 400, 411 (2001).  Information such as athletes' names, likenesses,

21   performance statistics, and biographical information "commands a substantial public interest"

22   and therefore "is a form of expression due substantial constitutional protection." *Id.*  This is true

23   even where such information is used in works such as sports websites and fan-driven "fantasy"

24   baseball games, which are far less expressive and transformative than the video games at issue

25   here. *See id.*; *C.B.C. Distrib. & Mktg. Inc. v. Major League Baseball Advanced Media, L.P.*, 505

26   F.3d 818, 823 (8th Cir. 2007).

27       Plaintiffs' individual causes of action fail for numerous additional reasons.  Plaintiffs'

28   cause of action alleging violation of the California statutory right of publicity is barred by the

1   statute's "public affairs" exception.  Courts have held that sports and information about athletes

2   fall within the "public affairs" category, thereby barring statutory right-of-publicity claims

3   involving such matters.  Plaintiffs' causes of action for conversion and trespass to chattels fail

4   because Plaintiffs do not allege that EA took their interests in tangible property.  Finally,

5   Plaintiffs' fifth cause of action for unjust enrichment is not recognized under California law.

6        For these reasons and as explained in detail below, Plaintiffs do not state any viable claim

7   for relief.  Nor do Plaintiffs demonstrate any possibility—much less the required probability—of

8   prevailing on their claims against EA.  Therefore, Plaintiffs claims should be dismissed under

9   Rule 12(b)(6) or, in the alternative, stricken under California's anti-SLAPP statute.

10                          **II.       BACKGROUND**

11   **A.     EA's Works**

12        EA is a leading developer and publisher of video games, including *Madden NFL*, which

13   EA has published annually for 20 years.  Each annual edition of *Madden NFL* is published no

14   later than August of the previous year; for example, *Madden NFL 09* was published in August

15   2008.[1]  Combining technically advanced computer and software engineering and creative

16   audiovisual elements, the games allow users to experience the excitement and challenge of NFL

17   football.  Users may compete against an opponent controlled by the game itself, against a person

18

19   ----

[1]      This case targets *Madden NFL* games that include "historic" teams and that "were sold after July 28, 2008 through the present."  *See, e.g.*, First Am. Compl. ("FAC") ¶¶ 5, 19.
20   Plaintiffs used that date because the statute of limitations bars claims regarding *Madden NFL* games commercially released before it.  *Christoff v. Nestle USA, INC.*, 47 Cal. 4th 468, 476 n.7
21   (2009) (applying two-year statute of limitations under Cal. Civ. Pro. Code § 339 to California publicity right claim).  Ignoring, for the time being, the single publication rule, the only editions
22   of *Madden NFL* that meet this definition are the versions of *Madden NFL 08* and *Madden NFL 09* for play on the Xbox and PlayStation 2 consoles.

23        Concurrently with this motion, EA has lodged with the Court versions of *Madden NFL 08* and *Madden NFL 09* for play on the Sony PlayStation 2 console, along with a PlayStation 2
24   console and two controllers.  *See* Declaration of Jeremy Strauser ("Strauser Decl.") ¶¶ 4-5; Notice of Manual Lodging ¶ 1-2.  All of the facts regarding the game play of *Madden NFL*
25   described in this motion may be verified through a review of the games themselves, which are subject to judicial notice.  *See* EA's Request for Judicial Notice at 1-2.  The accompanying
26   Declaration of Jeremy Strauser provides a summary of the content and features of the *Madden NFL* games.  *See* Strauser Decl. ¶¶ 6-13.  The summary aims to save the Court the hours of game
27   play needed to encounter the various content and features in each game.  *See* Fed. R. Evid. 1006 ("The contents of voluminous writings, recordings, or photographs which cannot conveniently be
28   examined in court may be presented in the form of a chart, summary, or calculation.").  If the Court wishes, EA can assist the Court in setting up and viewing the works.

1   connected to the same game system, or against a person connected over the Internet.

2       As a review of the game reveals, the virtual world of *Madden NFL* is constructed from an

3   array of video graphics, audio features and data.  After a user chooses two professional teams to

4   compete against each other, the game assigns a stadium for the match-up and populates it with

5   virtual players, coaches, referees, mascots, cheerleaders, and fans—all designed and rendered by

6   EA's graphic artists.  The game includes the trademarks and uniforms of the league and its

7   teams, which EA licenses from the NFL.

8       In the Xbox and PlayStation 2 versions of *Madden NFL 08* and *Madden NFL 09*, players

9   may choose to play current or historic teams.  The historic teams differ from the current teams in

10  important ways: the historic teams do not include photographs or images of actual players, the

11  historic teams do not include names of actual players who played on the historic teams, and the

12  uniform numbers of virtual players on the historic teams do not correspond to those worn by

13  actual players on the historic teams.  The virtual players on the historic teams are identified by a

14  randomly generated number and a player "name" combining their position and number (for

15  example, "HB #37").

16      Although the virtual players' characteristics (such as height, weight, athletic ability, and

17  experience) and other variables (including crowd noise and weather) affect the teams'

18  performances, the individual users most directly influence the game's outcome through their

19  play-calling and ability to use hand-held controllers to manipulate the virtual players' actions on

20  the field.  In other words, it is the user who selects each play of the virtual football game (*e.g.*,

21  whether to pass, run or punt) and, combined with the user's skill at manipulating the controller, it

22  is the user who predominantly determines the outcome of the selected play and the game.

23  Because of these numerous variables and the creative input of the user, the course of the game

24  changes each time it is played—no two game experiences are alike.

25      The user's control over the action and how the story of each game develops is further

26  enhanced by the user's ability to make changes to the virtual players themselves or other

27  elements of the game.  Users easily alter the various abilities, appearances and biographical

28  information of the virtual players in a multitude of ways, and users also may create custom

4

virtual players from scratch for their teams.  For example, a user may change the physical characteristics of the player (height, weight, hairstyle), any of a number of accessories (such as helmet visor, wristband), a player's physical abilities (such as speed and agility, throwing arm, passing accuracy), or a player's biographical details (place of origin) to create their own custom players and teams.

The users experience the game audio-visually through real-time, television-like animation and action-specific, play-by-play commentary.  The game also includes realistic original sounds, such as the crunch of players' pads as contact is made, the audible of a quarterback changing a play at the line of scrimmage and the roar of the crowd.

*Madden NFL* does not recreate, recount or imitate real-life or actual historic games.  The action of the game and the results achieved are fictional, virtual, user-generated, and driven by the user's creativity and skill.

## B.    Procedural History

On July 29, 2010, Plaintiff Tony Davis filed a complaint against EA but did not serve it. Doc. 1.  On November 8, 2010, Plaintiffs served the original complaint and simultaneously filed and served a first amended complaint ("FAC").  Doc. 11.  The FAC adds two additional Plaintiffs, Vince Ferragamo and Billy Joe Dupree.  Davis played in the NFL for six seasons, including from 1979-81 with the Tampa Bay Buccaneers.  FAC ¶ 6.  Ferragamo played in the NFL for nine seasons, including from 1977-80 with the Los Angeles Rams.  *Id.* ¶ 7.  Dupree played in the NFL for eleven season, including from 1973-83 with the Dallas Cowboys.  *Id.* ¶ 8.

Plaintiffs allege on behalf of themselves and others purportedly similarly situated that EA misappropriated their "likenesses" for inclusion in "historic teams" featured in certain *Madden NFL* games.  *Id.* ¶ 2.  Plaintiffs do not allege that EA used their names, photograph images or the uniform numbers they wore in the NFL (as EA does not use any of those characteristics in the game).  Instead, Plaintiffs allege that EA only uses "the player's position, years in the NFL, height, weight, 'skin tone,' as well as each player's relative skill level in different aspects of the

DEFENDANT'S MOTION TO DISMISS/SPECIAL MOTION TO STRIKE PURSUANT TO C.C.P. §425.16
CASE NO. 10-CV-3328-RS

1  game." FAC ¶ 34.[2]  Although Plaintiffs reference the *Madden NFL* games generally, the FAC

2  only contains specific allegations regarding alleged likenesses in the *Madden NFL 09* edition.

3  *See, e.g., id.* ¶¶ 4, 38-40, 42-51.  Based on EA's alleged misappropriation, Plaintiffs assert claims

4  for (1) violation of California's statutory right of publicity, (2) violation of California's common

5  law right of publicity, (3) conversion, (4) trespass to chattels and (5) unjust enrichment.  *Id.*

6  ¶¶ 73-109.[3]

7       EA is a defendant in two cases presently before the Ninth Circuit that concern the alleged

8  use of athlete likenesses in video games.  In *Brown v. Electronic Arts Inc.*, No. 2:09-cv-01598-

9  FMC-RZx (C.D. Cal.), former NFL player Jim Brown alleged—just as Plaintiffs here allege—

10  that EA used without permission his likeness in the "historic team" feature of *Madden NFL*.  As

11  it does here, EA moved to dismiss and to strike Brown's complaint pursuant to California anti-

12  SLAPP statute on the ground that Brown's claims were barred by the First Amendment.  In

13  September 2009, Judge Cooper of the Central District of California granted EA's motion to

14  dismiss Brown's complaint.  *See id.*, Slip Op. at 4-10 (C.D. Cal. Sept. 23, 2009) (attached at

15  Lauridsen Decl., Ex. B).  Brown appealed Judge Cooper's decision to the Ninth Circuit.  The

16  briefing on Brown's appeal is complete.

17       In *Keller v. Electronic Arts Inc., et al.*, No. C. 09-1967 CW (N.D. Cal.), a putative class

18  of former student-athletes alleged that EA improperly used their likenesses in EA's college

19  football and basketball games.  EA moved to dismiss and to strike Keller's claims under

20

---

21  [2]    EA accepts for purposes of this motion only Plaintiffs' allegation that EA uses Plaintiffs'
"likenesses."  Courts, however, have cast doubt on whether such general attributes (height,

22  weight, "skin tone") are protectable under § 3344.  *See Midler v. Ford Motor Co.*, 849 F.2d 460,
463 (9th Cir. 1988) (holding that sound-alike voice did not violate plaintiff's right of publicity).

23  [3]    EA assumes for purposes of this motion only that California law governs Plaintiffs'

24  claims, even though California law will not govern all matters in this action.  Under California
law, "if there is no law to the contrary, in the place where personal property is situated, it is

25  deemed to follow the person of its owner, and is governed by the law of his domicile."  Cal. Civ.
Code § 946; *see also Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1026 (C.D. Cal. 1998).

26  "[I]t appears that ... the state of plaintiff's residency ... has a greater interest in compensating its
residents for [publicity right] injuries of the type here alleged than other jurisdictions may have

27  in compensating foreigners so injured within their respective borders."  *Motschenbacher v. R.J.
Reynolds Tobacco Co.*, 498 F.2d 821, 823 n. 4 (9th Cir. 1974).  "[T]he state of plaintiff's

28  residency is normally the state of the greatest injury."  *Id*; *see also Page v. Something Weird
Videos*, 908 F. Supp. 714, 717 (C.D. Cal. 1995).

6

California's anti-SLAPP statute.  In February 2010, while accepting that the anti-SLAPP statute applied to EA's conduct, Judge Wilken denied EA's motions. *Id.*, 2010 WL 530108, at *10 (N.D. Cal. Feb. 8, 2010).  EA appealed the denial of its anti-SLAPP motion to the Ninth Circuit. The briefing on the appeal will be complete on January 12, 2011.[4]

## III.   ARGUMENT

### A.   Plaintiffs' Claims Should be Decided on a Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the plaintiff's claims.  Dismissal is required if no relief could be granted under any set of facts that could be proved consistent with the allegations.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007).  A plaintiff must do more than merely raise the possibility that some set of facts might support recovery; he must set forth factual allegations that "raise a right to relief above the speculative level." *Id.* at 555.  The Supreme Court recently affirmed these requirements, explaining the two principles underlying *Twombly*.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. . . .  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009).

When ruling on a motion to dismiss, a court may consider not only the plaintiff's allegations, but also material subject to judicial notice.  *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).  A court may consider "document[s] the authenticity of which [are] not contested, and upon which plaintiff's complaint necessarily relies[,]" even if those materials are not attached to the complaint.  *Parrino v. FHP Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds*, *Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 681 (9th Cir. 2006); *see also Barnett v. Evans*, No. C 06-0193 CW (PR), 2009 WL 799402, at *4 (N.D. Cal. Mar. 24, 2009).

Consistent with these principles, courts deciding Rule 12(b)(6) motions regularly have

---

[4]    The *Keller* plaintiffs have petitioned the Judical Panel on Multidistrict Litigation to transfer *Keller* and three other cases, including this one, for coordinated proceeding before a single court.  Additionally the *Keller* plaintiffs have moved to relate this case to *Keller* pursuant to Local Rule 3-12.

532739.06

examined expressive works, even if not attached to the complaint, to determine whether they are actionable. Applying the transformative-use test, for example, the California Supreme Court noted in *Winter* that misappropriation and related claims "can often [be] resolve[d] … as a matter of law simply by viewing the [defendant's] work in question.…" 30 Cal. 4th at 891; *cf. Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 872 (1979) (demurrer properly sustained based on the First Amendment).[5] In *Capcom Co. v. MKR Group, Inc.*, this Court engaged in analogous legal analysis, applying the *Rogers* First Amendment test to dismiss a Lanham Act claim. No. C. 08-0904 RS, 2008 WL 4661479 at *13 (N.D. Cal. Oct. 20, 2008). The Court decided as a matter of law that the disputed work's use of the term "dead" was artistically relevant and not explicitly misleading. *Id.* Courts similarly have dismissed libel claims on First Amendment grounds based solely on a review of the work at issue. *See, e.g., Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1120-27 (C.D. Cal. 1998), *aff'd* 210 F.3d 1036 (9th Cir. 2000). And for copyright claims, courts decide as a matter of law whether works are "substantially similar." *See, e.g., Capcom*, 2008 WL 4661479, at *4-11; *Thomas v. Walt Disney Co.*, No. C-07-4392 CW, 2008 WL 425647, at *2-6 (N.D. Cal. Feb 14, 2008). Although the lack of substantial similarity is not a First Amendment defense, courts dismiss claims on such grounds by engaging in a legal analysis of plot, characters, mood and setting that is more involved and rigorous than the First Amendment analysis for right of publicity claims. *See, e.g., id.* Thus, the Court can and should consider the contents of the games in deciding this motion to dismiss. *See* Request for Judicial Notice ("RJN") at 1-2.

By doing so, the Court may resolve this lawsuit at the pleading stage, which is especially appropriate because Plaintiffs' claims target an expressive work. The California Supreme Court explained this point simply: "because unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free

---

[5]   *See also Kent v. Universal Studios*, Case No. CV 08-2704 GAF (SHx) (C.D. Cal. Aug. 15. 2008) (granting Rule 12(b)(6) motion on First Amendment grounds after reviewing defendant's film) (attached at Lauridsen Decl., Ex. A); *Burnett v. Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962, 973 (C.D. Cal. 2007) (granting Rule 12(b)(6) motion after reviewing defendant's television program to dismiss plaintiff's misappropriation claim).

532739.06

1   speech is desirable." *Winter*, 30 Cal. 4th at 891.

2   **B.    Plaintiff's Claims Fall Within the Scope of the Anti-SLAPP Statute**

3          Plaintiffs' claims are also subject to a special motion to strike under California's anti-

4   SLAPP statute.[6]   In 1993, the California Legislature enacted the anti-SLAPP statute "to nip

5   SLAPP litigation in the bud[,]" by quickly disposing of claims that target the exercise of free

6   speech rights. *See Braun v. Chronicle Publ'g Co.*, 52 Cal. App. 4th 1036, 1042 (1997).  Under

7   anti-SLAPP, any "cause of action against a person arising from any act . . . in furtherance of the

8   person's right of . . . free speech . . . in connection with a public issue shall be subject to a special

9   motion to strike, unless the court determines that the plaintiff has established that there is a

10  probability that the plaintiff will prevail on the claim." Cal. Civ. Proc. Code § 425.16(b)(1).

11         The California Supreme Court has established a two-step process for determining

12  whether a claim must be stricken under anti-SLAPP. *See Equilon Enter. v. Consumer Cause,*

13  *Inc.*, 29 Cal. 4th 53, 67 (2002).  "First, the court decides whether the defendant has made a

14  threshold showing that the challenged cause of action is one arising from protected activity,"

15  which includes *any* conduct "in furtherance of the defendant's right of . . . free speech under the

16  United States or California Constitution in connection with a public issue." *Id.* (brackets

17  omitted; quoting Cal. Civ. Proc. Code § 425.16(b)(1)); *see also* Cal. Civ. Proc. Code

18  § 425.16(e)(4).  Second, once the defendant has made a threshold showing that the claim arises

19  from protected activity, the burden shifts to the plaintiff to demonstrate "a probability of

20  prevailing on the claim." *Equilon*, 29 Cal. 4th at 67; *see also* Cal. Civ. Proc. Code

21  § 425.16(b)(1).

22         Reacting to court rulings that interpreted the statute too narrowly and did not go far

23  enough to quash lawsuits that targeted free speech, the California Legislature amended the

24  statute in 1997 to ensure that it "shall be construed broadly."  The California Supreme Court

25  subsequently declared that "the broad construction expressly called for in [Section 425.16] is

26  _____

27  [6]     Defendants may file anti-SLAPP motions in federal court to defend claims targeting their
    expressive activity. *See, e.g., U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190
28  F.3d 963, 971-73 (9th Cir. 1999).

1  desirable from the standpoint of judicial efficiency," and cautioned "that [a narrow construction]

2  would serve Californians poorly." *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th

3  1106, 1120-22 (1999).

4      Consistent with the broad interpretation expressly required by the statute, courts have

5  applied Section 425.16 to claims arising from a variety of expressive works, including:  a

6  provocative radio deejay's morning show (*Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798,

7  808 (2002)); a radio talk show about dating (*Ingels v. Westwood One Broad. Serv.*, 129 Cal. App.

8  4th 1050, 1059 (2005)); a segment of the television program *Celebrity Justice* about an actor's

9  housekeeper (*Hall v. Time Warner, Inc.*, 153 Cal. App. 4th 1337, 1341 (2007)); a newspaper

10  article (*Thomas v. L.A. Times Commc'ns LLC*, 189 F. Supp. 2d 1005, 1010 (C.D. Cal. 2002),

11  *aff'd* 45 Fed. Appx. 801 (9th Cir. 2002)); an email message (*Troy Group, Inc. v. Tilson*, 364 F.

12  Supp. 2d 1149, 1155 (C.D. Cal. 2002)); and a website's listing of producer credits on a motion

13  picture (*Kronemyer v. Internet Movie Data Base, Inc.*, 150 Cal. App. 4th 941, 949 (2007)).

14      **1.**    ***Madden NFL* is an expressive work protected by the First Amendment.**

15      Each of plaintiffs' claims arises solely from the alleged use of their "likenesses" in EA's

16  *Madden NFL* video games.  *See, e.g.*, FAC ¶¶ 1-2, 5.  It is settled that video games are

17  constitutionally protected works under the First Amendment.  *See, e.g.*, *Video Software Dealers*

18  *Ass'n v. Schwarzenegger*, 556 F.3d 950, 958 (9th Cir. 2009) ("video games are a form of

19  expression protected by the First Amendment"); *Kirby*, 144 Cal. App. 4th at 58 ("[v]ideo games

20  are expressive works entitled to as much First Amendment protection as the most profound

21  literature"); *Interactive Digital Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 957 (8th Cir.

22  2003) ("[i]f the first amendment is versatile enough to 'shield [the] painting of Jackson Pollock,

23  music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll,'" there is "no reason why

24  the pictures, graphic design, concept art, sounds, music, stories and narrative present in video

25  games are not entitled to a similar protection" (citations omitted)).

26      The First Amendment's protection is not limited to select games with complex story

27  lines, scripts, and dialogue.  *Romantics v. Activision Publ'g, Inc.*, 574 F. Supp. 2d 758, 765 (E.D.

28  Mich. 2008).  Instead, the critical issue is whether the games have independent creative elements.

1   *Id.* In *Romantics*, for instance, the court considered whether *Guitar Hero*—which allows players

2   to pretend they are in a rock band—was entitled to First Amendment protection. *Id.* at 766. The

3   court easily concluded that the game was an expressive work because it "allow[ed] players to

4   customize their game play experience, contain[ed] large amounts of original artwork, and

5   require[d] complex synchronization so that the audio and visual elements of the [g]ame line up

6   with a player's manipulation of the controller." *Id.*; *see also E.S.S. Entm't 2000, Inc. v. Rock*

7   *Star Videos, Inc.*, 444 F. Supp. 2d 1012, 1039 (C.D. Cal. 2006), *aff'd* 547 F.3d 1095 (9th Cir.

8   2008) (holding that video game that "features three virtual cities, each of which contains

9   hundreds of interactive locations created by animated graphics[…] incorporates a narrative, and

10  offers an array of musical soundtracks . . . clearly qualifies as an 'artistic work' entitled to First

11  Amendment protection").

12        EA's *Madden NFL* video games are comprised of various independent creative elements.

13  As a review of the games demonstrates, EA's games combine complex computer engineering

14  with artistic expression. The game features original graphics, videos, sound, music and game

15  scenarios, all keyed to the players' manipulation of the game controls and other input. The

16  games allow users to choose among professional teams, direct team strategy decisions and

17  control individual athlete's movements in real time. Users can take control of a team as it exists

18  in EA's games or customize it based on their own preferences, altering the characteristics of

19  individual players. These features clearly demonstrate that the creativity and complexity of the

20  *Madden NFL* video games far exceeds that of other video games found to be constitutionally

21  protected expressive works.

22        **2.      EA's games relate to an "issue of public interest."**

23        *Madden NFL* also relates to a matter of public interest within the meaning of the anti-

24  SLAPP statute. Whether an "issue of public interest" is involved is construed broadly. *See*

25  *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1039 (2008). Matters of public interest

26  are not restricted to traditional news reports about current events or government conduct.

27  Instead, "[t]he definition of 'public interest' within the meaning of [Section 425.16] has been

28  broadly construed to include not only governmental matters, but also private conduct that

DEFENDANT'S MOTION TO DISMISS/SPECIAL MOTION TO STRIKE PURSUANT TO C.C.P. §425.16
CASE NO. 10-CV-3328-RS

1   impacts a broad segment of society." *Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th

2   468, 479 (2000).  "Taken together, these cases and the legislative history that discusses them

3   suggest that 'an issue of public interest' . . . is *any issue in which the public is interested.*"

4   *Nygard*, 159 Cal. App. 4th at 1042.  "In other words, the issue need not be 'significant' to be

5   protected by the anti-SLAPP statue—it is enough that it is one in which the public takes an

6   interest." *Id.*

7        Recent court decisions underscore the breadth of an "issue of public interest" for anti-

8   SLAPP purposes.  For example, in *Nygard* the court held that allegedly defamatory statements

9   about a Finnish businessman related to an issue of "public interest" within the meaning of anti-

10  SLAPP because the Finnish public—the target audience of the defendant magazine—took an

11  interest in him.  *Nygard*, 159 Cal. 4th at 1042.  And in *Seelig v. Infinity Broad. Corp.*, 97

12  Cal. App. 4th 798 (2002), the court noted that the reality show "Who Wants to Marry a

13  Millionaire" had been "of significant interest to the public and the media" because of "what its

14  advent signified about the condition of American society," and because of "the presumed

15  millionaire lifestyle to be furnished by the groom."  *Id.* at 807-08.[7]

16       Building on the wide range of subjects above, courts have recognized the significant

17  public interest in professional sports—both because of their broad impact on popular culture and

18  the particular attention paid to the details of sporting events and athletes' performance.  In

19  *Gionfriddo*, for example, the court noted that professional baseball "is followed by millions of

20  people across this country on a daily basis," and concluded that information about professional

21  baseball players "command[s] a substantial public interest."  94 Cal. App. 4th at 411.  As for

22  professional football, a California court has held that "public interest considerations . . . apply

23  with equal force to professional football."  *Montana v. San Jose Mercury News, Inc.*, 34 Cal.

24  App. 4th 790, 795-96 (1995).  Another court has explained that "the American public is

25

26  [7]     *See also Ingels*, 129 Cal. App. 4th at 1058 (on-air exchange from a talk radio show about
   dating held to be related to an issue of public interest); *Kronemyer*, 150 Cal. App. 4th at 949

27  (website listing the producer credits for the movie "My Big Fat Greek Wedding" held to be a
   topic of "widespread public interest"); *Hall*, 153 Cal. App. 4th ar 1346-47 (segment on the

28  television show *Celebrity Justice* about Marlon Brando's housekeeper satisfied the anti-SLAPP
   statute's public interest requirement).

DEFENDANT'S MOTION TO DISMISS/SPECIAL MOTION TO STRIKE PURSUANT TO C.C.P. §425.16
CASE NO. 10-CV-3328-RS

1   fascinated by professional sports," going on to hold that it "must affirm the proposition that

2   interest in professional football must be deemed an important incident among many incidents, of

3   a society founded upon a high regard for free expression." *Chuy v. Phil. Eagles Football Club*,

4   431 F. Supp. 254, 267 (E.D. Penn. 1977), *aff'd* 595 F.2d 1265 (3d Cir. 1979) (en banc).

5          In *Keller*, Judge Wilken assumed that right-of-publicity claims that challenged EA's

6   alleged use of the likenesses of student-athletes in its college football and basketball games arose

7   from protected activity. *Keller*, 2010 WL 530108, at *10. Just so here. If a magazine interview

8   about a Finnish employer, a deejay's rant about a reality show contestant, and a radio talk show

9   host's diatribe against a caller, all relate to matters of public interest under the anti-SLAPP

10  statute, so too does an EA video game about professional football.

11         EA has satisfied its initial burden of establishing that *Madden NFL* is an expressive work

12  protected by the First Amendment and relates to a matter of public interest. Accordingly, the

13  burden shifts to Plaintiffs to establish that they have a probability of succeeding on the merits.

14  As explained below, they cannot meet this burden.

15  **C.     Plaintiffs' Claims Fail as a Matter of Law.**

16         Plaintiffs fail to state any viable claim under Federal Rule of Civil Procedure 12(b)(6).

17  Alternatively, all of Plaintiffs' claims must be stricken under California's anti-SLAPP statute

18  because they fail to establish a probability of success on the merits.

19         **1.     Plaintiffs' claims are barred by the First Amendment.**

20         The right of publicity is not of constitutional dimension; it arises either by statute or

21  under the common law. "[E]ssentially [it is] an economic right ... to prevent others from

22  misappropriating the economic value generated by the celebrity's fame through the

23  merchandising of the 'name, voice, signature, photograph, or likeness' of the celebrity." *Comedy*

24  *III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 403 (2001) (citations omitted). The

25  *Restatement* explains that the right of publicity protects against "appropriate[ing] the commercial

26  value of a person's identity by using without consent the person's name, likeness, or other

27  indicia of their identity *for purposes of trade*." *Restatement (Third) of Unfair Competition*, § 46

28  (emphasis added). "The rationales underlying recognition of a right of publicity are generally

1   less compelling than those that justify rights in trademarks or trade secrets." *Id.*, § 46, cmt. c.

2       Courts have long cautioned that "[t]he right of publicity has a potential for frustrating"

3   constitutionally protected speech. *Comedy III*, 25 Cal. 4th at 397.  Countless expressive works,

4   including biographies, novels, magazine articles, movies, plays, songs, paintings, documentaries,

5   and video games, incorporate the name or likeness of real-life individuals.  *See* E. Volokh,

6   *Freedom of Speech and the Right of Publicity*, 40 Hous. L. Rev. 903, 904, 908 & n. 20.  To

7   protect such works, the California Supreme Court "has subjected the 'right of publicity' under

8   California law to a narrowing interpretation which accords with First Amendment values." *Cher*

9   *v. Forum Int'l*, 692 F.2d 634, 638 (9th Cir. 1982).

10       Despite the tension between the First Amendment and the right of publicity, the United

11   States Supreme Court has provided little guidance on this issue.  In its only right-of-publicity

12   decision, *Zacchini v. Scripps-Howard*, 433 U.S. 562 (1977), the Court considered whether the

13   First Amendment categorically defeated a right-of-publicity claim based on a television station's

14   broadcast of the plaintiff's entire human-cannonball act.  In allowing the claim to survive, the

15   Court declined to promulgate any specific balancing test; it merely held that "[w]herever the line

16   in particular situations is to be drawn between media reports that are protected [against right-of-

17   publicity claims] and those that are not, we are quite sure that the First and Fourteenth

18   Amendments do not immunize the media when they broadcast *a performer's entire act* without

19   his consent." *Id.* at 574-75 (emphasis added).  In subsequent right-of-publicity cases, courts have

20   pointed out the limited nature of *Zacchini's* holding.  As the California Supreme Court

21   explained, "*Zacchini* was not an ordinary right of publicity case: the defendant television station

22   had appropriated the plaintiff's entire act, a species of common law copyright violation."

23   *Comedy III*, 25 Cal. 4th at 401.

24       In the absence of direction from the United States Supreme Court, various tests have

25   arisen to ensure that right-of-publicity claims do not chill speech.  These tests include the

26   transformative-use test, the *Rogers* test, and the public-interest test.  Under any of these tests,

27   EA's motion to dismiss and anti-SLAPP motion to strike should be granted.

28

DEFENDANT'S MOTION TO DISMISS/SPECIAL MOTION TO STRIKE PURSUANT TO C.C.P. §425.16
CASE NO. 10-CV-3328-RS

1          a.      **The transformative-use test.**

2          The California Supreme Court articulated the transformative-use test in *Comedy III*.  In

3  that case, the owner of the rights to The Three Stooges sued an artist who sold t-shirts and prints

4  featuring literal images of the trio.  25 Cal. 4th at 393-94.  The California Supreme Court upheld

5  a judgment against the artist, finding that the First Amendment did not bar liability.  *Id.* at 409-

6  10.

7          In reaching its decision, the court formulated "what is essentially a balancing test

8  between the First Amendment and the right of publicity based on whether *the work in question*

9  adds significant creative elements so as to be transformed into something more than a mere

10  celebrity likeness or imitation."  *Id.* at 391 (emphasis added).  The court explained that "when an

11  artist is faced with a right of publicity challenge to his or her work, he or she may raise an

12  affirmative defense that *the work* is protected by the First Amendment inasmuch as *it contains*

13  *significant transformative elements* or that the value of the work does not derive primarily from

14  the celebrity's fame."  *Id.* at 407 (emphasis added).  The court emphasized that "the inquiry is

15  whether the celebrity likeness is *one* of the 'raw materials' from which an original work is

16  synthesized, or whether the depiction or imitation of the celebrity is the very *sum and substance*

17  *of the work* in question."  *Id.* at 406 (emphasis added).  "We ask, in other words, whether *a*

18  *product* containing a celebrity's likeness is so transformed that it has become primarily the

19  defendant's own expression rather than the celebrity's likeness."  *Id.* (emphasis added).

20  Applying this test in *Comedy III*, the court found that since the defendant's t-shirts contained

21  only a literal representation of The Three Stooges—no other creative elements or expression—

22  the First Amendment did not foreclose liability.  *Id.* at 410.

23          Just two years later, the California Supreme Court reaffirmed that the test turns on

24  whether a "*product* containing a celebrity's likeness is so transformed that it has become

25  primarily the defendant's own expression rather than the celebrity's likeness."  *Winter*, 30 Cal.

26  4th at 888 (emphasis added).  There, musicians Johnny and Edgar Winter sued a publisher of

27  comic books that featured characters named "Johnny and Edgar Autumn," whose faces

28  resembled the Winters.  *Id.* at 886.  But the characters were depicted as "half-worm, half-human

15

offspring" fathered by a "supernatural worm creature[.]" *Id*. Citing *Comedy III*, the court

reaffirmed that the crucial issue is whether the *defendant's work* "contain[s] significant creative

elements that transform [it] into something more than mere celebrity likenesses." *Winter*, 30

Cal. 4th at 885. To underscore the breadth of this protection, the court pointed out that

transformative works "can take many forms, from factual reporting to fictionalized portrayal,

from heavy-handed lampooning to subtle social criticism." *Id*. at 888 (citations omitted).

Turning to the defendants' comic books, the court stated that "[a]pplication of the test to this

case is not difficult." *Id*. at 890. The court "reviewed *the comic books*" and could "readily

ascertain that they are not just conventional depictions of plaintiffs but *contain significant*

*expressive content other than plaintiffs' mere likenesses*." *Id*. (emphasis added). The court also

noted that the plaintiffs were depicted as "cartoon characters – half-human and half-worm – *in a*

*larger story, which is itself quite expressive*." *Id*. (emphasis added).

Other courts applying the transformative-use test have similarly focused on whether

defendant's work, as a whole, is transformative. In *Kirby*, for example, where the plaintiff sued

Sega for allegedly using her likeness in a video game, the California Court of Appeal correctly

pointed out that the test "requires the court to examine and compare the allegedly expressive

work with the images of the plaintiff to discern if the defendant's work contributes significantly

distinctive and expressive content." 144 Cal. App. 4th at 61. Thus, the game's theme music,

story lines, and different levels of difficulty all were relevant to the court's conclusion that the

plaintiff's image was not the "sum and substance" of the game, and that the use thus was

transformative. *Id*. The Sixth Circuit reached a similar result in *ETW Corp. v. Jireh Publ'g*, 332

F.3d 915 (6th Cir. 2003), where Tiger Woods' licensing agent sued the publisher of a painting by

artist Rick Rush showing Woods in three different poses at the Masters Tournament with the

likenesses of famous golfers of the past looking down on him. The court explained that "Rush's

work does not capitalize solely on a literal depiction of Woods. Rather, Rush's work consists of

*a collage of images in addition to Woods' image* which are combined to describe, in artistic

form, a historic event in sports history and to convey a message about the significance of Woods'

achievement in that event." *Id*. at 938 (emphasis added). "Because Rush's work has substantial

532739.06

1   transformative elements," the court concluded that "Woods' right of publicity must yield to the

2   First Amendment." *Id.*

3       Here, the transformative-use test requires the Court to consider whether *Madden NFL*

4   contains "significant transformative elements," so that it is primarily EA's own creative

5   expression rather than merely a depiction of Plaintiffs' alleged likenesses. *Comedy III*, 25 Cal.

6   4th at 407.  A review of *Madden NFL 08* and *Madden NFL 09* confirms that the games are

7   transformative.  EA's *Madden NFL* games contain an array of original graphics, videos, sound

8   effects, and game scenarios, all keyed to users' strategic decisions and manipulation of the game

9   controls.  These elements are synchronized to deliver television-quality images and realistic

10  sounds, such as the crunch of football pads, the audible of the quarterback, and play-by-play

11  commentary.  The game allows the user to become the storyteller by directing strategy decisions

12  and controlling individual athlete's movements in real time.  Users can operate a team as initially

13  configured in EA's games, or can customize the team based on their own preferences altering the

14  characteristics of individual players.  The interactive environment extends beyond single games,

15  allowing users to control a franchise for a season or more and, in effect, to create an original

16  narrative of that franchise's history.

17      These creative elements easily satisfy the transformative-use test.  Plaintiffs' alleged

18  likenesses that appear in *Madden NFL* are surrounded by innumerable other creative elements.

19  In other words, the likenesses would be only one of the countless "raw materials" from which

20  EA creates its expressive work.  As discussed above, the game contains so many other creative

21  audiovisual, software, and computer-engineering elements that an athlete's likeness cannot even

22  remotely be considered the "sum and substance" of the game.

23      In *Keller*, 2010 WL 530108 at *3-7, Judge Wilken ruled that the transformative-use test

24  did not bar the claims of college athletes regarding EA's alleged use of their likenesses in its

25  college football and basketball video games.  The *Keller* order is currently on appeal before the

26  Ninth Circuit.  Judge Wilken ruled on EA's First Amendment defense based in large part on the

27  Ninth Circuit's decision in *Hilton v. Hallmark Cards*, 580 F.3d 874 (9th Cir. 2009) (*Hilton I*).

28  *See Keller*, 2010 WL 530108 at *3-7.  Following Wilken's ruling, however, the Ninth Circuit

1    revised its opinion, materially altering the sections on which Wilken relied. *See Hilton v.*

2    *Hallmark Cards* (*Hilton II*), 599 F.3d 894 (9th Cir. 2010) (amended order).  In ruling on EA's

3    motions, Wilken lacked the benefit of three major revisions to the *Hilton* order.  First, the revised

4    opinion eliminated language that appeared to raise the bar for challenging publicity right claims

5    that target expressive works by describing *Comedy III* and *Winter* as "bookends" of

6    misappropriation claims.  *Compare Hilton I*, 580 F.3d at 890 *with Hilton II*, 599 F.3d at 911.

7    Second, the revised opinion clarified that the transformative-use test does not require fanciful

8    modifications of the individual likeness and, instead, can be satisfied by surrounding a realistic

9    likeness with additional creative elements.  *Compare Hilton I*, 580 F.3d at 891 (characterizing

10   protected works as having "total, phantasmagoric conversion" of plaintiffs' likenesses) *with*

11   *Hilton II*, 599 F.3d at 911 (holding that "a work need not be phantasmagoric as in *Winter* or

12   fanciful as in *Kirby* in order to be transformative").  Third, the revised opinion signaled that the

13   Ninth Circuit may not limit itself to the transformative use test when evaluating right-of-

14   publicity claims that challenge expressive works.  *See Hilton II*, 599 F.3d at 909 n.11.

15          Because EA's alleged use of Plaintiffs' likenesses in its game is transformative, the Court

16   should dismiss Plaintiffs' claims or strike them pursuant to the California anti-SLAPP statute.

17          **b.      The *Rogers* test.**

18          Following *Hilton II* it is clear that this Court may consider and apply a different test than

19   the transformative-use test—one that is less prone to misinterpretation and more protective of

20   free expression.  In *Hilton II*, the Ninth Circuit deferred "for another day" the question of

21   whether the First Amendment affords broader protection against right-of-publicity claims than is

22   provided by the tests set forth by California state courts.  *Hilton II*, 599 F.3d at 909 n.11.

23          *Rogers v. Grimaldi*, 875 F.2d 994, 996-97 (2d Cir. 1989), offers a more comprehensive

24   approach to balancing First Amendment concerns against a right-of-publicity claim targeting an

25   expressive work.  The Ninth Circuit has adopted *Rogers'* nearly identical test for determining

26   whether the First Amendment protects expressive works against Lanham Act claims.  *Mattel Inc.*

27   *v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002); *E.S.S.*, 547 F.3d at 1099; *see also*

28   *Capcom*, 2008 WL 4661479 at *13.  In *Rogers*, Ginger Rogers brought Lanham Act, right-of-

DEFENDANT'S MOTION TO DISMISS/SPECIAL MOTION TO STRIKE PURSUANT TO C.C.P. §425.16
CASE NO. 10-CV-3328-RS

1   publicity and other claims against the producers of the film *Ginger and Fred*—a title that alluded

2   to Rogers' collaboration with Fred Astaire.  875 F.2d at 996-97.  The film was not about the

3   iconic American performers, but about two fictional Italian cabaret singers who once earned their

4   livings by imitating the real Ginger and Fred.  *See id.*

5         Addressing the Lanham Act claim first, the *Rogers* court reasoned that "[t]itles, like the

6   artistic works they identify, are of a hybrid nature, combining artistic expression and commercial

7   promotion." *Id.* at 998.  Consumers of artistic works therefore "have a duel interest" in "not

8   being misled" and in "enjoying the results of the author's freedom of expression." *Id.*

9   Accordingly, "the expressive element of titles requires more protection than the labeling of

10  ordinary commercial products." *Id.*  The court concluded that, "[b]ecause overextension of

11  Lanham Act restrictions in the area of titles might intrude on First Amendment values, we must

12  construe the Act narrowly to avoid such a conflict," and allow Lanham Act claims to proceed

13  "only where the public interest in avoiding consumer confusion outweighs the public interest in

14  free expression." *Id.* at 998-99.  That balance, the court held, must favor the First Amendment

15  "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some

16  artistic relevance, unless the title explicitly misleads as to the source or the content of the work."

17  *Id.* at 999.  Applying that two-part test, the court dismissed Rogers' Lanham Act claim. *Id.* at

18  1001-02.

19        Turning next to Rogers' right-of-publicity claim, the court cautioned that such claims

20  pose even greater dangers to free speech.  "Because of the right of publicity, unlike the Lanham

21  Act, has no likelihood of confusion requirement," the court warned that "it is potentially more

22  expansive than the Lanham Act." *Id.* at 1004.  "Perhaps for that reason, courts delineating the

23  right of publicity, more frequently than in applying the Lanham Act, have recognized the need to

24  limit the right to accommodate First Amendment concerns." *Id.*  Borrowing heavily from its

25  Lanham Act analysis, the court predicted that state law would not "permit the right of publicity

26  to bar the use of a celebrity's name in a movie title unless the title was '*wholly unrelated*' to the

27  movie or was '*simply a disguised commercial advertisement* for the sale of goods or services.'"

28  *Id.* at 1004 (emphases added; citation omitted).  Applying that test, the court held that Rogers'

1   right-of-publicity claim also was barred by the First Amendment. *Id.* at 1004-05.

2        Applying the *Rogers* test to a Lanham Act claim factually indistinguishable from

3   Plaintiffs' right-of-publicity claims here—the alleged use of a player's likeness on a "historic"

4   team in *Madden NFL*—the court in *Brown v. Electronic Arts* held the claim to be barred on First

5   Amendment grounds. Slip Op. at 7-9 (attached at Lauridsen Decl., Ex. B). As an initial matter,

6   the *Brown* court found that

7        [t]he *Madden* games contain numerous creative elements. Although the games
         seek to realistically replicate NFL football, they use creative means to achieve
8        that goal. The games contain virtual stadiums, athletes, coaches, fans, sound
         effects, music and commentary, all of which are created or compiled by the
9        games' designers. By manipulating virtual athletes and franchises as they wish,
         video game players interact with the designers' creative interpretation of real-
10       world NFL game play. The football season can itself become a storyline in
         *Madden NFL*, as game players navigate their chosen athletes and franchises
11       towards victory.

12   *Id.* at 7. For the first prong of the *Rogers* test, the *Brown* court found that even assuming that EA

13   had used Brown's likeness as a virtual player on one of the teams in the game, the "[u]se of a

14   legendary NFL player's likeness in a game about NFL football is clearly relevant." *Id.* at 8. For

15   the second *Rogers* prong, the court held that the "[m]ere use of [Brown's] likeness, without

16   more, is insufficient to make the use explicitly misleading." *Id.* at 8. "[I]t would require a leap

17   of logic to conclude that the anonymous, mis-numbered player's presence in the games equates

18   to Brown's endorsement of the games. Moreover, the virtual player's mere presence in *Madden*

19   *NFL* does not constitute an *explicit* attempt to convince consumers the [sic] Brown endorsed the

20   games." *Id.* at 9. The *Brown* court's logic applies equally here.

21        The Court should apply the *Rogers* test for right-of-publicity claims and reach the same

22   outcome here as in *Brown*. First, since Plaintiffs played football for NFL teams, EA's alleged

23   inclusion of their likenesses is not "wholly unrelated" to the content of *Madden NFL*, a game that

24   allows users to experience NFL football in an interactive virtual environment. The *Rogers* test

25   already has been applied in an analogous context—to bar right-of-publicity claims arising from

26   the alleged use of a band's "distinctive sound" in the band-simulation game *Guitar Hero*.

27   *Romantics*, 574 F. Supp. 2d at 766. "Given that the purpose of the Game is to allow [users] to

28   pretend they are in a rock band," the court concluded that "the Song is not wholly unrelated to

20

1   the content of the work." *Id.*  Here, the strong relationship between the alleged likenesses of

2   former professional football players and the *Madden NFL* game—a game that allows users to

3   pretend they are professional football players—is beyond dispute.

4          Second, Plaintiffs rightly do not claim that EA's alleged use of their likenesses is "simply

5   a disguised commercial advertisement" for the sale of EA's games or some other product.

6   Applying the *Rogers* test to dismiss the Lanham Act claim in *Mattel*, the Ninth Circuit noted that

7   "[t]he only indication that Mattel might be associated with the song is the use of Barbie in the

8   title; if this were enough to satisfy this prong of the *Rogers* test, it would render *Rogers* a

9   nullity." 296 F.3d at 902.  Discussing application of the test to a trademark claim in *E.S.S.*, the

10  Ninth Circuit again observed that "a trademark infringement claim presupposes use of the mark.

11  If that necessary element in every trademark case vitiated a First Amendment defense, the First

12  Amendment would provide no defense at all." 547 F.3d at 1099.  Here, the only indication that

13  Plaintiffs might be associated with EA's video game is the alleged use of their likenesses within

14  the game (not even in the title).  FAC ¶ 34.  That use alone cannot be sufficient to satisfy the

15  second prong of the *Rogers* test in right-of-publicity cases either.

16         The Court should dismiss Plaintiffs' claims or strike them pursuant to the California anti-

17  SLAPP statute.

18                    **c.**      **The public-interest test.**

19         Courts in California and elsewhere have held that the public's interest in information

20  about sports and athletes justifies full First Amendment protection for expressive works that

21  incorporate athletes' names, statistics, and other biographical information.  This constitutional

22  public-interest defense is yet another barrier to Plaintiffs' right-of-publicity claims.

23         In *Gionfriddo*, for example, the defendant used baseball players' names, photographs,

24  and biographical information, as well as video clips of their on-the-field performances, in game

25  programs, videos, and online features, all without the players' permission.  *Id.* at 410.

26  Dismissing the players' right-of-publicity claim, the court held that "[t]he recitation and

27  discussion of factual data concerning the athletic performance of these plaintiffs command a

28  substantial public interest, and, therefore, [are] a form of expression due substantial

21

DEFENDANT'S MOTION TO DISMISS/SPECIAL MOTION TO STRIKE PURSUANT TO C.C.P. §425.16
CASE NO. 10-CV-3328-RS

constitutional protection." *Id.* at 411.  The court concluded that "the public interest favoring the free dissemination of information regarding baseball's history far outweighs any proprietary interests at stake," and that the plaintiffs' right-of-publicity claim thus failed as a matter of law. *Id.* at 415.

Similarly, in *C.B.C.*, the plaintiff marketed fantasy online baseball games that incorporated the actual names, statistics, and other biographical data of Major League Baseball players.  505 F.3d at 823.  The plaintiff initially licensed this information from the Major League Baseball Players' Association.  But when the association declined to renew the license, the plaintiff sought a judicial declaration of its First Amendment right to use the players' information without a license.  *See id.* at 821.  The Eighth Circuit agreed that the First Amendment protected the plaintiff's use of the athletes' names and other information.  As the court explained, "the information used in [the plaintiff's] fantasy baseball games is all readily available in the public domain, and it would be strange law that a person would not have a first amendment right to use information that is available to everyone." *Id.* at 823.[8]

As in *Gionfriddo*, *C.B.C.*, and these other cases, the Court should find that the First Amendment protects EA's alleged use in its games of Plaintiffs' likenesses.  Plaintiffs' complaint recognizes the vast popularity of NFL football and historic NFL teams.  FAC ¶ 3. Plaintiffs' complaint further recognizes that all the information allegedly used by EA is publicly available.  *See* FAC ¶ 39 (citing NFL team media guides).  This factual, public-domain information about former NFL players commands a substantial public interest, as courts have repeatedly recognized.  *See C.B.C.*, 505 F.3d at 823-24; *CBS Interactive*, 259 F.R.D. at 417-18; *Gionfriddo*, 94 Cal. App. 4th at 411; *Montana*, 34 Cal. App. 4th at 794-96.  The First Amendment protection extended to entertainment websites (*Gionfriddo*), fantasy sports games (*C.B.C.* & *CBS Interactive*) and commemorative posters (*Montana*) is not based on the

---

[8]   *See also CBS Interactive v. Nat'l Football League Players Ass'n*, 259 F.R.D. 398, 417-18 (D. Minn. 2009) (same; First Amendment protects use of players' names, statistics, and other information in fantasy football game); *Montana*, 34 Cal. App. 4th at 795 (dismissing NFL quarterback's right-of-publicity claims based on sale of posters featuring his likeness; posters were "a form of public interest presentation to which protection must be extended").

532739.06

1  protection of strict "news" reporting. "Speech that entertains, like speech that informs, is

2  protected by the First Amendment because '[t]he line between the informing and the entertaining

3  is too elusive for the protection of that basic right.'" *C.B.C.* 505 F.3d at 823 (citation omitted).

4    Based on the public's interest in information about sports, EA's alleged use of Plaintiffs'

5  likenesses (and other publicly available information) is entitled to First Amendment protection.

6  The Court, therefore, should dismiss Plaintiffs' claims and/or strike them pursuant to the

7  California anti-SLAPP statute.

8     **d.**  **Meritorious misappropriation claims target advertisements.**

9    In contrast to the allegations here, successful misappropriation claims generally arise

10  from the use of the plaintiff's name or likeness in advertising or merchandising of non-

11  transformative works.[9]  The line of authority restricting the use of a celebrity's likeness in

12  commercial advertising "concerns only the market which exists in our society for the

13  exploitation of celebrity to *sell products* ... ." *White,* 971 F.2d at 1401 n.3. This is not the case

14  here. *Madden NFL* is not commercial speech—*i.e.* "speech that does no more than propose a

15  commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Counsel, Inc.,*

16  425 U.S. 748, 772 n. 24 (1976); *see also Restatement (Third) Of Unfair Competition* § 47,

17  comment c. Here, Plaintiffs rightly do not claim that EA's alleged use of their likenesses is in an

18  advertisement or an endorsement to promote an unrelated product. EA's works, therefore, are

19  entitled to the full protection of the First Amendment as recognized by the tests discussed above.

20    **2.**  **Section 3344(d)'s public-affairs exception bars Plaintiffs' statutory claim.**

21    California Civil Code Section 3344(d) exempts from liability the "use of a name ... or

22  likeness in connection with any ... public affairs, or sports broadcast or account." This

23  
_____

24  [9]  *See, e.g., Newcombe v. Adolf Coors Co.,* 157 F.3d 686, 691 (9th Cir. 1998) (use of
pitcher's image in beer advertisement); *Wendt v. Host Int'l, Inc.,* 125 F.3d 806, 809 (9th Cir.

25  1997) (use of animatronic figures of television characters in airport bars); *Abdul-Jabbar v. Gen.
Motors Corp.,* 85 F.3d 407, 409 (9th Cir. 1996) (use of basketball star's former name in

26  television car commercial); *White v. Samsung Elecs. Am., Inc.,* 971 F.2d 1395, 1396 (9th Cir.
1992) (use of game-show hostess's identity in advertisements for electronic products); *Midler v.

27  Ford Motor Co.,* 849 F.2d 460, 461-62 (9th Cir. 1988) (use of sound-alike of famous singer in
car commercial featuring singer's hit song); *Motschenbacher v. R.J. Reynolds Tobacco Co.,* 498

28  F.2d 821, 822 (9th Cir. 1974) (use of famous race car driver's distinctive car in cigarette
commercial).

1  exemption affords even broader protection against statutory misappropriation claims than the

2  First Amendment does.  As the Ninth Circuit recognized, "the section 3344(d) defense is not

3  coextensive with the First Amendment.  Rather, it is designed to avoid First Amendment

4  questions in the area of misappropriation by providing extra breathing space for the use of a

5  person's name in connection with matters of public interest."  *New Kids*, 971 F.2d at 310 n.10.

6  Laws regulating speech must be "authoritatively construed to punish only unprotected speech

7  and not be susceptible of application to protected expression."  *Gooding v. Wilson*, 405 U.S. 518,

8  522 (1972).  In other words, courts must err on the side of free expression when construing

9  legislation that purports to regulate speech.

10      Here, this principle dictates a narrow construction of the liability-creating parts of Section

11  3344 and a broad construction of its public-affairs exemption.  Courts have applied the "public

12  affairs" exception broadly to protect a variety of sports-related expressive works.  In *Dora v.*

13  *Frontline Video, Inc.*, the exempt work was a surfing documentary, 15 Cal. App. 4th 536, 545-46

14  (1993); in *Gionfriddo*, the exempt works included baseball websites and programs, 94 Cal. App.

15  4th at 410-11; and in *Montana*, the exempt work was a poster about NFL football, 34 Cal. App.

16  4th at 792.  If those works were exempt under Section 3344(d), then so too are EA's games about

17  NFL football.

18      The Court, therefore, should dismiss and/or strike under California's anti-SLAPP statute

19  Plaintiffs' statutory right-of-publicity claim.

20      **3.      Plaintiffs' ancillary claims also must be dismissed.**

21      Because Plaintiffs cannot demonstrate a probability of overcoming any of the defenses to

22  their statutory and common-law right-of-publicity claims, Plaintiffs' ancillary conversion,

23  trespass to chattels and unjust enrichment claims also must be dismissed.  Each of these other

24  claims challenges EA's alleged use of Plaintiffs' likenesses in its video games, and is subject to

25  the same defenses as the right-of-publicity claims.  *See, e.g., E.S.S.*, 547 F.3d at 1101; *see also*

26  *Gionfriddo*, 94 Cal. App. 4th at 407.

27      Plaintiffs' third cause of action for conversion and fourth cause of action for trespass to

28  chattel also fail because Plaintiffs do not allege that EA dispossessed them of their interests in

24

532739.06

1    tangible personal property.  *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1565 (1996)

2    ("Courts have traditionally refused to recognize as conversion the unauthorized taking of

3    intangible interests that are not merged with, or reflected in, something tangible."); *GNI*

4    *Waterman LLC v. A/M Valve Co. LLC*, No. CV F 07-0863, 2007 WL 2669503, at *11 (E.D. Cal.

5    Sept. 7, 2007) (holding that allegations of interference with the "ownership right to the

6    proprietary forms, designs and patterns" does not state a claim for trespass to chattels).  Here,

7    because publicity rights are intangible property and not merged with or reflected in something

8    tangible taken by EA (for example, a stock certificate), Plaintiffs fail to state a claim for

9    conversion or trespass to chattels.  *See also Beilstein-Institut Zur Forderung Der Chemischen*

10   *Wissenschaften et al. v. MDL Information Sys., Inc.*, No. C. 04-5368 SI, 2006 WL 3218719, at

11   *3-4 (N.D. Cal. Nov. 7, 2006).

12         Plaintiffs' fifth cause of action for unjust enrichment is not recognized under California

13   law absent independent grounds for imposing an implied contract or constructive trust on the

14   defendant.  "There is no cause of action for unjust enrichment.  Rather, unjust enrichment is a

15   basis for obtaining restitution based on quasi-contract or imposition of a constructive trust."

16   *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1490 (2006); *accord Roots Ready*

17   *Made Garments v. Gap Inc.*, No. C. 07-3363 CRB, 2008 WL 239254, at *8 (N.D. Cal. Jan. 28,

18   2008) (dismissing unjust enrichment claim with prejudice).  Plaintiffs have neither alleged that

19   an implied contract exists between the parties nor that a constructive trust would be appropriate.

20   Thus, Plaintiffs fail to state a claim for unjust enrichment because California law does not

21   recognize such a claim based on bare allegations that a defendant has unjustly benefitted.

22                              **IV.    CONCLUSION**

23         For these reasons, EA respectfully requests that the Court dismiss Plaintiffs' complaint,

24   or, in the alternative, strike it pursuant to California Code of Civil Procedure § 425.16.

25   Dated:  January 6, 2011                    KEKER & VAN NEST LLP

26

27                                    By:    */s/ R. James Slaughter*
                                          R. JAMES SLAUGHTER
28                                        Attorneys for Defendant
                                          ELECTRONIC ARTS INC.

532739.06