KEKER & VAN NEST LLP
ROBERT A. VAN NEST - #84065
rvannest@kvn.com
R. JAMES SLAUGHTER - #192813
rslaughter@kvn.com
R. ADAM LAURIDSEN - #243780
alauridsen@kvn.com
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Defendant
ELECTRONIC ARTS INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MICHAEL E. DAVIS, aka TONY DAVIS, VINCE FERRAGAMO, and BILLY JOE DUPREE, on behalf of themselves and all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ELECTRONIC ARTS INC.,<br><br>Defendant. | Case No. 10-CV-3328-RS<br><br>**NOTICE OF MOTION AND MOTION TO STRIKE PURSUANT TO C.C.P. §425.16; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: August 25, 2011<br>Time: 1:30 p.m.<br>Dept: Courtroom 3, 17th Floor<br>Judge: Hon. Richard Seeborg<br><br>Date Comp. Filed: July 29, 2010<br><br>Trial Date: None |

550618.03

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................1

II.  BACKGROUND ...............................................................................................3

    A.   EA's Works..............................................................................................3

    B.   Procedural History ..................................................................................5

III. ARGUMENT ....................................................................................................7

    A.   Plaintiffs' Claims Fall Within the Scope of the Anti-SLAPP Statute ....................7

        1.   *Madden NFL* is an expressive work protected by the First Amendment..................................................................................8

        2.   EA's games relate to an "issue of public interest."................................10

    B.   Plaintiffs' Claims Fail as a Matter of Law...........................................12

        1.   Plaintiffs' claims are barred by the First Amendment. ...........................12

            a.   The transformative-use test.........................................................13

            b.   The *Rogers* test. ........................................................16

            c.   The public-interest test................................................................19

            d.   Meritorious misappropriation claims target advertisements...................................................................21

        2.   Section 3344(d)'s public-affairs exception bars Plaintiffs' statutory claim..........................................................................22

        3.   Plaintiffs' ancillary claims also must be stricken. ...................................23

IV.  CONCLUSION..................................................................................................24

NOTICE OF MOTION AND MOTION TO STRIKE PURSUANT TO C.C.P. §425.16; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 10-CV-3328-RS

550618.03

# TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases

*Abdul-Jabbar v. Gen. Motors Corp.*
   85 F.3d 407 (9th Cir. 1996) ...................................................................................21

*Alberghetti v. Corbis Corp.*
   713 F. Supp. 2d 971 (C.D. Cal. 2010) .....................................................................3

*Beilstein-Institut Zur Forderung Der Chemischen Wissenschaften et al. v.*
   *MDL Information Sys., Inc.*
   No. C. 04-5368 SI, 2006 WL 3218719 (N.D. Cal. Nov. 7, 2006) ...........................23

*Brown v. Electronic Arts Inc.*
   No. 2:09-cv-01598-FMC-RZx (C.D. Cal. Sept. 23, 2009) ............................... *passim*

*C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media,*
   *L.P.*, 505 F.3d 818 (8th Cir. 2007) .....................................................................20, 21

*Cairns v. Franklin Mint Co.*
   24 F. Supp. 2d 1013 (C.D. Cal. 1998) .....................................................................6

*Capcom Co. v. MKR Group, Inc.*
   No. C. 08-0904 RS, 2008 WL 4661479 (N.D. Cal. Oct. 20, 2008) .........................17

*CBS Interactive v. Nat'l Football League Players Ass'n*
   259 F.R.D. 398 (D. Minn. 2009) .......................................................................20, 21

*Cher v. Forum Int'l*
   692 F.2d 634 (9th Cir. 1982) .................................................................................12

*Chuy v. Phil. Eagles Football Club*
   431 F. Supp. 254 (E.D. Penn. 1977) .......................................................................11

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*
   444 F. Supp. 2d 1012 (C.D. Cal. 2006) .................................................9, 17, 19, 23

*ETW Corp. v. Jireh Publ'g*
   332 F.3d 915 (6th Cir. 2003) .................................................................................14

*GNI Waterman LLC v. A/M Valve Co. LLC*
   No. CV F 07-0863, 2007 WL 2669503 (E.D. Cal. Sept. 7, 2007) ..........................23

*Gooding v. Wilson*
   405 U.S. 518 (1972) ...............................................................................................22

*Hilton v. Hallmark Cards*
   580 F.3d 874 (9th Cir. 2009) .............................................................................15, 16

*Hilton v. Hallmark Cards*
   599 F.3d 894 (9th Cir. 2010) .............................................................................15, 16

*Interactive Digital Software Ass'n v. St. Louis Cnty.*
   329 F.3d 954 (8th Cir. 2003) ...................................................................................9

*Keller v. Electronic Arts Inc., et al.*
   No. C. 09-1967 CW, 2010 WL 530108 (N.D. Cal. Feb. 8, 2010) ...................7, 11, 15

*Mattel Inc. v. MCA Records, Inc.*
   296 F.3d 894 (9th Cir. 2002) .............................................................................17, 19

ii

550618.03

1

**TABLE OF AUTHORITIES**
(cont'd)

2

**Page(s)**

3

*Midler v. Ford Motor Co.*
   849 F.2d 460 (9th Cir. 1988) ...............................................................6, 21

4

*Motschenbacher v. R.J. Reynolds Tobacco Co.*
   498 F.2d 821 (9th Cir. 1974) ...............................................................6, 21

5

*New Kids on the Block v. News Am. Publ'g Inc.*
   971 F.2d 302 (9th Cir. 1992) ....................................................................22

6

*Newcombe v. Adolf Coors Co.*
   157 F.3d 686 (9th Cir. 1998) ....................................................................21

7

*Page v. Something Weird Videos*
   908 F. Supp. 714 (C.D. Cal. 1995) .............................................................6

8

*Rogers v. Grimaldi*
   875 F.2d 994 (2d Cir. 1989) ............................................................ *passim*

9

*Romantics v. Activision Publ'g, Inc.*
   574 F. Supp. 2d 758 (E.D. Mich. 2008).................................................9, 19

10

*Roots Ready Made Garments v. Gap Inc.*
   No. C. 07-3363 CRB, 2008 WL 239254 (N.D. Cal. Jan. 28, 2008) ........................23

11

*Stewarts Surfboards, Inc. v. Disney Book Group*
   Case No. CV 10-2982 (C.D. Cal. May 11, 2011).............................................17

12

*Thomas v. L.A. Times Commc'ns LLC*
   189 F. Supp. 2d 1005 (C.D. Cal. 2002) ........................................................8

13

*Troy Group, Inc. v. Tilson*
   364 F. Supp. 2d 1149 (C.D. Cal. 2002) ........................................................8

14

*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*
   190 F.3d 963 (9th Cir. 1999) ......................................................................7

15

*Video Software Dealers Ass'n v. Schwarzenegger*
   556 F.3d 950 (9th Cir. 2009) ......................................................................9

16

*Virginia State Bd. of Pharmacy v. Va. Citizens Consumer Counsel, Inc.*
   425 U.S. 748 (1976)...................................................................................21

17

*Wendt v. Host Int'l, Inc.*
   125 F.3d 806 (9th Cir. 1997) ....................................................................21

18

*White v. Samsung Elecs. Am., Inc.*
   971 F.2d 1395 (9th Cir. 1992) ..............................................................6, 21

19

**State Cases**

20

*Braun v. Chronicle Publ'g Co.*
   52 Cal. App. 4th 1036 (1997) .....................................................................7

21

*Briggs v. Eden Council for Hope & Opportunity*
   19 Cal. 4th 1106 (1999).............................................................................8

22

*Christoff v. Nestle USA, INC.*
   47 Cal. 4th 468 (2009) ...............................................................................3

23

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*
   25 Cal. 4th 387 (2001) ..................................................................... *passim*

24

25

26

27

28

iii

NOTICE OF MOTION AND MOTION TO STRIKE PURSUANT TO C.C.P. §425.16; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 10-CV-3328-RS

550618.03

1

2

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

3

*Damon v. Ocean Hills Journalism Club*
   85 Cal. App. 4th 468 (2000) .................................................................................10

4

*Dora v. Frontline Video, Inc.*
   15 Cal. App. 4th 536 (1993) .................................................................................22

5

*Equilon Enter. v. Consumer Cause, Inc.*
   29 Cal. 4th 53 (2002) ........................................................................................7, 8

6

*Gionfriddo v. Major League Baseball*
   94 Cal. App. 4th 400 (2001) ........................................................................ *passim*

7

*Hall v. Time Warner, Inc.*
   153 Cal. App. 4th 1337 (2007) .........................................................................8, 11

8

*Hensler v. City of Glendale*
   8 Cal. 4th 1 (1994) ...............................................................................................3

9

*Ingels v. Westwood One Broad. Serv.*
   129 Cal. App. 4th 1050 (2005) .........................................................................8, 11

10

*Kirby v. Sega of Am., Inc.*
   144 Cal. App. 4th 47 (2006) ...................................................................1, 9, 14, 16

11

*Kronemyer v. Internet Movie Data Base, Inc.*
   150 Cal. App. 4th 941 (2007) ...........................................................................8, 11

12

*McKell v. Wash. Mut., Inc.*
   142 Cal. App. 4th 1457 (2006) .............................................................................23

13

*Montana v. San Jose Mercury News, Inc.*
   34 Cal. App. 4th 790 (1995) .............................................................11, 20, 21, 22

14

*No Doubt v. Activision Pub'g*
   No. B223996, 2011 WL 507479 (Cal. Ct. App. Feb. 15, 2011).............................16

15

*Nygard, Inc. v. Uusi-Kerttula*
   159 Cal. App. 4th 1027 (2008) .............................................................................10

16

*Seelig v. Infinity Broad. Corp.*
   97 Cal. App. 4th 798 (2002) .......................................................................8, 10, 11

17

*Thrifty-Tel, Inc. v. Bezenek*
   46 Cal. App. 4th 1559 (1996) ...............................................................................23

18

*Winter v. D.C. Comics*
   30 Cal. 4th 881 (2003) ..........................................................................13, 14, 15, 16

## State Statutes

Cal. Civ. Code § 946 ...............................................................................................6

Cal. Civ. P. Code § 339 ...........................................................................................3

Cal. Civ. P. Code § 425.16 ..........................................................................1, 5, 8, 10, 24

Cal. Civ. P. Code § 425.16(a) .................................................................................8

Cal. Civ. P. Code § 425.16(b)(1) ........................................................................7, 8

Cal. Civ. P. Code § 425.16(e)(4) ............................................................................8

Cal. Civ. P. Code § 3344 .........................................................................................6

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO STRIKE PURSUANT TO C.C.P. §425.16; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 10-CV-3328-RS

550618.03

1

## TABLE OF AUTHORITIES
### (cont'd)

2

**Page(s)**

3

Cal. Civ. P. Code § 3344(d) ...................................................................................22

4

### Federal Rules

Fed. R. Evid. 1006 .................................................................................................4

5

### Treatises

6

*Restatement (Third) of Unfair Competition*, § 46 ........................................12

7

*Restatement (Third) Of Unfair Competition* § 47, comment c ....................22

### Other Authorities

8

E. Volokh, *Freedom of Speech and the Right of Publicity*, 40 Hous. L.
  Rev. 903, 904, 908 & n. 20 ................................................................................12

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

v

550618.03

## NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT

**PLEASE TAKE NOTICE** that on August 25, 2011, before the Honorable Richard Seeborg, United States District Court, 450 Golden Gate Avenue, Courtroom 3, 17th Floor, San Francisco, California 94102, defendant Electronic Arts Inc. ("EA") will, and hereby does, move the Court for an order striking pursuant to California Code of Civil Procedure § 425.16 all causes of action in Plaintiffs' complaint.

EA moves to strike all of Plaintiffs' causes of action because they are barred by the First Amendment.  First, under the test applied by California state courts, EA's expressive works are "transformative."  Second, under the two-part *Rogers* test, EA's alleged use of Plaintiffs' likenesses in its expressive works is not "wholly unrelated" to the works or "simply a disguised commercial advertisement for the sale of goods or services."  Third, under the public-interest test, EA's expressive works are due constitutional protection because information about professional football players commands a substantial public interest.

EA also moves to strike Plaintiffs' individual causes of actions for additional reasons. Plaintiffs' first cause of action for violation of California Civil Code § 3344 is barred by the statute's "public affairs" exception.  Plaintiffs' third cause of action for conversion fails because Plaintiffs do not allege that EA dispossessed them of their interests in tangible personal property. Plaintiffs' fourth cause of action for trespass to chattel similarly fails because Plaintiffs do not allege interference with tangible personal property.  Finally, Plaintiffs' fifth cause of action for unjust enrichment is not recognized under California law.

For each of these reasons, EA respectfully requests that the Court grant this Motion and strike Plaintiffs' causes of action against EA with prejudice.

This Motion is based on this Notice; on the attached Memorandum of Points and Authorities; on the concurrently-filed Request for Judicial Notice, the Declaration of Philip N. Frazier, the Declaration of Adam Lauridsen; on the concurrently-lodged editions of *Madden NFL 09*, PlayStation 2 console and controllers, Xbox console and controllers; all pleadings, files and records in this action; and on such other argument as may be received by this Court at the hearing on this Motion.

1

550618.03

1

2   Dated:  June 9, 2011                          KEKER & VAN NEST, LLP

3

4

                                            By:  /s/ R. James Slaughter
5                                                R. JAMES SLAUGHTER
                                                 R. ADAM LAURIDSEN
6                                                Attorneys for Defendant
                                                 ELECTRONIC ARTS INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

550618.03

# I.     INTRODUCTION[1]

"Video games are expressive works entitled to as much First Amendment protection as the most profound literature." *Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47, 58 (2006).  In this case, individuals seek to restrict the ability of content providers like Electronic Arts Inc. ("EA") to exercise their First Amendment right to free expression by dramatically expanding economic rights protected by right-of-publicity laws.  Here, former National Football League ("NFL") players allege that EA violated their statutory and common law rights of publicity by using their "likenesses" as a few of the thousands of virtual athletes in its *Madden NFL* videogame.  If Plaintiffs had sued a filmmaker who used their photographs in a documentary about football, or a screenwriter who depicted them as characters in a fictional movie about their teams, the First Amendment would defeat any right-of-publicity claim.  That result does not change simply because EA's highly creative works are embodied in a different medium.

Since Plaintiffs' complaint challenges EA's right to free expression regarding an issue of public interest, Plaintiff's claims are subject to a Special Motion to Strike pursuant to California's anti-SLAPP statute.  *See* Cal. Civ. Proc. Code § 425.16.  Because, as EA shows below, the alleged conduct was "in furtherance" of its free speech rights regarding a matter of public interest, the burden rests with Plaintiffs to demonstrate that they have a "probability" of success on the merits.  *Id.* at (b)(1).  Plaintiffs cannot meet their burden here because all of Plaintiffs claims fail as a matter of law.

EA does not use Plaintiffs' names or photographs.  Nevertheless, even accepting the allegation that EA used some protectable element of Plaintiffs' likenesses, Plaintiffs' misappropriation claims are barred by the First Amendment.  To prevent the stifling of free expression, courts have narrowly circumscribed statutory and common law misappropriation claims that target videogames and other protected works.  *See, e.g., Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 404-05 (2001); *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir.

---

[1]     Concurrently with the filing of this anti-SLAPP motion to strike, EA is filing a Rule 12(b)(6) motion to dismiss.  Except for the sections setting forth the applicable legal standards, these motions are identical and describe the reasons why Plaintiffs' claims fail as a matter of law.

1989).  Courts have applied various tests to ensure that right-of-publicity claims do not chill speech, including the transformative-use test, the *Rogers* / Restatement relatedness test, and the public interest test.  Under any of these tests, EA's anti-SLAPP motion to strike must be granted.

Under the transformative-use test, an expressive work that incorporates an individual's likeness is constitutionally protected if the use is "transformative."  *Comedy III*, 25 Cal. 4th at 405.  The relevant inquiry "is whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized," in which case it is protected, "or whether the depiction … of the celebrity is the very sum and substance of the work in question."  *Id.* at 406.  The accompanying editions of *Madden NFL* show that the game is much more than a mere celebrity likeness.  Because any purported use of Plaintiffs' likenesses is transformative, the First Amendment defeats their misappropriation claims.

Under *Rogers*, the First Amendment bars right-of-publicity claims arising from the use of a plaintiff's name or likeness in an expressive work, unless the use is "wholly unrelated" to the work or is "simply a disguised commercial advertisement for the sale of good or services."  *Rogers*, 875 F.2d at 1004.  EA's alleged use of former NFL players' likenesses clearly is not "wholly unrelated" to the content of a videogame about professional football.  Nor could EA's use be characterized as "a disguised commercial advertisement" for the sale of that work.  Consequently, under the *Rogers* test, the court should strike Plaintiffs' claims under California's anti-SLAPP statute.

Separately, courts repeatedly have held that the public's interest in information about sports and athletes "far outweighs" the athletes' right of publicity.  *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 415 (2001).  Information such as athletes' names, likenesses, performance statistics, and biographical information "commands a substantial public interest" and therefore "is a form of expression due substantial constitutional protection."  *Id.* at 411.  This is true even in fan-driven "fantasy" baseball games, which are far less expressive and transformative than the videogames at issue here.

Plaintiffs' individual causes of action fail for numerous additional reasons.  Plaintiffs' cause of action alleging violation of the California statutory right of publicity is barred by the

2

statute's "public affairs" exception.  Courts have held that sports and information about athletes fall within the "public affairs" category, thereby barring statutory right-of-publicity claims involving such matters.  Plaintiffs' causes of action for conversion and trespass to chattels fail because Plaintiffs do not allege that EA took their interests in tangible property.  Finally, Plaintiffs' fifth cause of action for unjust enrichment is not recognized under California law.

For these reasons and as explained in detail below, Plaintiffs do not demonstrate any possibility—much less the required probability—of prevailing on their claims against EA.  Therefore, Plaintiffs' claims should be stricken under California's anti-SLAPP statute.

## II.      BACKGROUND

**A.      EA's Works**

EA is a leading developer and publisher of videogames, including *Madden NFL*, which EA has published annually for 20 years.  Each annual edition of *Madden NFL* is published no later than August of the previous year; for example, *Madden NFL 09* was published in August 2008. First Amended Complaint ("FAC") ¶ 75.[2]  Combining technically advanced computer and software engineering and creative audiovisual elements, the games allow users to experience the excitement and challenge of NFL football.  Users may compete against an opponent controlled by the game itself, against a person connected to the same game system, or against a person connected over the Internet.

---

[2]      *Madden NFL 09* is the only annual edition of *Madden* at issue.  EA did not include historic teams in later editions, FAC ¶ 33, and claims targeting earlier editions are time-barred under the two-year statute of limitations for publicity-right claims.  *See Christoff v. Nestle USA, INC.*, 47 Cal. 4th 468, 476 n.7 (2009).  Under California's single-publication rule, the statute of limitations for publicity right claims begins to run on the date the work was published. *Alberghetti v. Corbis Corp.*, 713 F. Supp. 2d 971, 976-77 (C.D. Cal. 2010).  *Madden NFL 09* was the only game containing "historic" teams published within two years of the July 29, 2010 filing of the Complaint.  FAC ¶ 75.  Plaintiffs' conversion, trespass to chattels and unjust enrichment claims do not extend the applicable statute of limitations because the claims' gravamen is the same as Plaintiffs' right of publicity claims.  *See Hensler v. City of Glendale*, 8 Cal. 4th 1, 22 (1994).  These tag-along claims concerning intangible property rights are subject to Code of Civil Procedure section 339's two-year statute of limitations.  *See, e.g., Alberghetti*, 713 F. Supp. 2d at 983-84.

550618.03

As a review of the game reveals,[3] the virtual world of *Madden NFL* is constructed from an array of video graphics, audio features and data.  After a user chooses two professional teams to compete against each other, the game assigns a stadium for the match-up and populates it with virtual players, coaches, referees, mascots, cheerleaders, and fans—all designed and rendered by EA's graphic artists.

In the Xbox and PlayStation 2 versions of *Madden NFL 09*, players may choose to play current or historic teams.  The historic teams differ from the current teams in important ways: the historic teams do not include photographs or images of actual players, the historic teams do not include names of actual players who played on the historic teams, and the uniform numbers of virtual players on the historic teams do not correspond to those worn by actual players on the historic teams.  *See* FAC ¶¶ 53-54.  The virtual players on the historic teams are identified by a number and a player "name" combining their position and number (for example, "HB #37").  *Id.*

Although the virtual players' characteristics (such as height, weight, athletic ability, and experience) and other variables (including crowd noise and weather) affect the teams' performances, the individual users most directly influence the game's outcome through their play-calling and ability to use hand-held controllers to manipulate the virtual players' actions on the field.  In other words, it is the user who selects each play of the virtual football game (*e.g.*, whether to pass, run or punt) and, combined with the user's skill at manipulating the controller, it is the user who predominantly determines the outcome of the selected play and the game.  Because of these numerous variables and the creative input of the user, the course of the game

---

[3]      EA has lodged with the Court versions of *Madden NFL 09* for the Xbox and PlayStation—the two versions of the game that include historic teams.  To play these games, EA also has lodged a Sony PlayStation 2 console, an Xbox console, and the appropriate controllers.  *See* Declaration of Philip N. Frazier ("Frazier Decl.") ¶¶ 4-5; Notice of Manual Lodging ¶ 1-2.  All of the facts regarding the game play of *Madden NFL* described in this motion may be verified through a review of the games themselves, which are subject to judicial notice.  *See* EA's Request for Judicial Notice at 1-2.  The accompanying Frazier Declaration provides a summary of the content and features of the *Madden NFL* games.  *See* Frazier Decl. ¶¶ 6-13.  The summary aims to save the Court the hours of game play needed to encounter the various content and features in each game.  *See* Fed. R. Evid. 1006 ("The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation.").  If the Court wishes, EA can assist the Court in setting up and viewing the works.

changes each time it is played—no two game experiences are alike.

As a review of the game reveals, the user's control over the action and how the story of each game develops is further enhanced by the user's ability to make changes to the virtual players themselves or other elements of the game.  Users easily alter the various abilities, appearances and biographical information of the virtual players in a multitude of ways, and users also may create custom virtual players from scratch for their teams.  For example, a user may change the physical characteristics of the player (height, weight, hairstyle), any of a number of accessories (such as helmet visor, wristband), a player's physical abilities (such as speed and agility, throwing arm, passing accuracy), or a player's biographical details (place of origin) to create their own custom players and teams.

The users experience the game audio-visually through real-time, television-like animation and action-specific, play-by-play commentary.  The game also includes realistic original sounds, such as the crunch of players' pads as contact is made, the audible of a quarterback changing a play at the line of scrimmage and the roar of the crowd.

*Madden NFL* does not recreate, recount or imitate real-life or actual historic games.  The action of the game and the results achieved are fictional, virtual, user-generated, and driven by the user's creativity and skill.

**B.    Procedural History**

On July 29, 2010, Plaintiff Tony Davis filed a complaint against EA but did not serve it.  Doc. 1.  On November 8, 2010, Plaintiffs served the original complaint and simultaneously filed and served the FAC.  Doc. 11.  The FAC adds two additional Plaintiffs, Vince Ferragamo and Billy Joe Dupree.[4]

Plaintiffs allege on behalf of themselves and others purportedly similarly situated that EA misappropriated their "likenesses" for inclusion in "historic teams" featured in certain *Madden*

---

[4]    On January 6, 2011, EA filed a Motion to Dismiss, or, in the Alternative, Motion to Strike Pursuant to C.C.P. 425.16.  *See* Doc. 20.  The Court denied EA's motion without prejudice in order to give the parties time to meet and confer regarding the discovery, if any, necessary to oppose EA's motion and ordered that EA respond to the FAC by June 9, 2011.  *See* Doc. 35.  By this anti-SLAPP motion to strike, and the concurrently filed motion to dismiss, EA responds to the FAC.

1   *NFL* games.  FAC ¶ 2.  Plaintiffs do not allege that EA used actual players' names, photograph

2   images or the uniform numbers they wore in the NFL (as EA does not use any of those

3   characteristics in the game).  In other words, in *Madden NFL 09* there is no virtual player named

4   Michael Davis, there is no photographic image of Michael Davis, and the virtual player Plaintiffs

5   claim uses Michael Davis' likeness does not share his actual number.  Instead, Plaintiffs allege

6   only that EA uses "the player's position, years in the NFL, height, weight, 'skin tone,' as well as

7   each player's relative skill level in different aspects of the game."  *Id*. ¶ 34.[5]  Based on EA's

8   alleged misappropriation, Plaintiffs assert claims for (1) violation of California's statutory right

9   of publicity, (2) violation of California's common law right of publicity, (3) conversion,

10  (4) trespass to chattels and (5) unjust enrichment.  *Id.* ¶¶ 73-109.[6]

11          EA is a defendant in two cases presently before the Ninth Circuit that concern the alleged

12  use of athlete likenesses in videogames.  In *Brown v. Electronic Arts Inc.*, No. 2:09-cv-01598-

13  FMC-RZx (C.D. Cal.), former NFL player (and putative class member in this case) Jim Brown

14  alleged—just as Plaintiffs here allege—that EA used without permission his likeness in the

15  "historic team" feature of *Madden NFL*.  Brown's claims concerned the same alleged "personal

16  characteristics" as Plaintiffs' claims—roster position, skin tone, but not name or photo—and the

17  same game, *Madden NFL 09*.  As it does here, EA moved to dismiss and to strike Brown's

18  complaint pursuant to California anti-SLAPP statute on the ground that Brown's claims were

---

[5]        EA accepts for purposes of this motion only Plaintiffs' allegation that EA uses Plaintiffs' likeness.  But it is far from clear that such general characteristics identified by Plaintiffs are legally recognizable as a person's "likeness."  Certainly, such general attributes (height, weight, "skin tone") are not protectable under Cal. Civil Code § 3344.  *See White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1397 (9th Cir. 1992) (dismissing Civil Code § 3344 claim based on robot that allegedly looked like Vanna White); *Midler v. Ford Motor Co.*, 849 F.2d 460, 463 (9th Cir. 1988) (holding that sound-alike voice did not violate plaintiff's right of publicity).

[6]        EA assumes for purposes of this motion only that California law governs Plaintiffs' claims, even though California law will not govern all matters in this action.  Under California law, "if there is no law to the contrary, in the place where personal property is situated, it is deemed to follow the person of its owner, and is governed by the law of his domicile."  Cal. Civ. Code § 946; *see also Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1026 (C.D. Cal. 1998).  "[I]t appears that … the state of plaintiff's residency … has a greater interest in compensating its residents for [publicity right] injuries of the type here alleged than other jurisdictions may have in compensating foreigners so injured within their respective borders."  *Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F.2d 821, 823 n. 4 (9th Cir. 1974).  "[T]he state of plaintiff's residency is normally the state of the greatest injury."  *Id; see also Page v. Something Weird Videos,* 908 F. Supp. 714, 717 (C.D. Cal. 1995).

1  barred by the First Amendment.  In September 2009, Judge Cooper granted EA's motion to

2  dismiss the Lanham Act claim, finding that EA's *Madden NFL* videogame was an expressive

3  work protected by the First Amendment and that Brown's claim was barred under the First

4  Amendment.  *See id.*, Slip Op. at 4-10 (C.D. Cal. Sept. 23, 2009) (attached at Lauridsen Decl.,

5  Ex. B).  Brown appealed Judge Cooper's decision to the Ninth Circuit.  Brown's appeal has been

6  briefed and argued.

7    In *Keller v. Electronic Arts Inc., et al.*, No. C. 09-1967 CW (N.D. Cal.), a putative class

8  of former student-athletes alleged that EA improperly used their likenesses in EA's college

9  football and basketball games.  EA moved to dismiss and to strike Keller's claims under

10 California's anti-SLAPP statute.  In February 2010, while accepting that the anti-SLAPP statute

11 applied to EA's conduct, Judge Wilken denied EA's motions.  *Id.*, 2010 WL 530108, at *10

12 (N.D. Cal. Feb. 8, 2010).  EA appealed the denial of its anti-SLAPP motion to the Ninth Circuit.

13 Keller's appeal has been briefed and argued.

14         **III. ARGUMENT**

15 **A. Plaintiffs' Claims Fall Within the Scope of the Anti-SLAPP Statute**

16   Plaintiffs' claims are subject to a special motion to strike under California's anti-SLAPP

17 statute.[7]  In 1993, the California Legislature enacted the anti-SLAPP statute "to nip SLAPP

18 litigation in the bud[,]" by quickly disposing of claims that target the exercise of free speech

19 rights.  *See Braun v. Chronicle Publ'g Co.*, 52 Cal. App. 4th 1036, 1042 (1997).  Under anti-

20 SLAPP, any "cause of action against a person arising from any act . . . in furtherance of the

21 person's right of . . . free speech . . . in connection with a public issue shall be subject to a special

22 motion to strike, unless the court determines that the plaintiff has established that there is a

23 probability that the plaintiff will prevail on the claim."  Cal. Civ. Proc. Code § 425.16(b)(1).

24   The California Supreme Court has established a two-step process for determining

25 whether a claim must be stricken under anti-SLAPP.  *See Equilon Enter. v. Consumer Cause,*

26 ———————————

27   [7]  Defendants may file anti-SLAPP motions in federal court to defend claims targeting their expressive activity.  *See, e.g., U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190

28 F.3d 963, 971-73 (9th Cir. 1999).

NOTICE OF MOTION AND MOTION TO STRIKE PURSUANT TO C.C.P. §425.16; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 10-CV-3328-RS

*Inc.*, 29 Cal. 4th 53, 67 (2002).  "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity," which includes any conduct "in furtherance of the defendant's right of . . . free speech under the United States or California Constitution in connection with a public issue."  *Id.* (brackets omitted; quoting Cal. Civ. Proc. Code § 425.16(b)(1)); *see also* Cal. Civ. Proc. Code § 425.16(e)(4).  Second, once the defendant has made a threshold showing that the claim arises from protected activity, the burden shifts to the plaintiff to demonstrate "a probability of prevailing on the claim."  *Equilon*, 29 Cal. 4th at 67; *see also* Cal. Civ. Proc. Code § 425.16(b)(1).

Reacting to court rulings that interpreted the statute too narrowly and did not go far enough to quash lawsuits that targeted free speech, the California Legislature amended the statute in 1997 to ensure that it "shall be construed broadly."  Cal. Civ. Proc. Code § 425.16(a).  The California Supreme Court subsequently declared that "the broad construction expressly called for in [Section 425.16] is desirable from the standpoint of judicial efficiency," and cautioned "that [a narrow construction] would serve Californians poorly."  *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1120-22 (1999).

Consistent with the broad interpretation expressly required by the statute, courts have applied Section 425.16 to claims arising from a variety of expressive works, including:  a provocative radio deejay's morning show (*Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 808 (2002)); a radio talk show about dating (*Ingels v. Westwood One Broad. Serv.*, 129 Cal. App. 4th 1050, 1059 (2005)); a segment of the television program *Celebrity Justice* about an actor's housekeeper (*Hall v. Time Warner, Inc.*, 153 Cal. App. 4th 1337, 1341 (2007)); a newspaper article (*Thomas v. L.A. Times Commc'ns LLC*, 189 F. Supp. 2d 1005, 1010 (C.D. Cal. 2002), *aff'd* 45 Fed. Appx. 801 (9th Cir. 2002)); an email message (*Troy Group, Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1155 (C.D. Cal. 2002)); and a website's listing of producer credits on a motion picture (*Kronemyer v. Internet Movie Data Base, Inc.*, 150 Cal. App. 4th 941, 949 (2007)).

> ### 1.   *Madden NFL* is an expressive work protected by the First Amendment.

Each of Plaintiffs' claims arises solely from the alleged use of their "likenesses" in EA's

8

*Madden NFL* videogames.  *See, e.g.*, FAC ¶¶ 1-2, 5.  It is settled that videogames are constitutionally protected works under the First Amendment.  *See, e.g., Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 958 (9th Cir. 2009) ("video games are a form of expression protected by the First Amendment"); *Kirby*, 144 Cal. App. 4th at 58 ("[v]ideo games are expressive works entitled to as much First Amendment protection as the most profound literature"); *Interactive Digital Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 957 (8th Cir. 2003) ("[i]f the first amendment is versatile enough to 'shield [the] painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll,'" there is "no reason why the pictures, graphic design, concept art, sounds, music, stories and narrative present in video games are not entitled to a similar protection" (citations omitted)).

The First Amendment's protection is not limited to select games with complex story lines, scripts, and dialogue.  *Romantics v. Activision Publ'g, Inc.*, 574 F. Supp. 2d 758, 765 (E.D. Mich. 2008).  Instead, the critical issue is whether the games have independent creative elements. *Id.*  In *Romantics*, for instance, the court considered whether *Guitar Hero*—which allows players to pretend they are in a rock band—was entitled to First Amendment protection.  *Id.* at 766.  The court easily concluded that the game was an expressive work because it "allow[ed] players to customize their game play experience, contain[ed] large amounts of original artwork, and require[d] complex synchronization so that the audio and visual elements of the [g]ame line up with a player's manipulation of the controller."  *Id.*; *see also E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 444 F. Supp. 2d 1012, 1039 (C.D. Cal. 2006), *aff'd* 547 F.3d 1095 (9th Cir. 2008) (holding that videogame that "features three virtual cities, each of which contains hundreds of interactive locations created by animated graphics[…] incorporates a narrative, and offers an array of musical soundtracks . . . clearly qualifies as an 'artistic work' entitled to First Amendment protection").

EA's *Madden NFL* videogames are comprised of various independent creative elements. The *Brown* court, considering the same game at issue here—*Madden NFL 09*—held it to be an "expressive work[], akin to an expressive painting that depicts celebrity athletes of past and present in a realistic sporting environment."  Slip Op. at 7 (attached at Lauridsen Decl., Ex. B).

9

As a review of the game itself demonstrates, *Madden NFL* combines complex computer engineering with artistic expression.  The game features original graphics, videos, sound, music and game scenarios, all keyed to the players' manipulation of the game controls and other input.  The games allow users to choose among professional teams, direct team strategy decisions and control individual athlete's movements in real time.  Users can take control of a team as it exists in EA's games or customize it based on their own preferences, altering the characteristics of individual players.  These features clearly demonstrate that the creativity and complexity of the *Madden NFL* videogames far exceeds that of other games found to be constitutionally protected expressive works.

**2.      EA's games relate to an "issue of public interest."**

*Madden NFL* also relates to a matter of public interest within the meaning of the anti-SLAPP statute.  Whether an "issue of public interest" is involved is construed broadly.  *See Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1039 (2008).  Matters of public interest are not restricted to traditional news reports about current events or government conduct.  Instead, "[t]he definition of 'public interest' within the meaning of [Section 425.16] has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society."  *Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468, 479 (2000).  "Taken together, these cases and the legislative history that discusses them suggest that 'an issue of public interest' . . . is *any issue in which the public is interested.*"  *Nygard*, 159 Cal. 4th at 1042.  "In other words, the issue need not be 'significant' to be protected by the anti-SLAPP statue—it is enough that it is one in which the public takes an interest."  *Id.*

Recent court decisions underscore the breadth of an "issue of public interest" for anti-SLAPP purposes.  For example, in *Nygard* the court held that allegedly defamatory statements about a Finnish businessman related to an issue of "public interest" within the meaning of anti-SLAPP because the Finnish public—the target audience of the defendant magazine—took an interest in him.  *Nygard*, 159 Cal. App. 4th at 1042.  And in *Seelig*, 97 Cal. App. 4th at 807-08, the court noted that the reality show "Who Wants to Marry a Millionaire" had been "of

10

significant interest to the public and the media" because of "what its advent signified about the condition of American society," and because of "the presumed millionaire lifestyle to be furnished by the groom."  *Id.*[8]

Building on the wide range of subjects above, courts have recognized the significant public interest in professional sports—both because of their broad impact on popular culture and the particular attention paid to the details of sporting events and athletes' performance.  In *Gionfriddo*, for example, the court noted that professional baseball "is followed by millions of people across this country on a daily basis," and concluded that information about professional baseball players "commands a substantial public interest."  94 Cal. App. 4th at 411.  As for professional football, a California court has held that "public interest considerations . . . apply with equal force to professional football."  *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 795-96 (1995).  Another court has explained that "the American public is fascinated by professional sports," going on to hold that it "must affirm the proposition that interest in professional football must be deemed an important incident among many incidents, of a society founded upon a high regard for free expression."  *Chuy v. Phil. Eagles Football Club*, 431 F. Supp. 254, 267 (E.D. Penn. 1977), *aff'd* 595 F.2d 1265 (3d Cir. 1979) (en banc).

In *Keller*, Judge Wilken assumed that right-of-publicity claims that challenged EA's alleged use of the likenesses of student-athletes in its college football and basketball games arose from protected activity.  *Keller*, 2010 WL 530108, at *10.  Just so here.  If a magazine interview about a Finnish employer, a deejay's rant about a reality show contestant, and a radio talk show host's diatribe against a caller, all relate to matters of public interest under the anti-SLAPP statute, so too does an EA videogame about professional football.

EA has satisfied its initial burden of establishing that *Madden NFL* is an expressive work protected by the First Amendment and relates to a matter of public interest.  Accordingly, the

---

[8]    *See also Ingels*, 129 Cal. App. 4th at 1058 (on-air exchange from a talk radio show about dating held to be related to an issue of public interest); *Kronemyer*, 150 Cal. App. 4th at 949 (website listing the producer credits for the movie "My Big Fat Greek Wedding" held to be a topic of "widespread public interest"); *Hall*, 153 Cal. App. 4th ar 1346-47 (segment on the television show *Celebrity Justice* about Marlon Brando's housekeeper satisfied the anti-SLAPP statute's public interest requirement).

1    burden shifts to Plaintiffs to establish that they have a probability of succeeding on the merits.

2    As explained below, they cannot meet this burden.

3    **B.      Plaintiffs' Claims Fail as a Matter of Law.**

4         All of Plaintiffs' claims must be stricken under California's anti-SLAPP statute because

5    they fail as a matter of law.

6         **1.      Plaintiffs' claims are barred by the First Amendment.**

7         The right of publicity is not of constitutional dimension; it arises either by statute or

8    under the common law.  "[E]ssentially [it is] an economic right … to prevent others from

9    misappropriating the economic value generated by the celebrity's fame through the

10   merchandising of the 'name, voice, signature, photograph, or likeness' of the celebrity."  *Comedy*

11   *III*, 25 Cal. 4th at 403 (citations omitted).  The Restatement explains that the right of publicity

12   protects against "appropriat[ing] the commercial value of a person's identity by using without

13   consent the person's name, likeness, or other indicia of their identity *for purposes of trade*."

14   *Restatement (Third) of Unfair Competition*, § 46 (emphasis added).  "The rationales underlying

15   recognition of a right of publicity are generally less compelling than those that justify rights in

16   trademarks or trade secrets."  *Id.*, § 46, cmt. c.

17        Courts have long cautioned that "[t]he right of publicity has a potential for frustrating"

18   constitutionally protected speech.  *Comedy III*, 25 Cal. 4th at 397.  Countless expressive works,

19   including biographies, novels, magazine articles, movies, plays, songs, paintings, documentaries,

20   and videogames, incorporate the name or likeness of real-life individuals.  *See* E. Volokh,

21   *Freedom of Speech and the Right of Publicity*, 40 Hous. L. Rev. 903, 904, 908 & n. 20.  To

22   protect such works, the California Supreme Court "has subjected the 'right of publicity' under

23   California law to a narrowing interpretation which accords with First Amendment values."

24   *Cher v. Forum Int'l*, 692 F.2d 634, 638 (9th Cir. 1982).

25        Various tests have arisen to ensure that right-of-publicity claims do not chill speech.

26   These tests include the transformative-use test, the *Rogers* test, and the public-interest test.

27   Under any of these tests, EA's anti-SLAPP motion to strike should be granted.

28

### a.    The transformative-use test.

The California Supreme Court articulated the transformative-use test in *Comedy III*.  In that case, the owner of the rights to The Three Stooges sued an artist who sold t-shirts and prints featuring literal images of the trio.  25 Cal. 4th at 393-94.  The California Supreme Court upheld a judgment against the artist, finding that the First Amendment did not bar liability.  *Id.* at 409-10.

In reaching its decision, the court formulated "what is essentially a balancing test between the First Amendment and the right of publicity based on whether the work in question adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation."  *Id.* at 391 (emphasis added).  "[T]he inquiry is whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question."  *Id.* at 406.  "We ask, in other words, whether a product containing a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness."  *Id.*  Applying this test in *Comedy III*, the court found that since the defendant's t-shirts contained only a literal representation of The Three Stooges—no other creative elements or expression—the First Amendment did not foreclose liability.  *Id.* at 410.

Two years later, the California Supreme Court reaffirmed that the test turns on whether "*a product containing* a celebrity's likeness is so transformed that it has become primarily the defendant's own expression rather than the celebrity's likeness."  *Winter v. D.C. Comics*, 30 Cal. 4th 881, 888 (2003) (emphasis added).  There, musicians Johnny and Edgar Winter sued a publisher of comic books that featured characters named "Johnny and Edgar Autumn," whose faces resembled the Winters.  *Id.* at 886.  But the characters were depicted as "half-worm, half-human offspring" fathered by a "supernatural worm creature[.]"  *Id.*  Citing *Comedy III*, the court reaffirmed that the crucial issue is whether the defendant's work "contain[s] significant creative elements that transform [it] into something more than mere celebrity likenesses."  *Id.* at 885.  The court "reviewed the comic books" and could "readily ascertain that they are not just conventional depictions of plaintiffs but contain significant expressive content other than

13

1   plaintiffs' mere likenesses." *Id.* at 890.

2        Other courts applying the transformative-use test have similarly focused on whether

3   defendant's work, as a whole, is transformative.  In *Kirby*, for example, where the plaintiff sued

4   Sega for allegedly using her likeness in a videogame, the California Court of Appeal correctly

5   pointed out that the test "requires the court to examine and compare the allegedly expressive

6   work with the images of the plaintiff to discern if the defendant's work contributes significantly

7   distinctive and expressive content."  144 Cal. App. 4th at 61.  Thus, the game's theme music,

8   story lines, and different levels of difficulty all were relevant to the court's conclusion that the

9   plaintiff's image was not the "sum and substance" of the game, and that the use thus was

10  transformative.  *Id.*  The Sixth Circuit reached a similar result in *ETW Corp. v. Jireh Publ'g*, 332

11  F.3d 915 (6th Cir. 2003), where Tiger Woods' licensing agent sued the publisher of a painting by

12  artist Rick Rush showing Woods in three different poses at the Masters Tournament with the

13  likenesses of famous golfers of the past looking down on him.  The court explained that "Rush's

14  work does not capitalize solely on a literal depiction of Woods.  Rather, Rush's work consists of

15  a collage of images in addition to Woods' image which are combined to describe, in artistic

16  form, a historic event in sports history and to convey a message about the significance of Woods'

17  achievement in that event."  *Id.* at 938.  "Because Rush's work has substantial transformative

18  elements," the court concluded that "Woods' right of publicity must yield to the First

19  Amendment."  *Id.*

20        Here, the transformative-use test requires the Court to consider whether *Madden NFL*

21  contains "significant transformative elements," so that it is primarily EA's own creative

22  expression rather than merely a depiction of Plaintiffs' alleged likenesses.  *Comedy III*, 25 Cal.

23  4th at 407.  A review of *Madden NFL 09* confirms that the games are transformative.  EA's

24  *Madden NFL* games contain an array of original graphics, videos, sound effects, and game

25  scenarios, all keyed to users' strategic decisions and manipulation of the game controls.  These

26  elements are synchronized to deliver television-quality images and realistic sounds, such as the

27  crunch of football pads, the audible of the quarterback, and play-by-play commentary.  The game

28  allows the user to become the storyteller by directing strategy decisions and controlling

14

1   individual athlete's movements in real time.  Users can operate a team as initially configured in

2   EA's games, or can customize the team based on their own preferences altering the

3   characteristics of individual players.  The interactive environment extends beyond single games,

4   allowing users to control a franchise for a season or more and, in effect, to create an original

5   narrative of that franchise's history.

6           These creative elements easily satisfy the transformative-use test.  As the *Brown* court

7   held, "[t]he Madden games contain numerous creative elements" and "manifest their designers'

8   creative vision."  Slip Op. at 7 (Attached at Lauridsen Decl., Ex. B).  Plaintiffs' alleged

9   likenesses are surrounded by innumerable other creative elements.  In other words, the likenesses

10  would be only one of the countless "raw materials" from which EA creates its expressive work.

11  As discussed above, the game contains so many other creative audiovisual, software, and

12  computer-engineering elements that an athlete's likeness cannot even remotely be considered the

13  "sum and substance" of the game.

14          In *Keller*, 2010 WL 530108 at *3-7, Judge Wilken ruled that the transformative-use test

15  did not bar the claims of college athletes regarding EA's alleged use of their likenesses in its

16  college football and basketball videogames.  The *Keller* order is currently on appeal before the

17  Ninth Circuit.  Judge Wilken ruled on EA's First Amendment defense based in large part on the

18  Ninth Circuit's original decision in *Hilton v. Hallmark Cards*, 580 F.3d 874 (9th Cir. 2009)

19  ("*Hilton I*").  *See Keller*, 2010 WL 530108 at *3-7.  Following Judge Wilken's ruling, however,

20  the Ninth Circuit revised its opinion, materially altering the sections on which Judge Wilken

21  relied.  *See Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010) ("*Hilton II*") (amended

22  order).  In ruling on EA's motions, Judge Wilken lacked the benefit of three major revisions to

23  the *Hilton* order.  First, the revised opinion eliminated language that appeared to raise the bar for

24  challenging publicity right claims that target expressive works by describing *Comedy III* and

25  *Winter* as "bookends" of misappropriation claims.  *Compare Hilton I*, 580 F.3d at 890 with

26  *Hilton II*, 599 F.3d at 911.  Second, the revised opinion clarified that the transformative-use test

27  does not require fanciful modifications of the individual likeness and, instead, can be satisfied by

28

15

surrounding a realistic likeness with additional creative elements.[9]  *Compare Hilton I*, 580 F.3d at 891 (characterizing protected works as having "total, phantasmagoric conversion" of plaintiffs' likenesses) with *Hilton II*, 599 F.3d at 911 (holding that "a work need not be phantasmagoric as in *Winter* or fanciful as in *Kirby* in order to be transformative").  Third, the revised opinion signaled that the Ninth Circuit may not limit itself to the transformative-use test when evaluating right-of-publicity claims that challenge expressive works.  *See Hilton II*, 599 F.3d at 909 n.11.

Because EA's alleged use of Plaintiffs' likenesses in its game is transformative, the Court should strike Plaintiffs' claims pursuant to the California anti-SLAPP statute.

### b.    The *Rogers* test.

Following *Hilton II* it is clear that this Circuit is open to applying a different test than the transformative-use test—one that is less prone to misinterpretation and more protective of free expression.  In *Hilton II*, the Ninth Circuit deferred "for another day" the question of whether the First Amendment affords broader protection against right-of-publicity claims than is provided by the tests set forth by California state courts.  *Hilton II*, 599 F.3d at 909 n.11.

*Rogers v. Grimaldi*, 875 F.2d 994, 996-97 (2d Cir. 1989), offers a more comprehensive approach to balancing First Amendment concerns against a right-of-publicity claim targeting an expressive work.  The Ninth Circuit has adopted *Rogers'* nearly identical test for determining

---

[9]    A recent California Court of Appeal decision engaged in the same unjustifiably narrow interpretation of the transformative-use test rejected by *Hilton II*.  *No Doubt v. Activision Pub'g*, No. B223996, 2011 WL 507479 (Cal. Ct. App. Feb. 15, 2011).  The *No Doubt* majority mistakenly suggested that the person's image itself must be transformed—a conclusion belied by express language in *Comedy III* and *Winter*.

Not only is the majority's rationale incorrect, but *No Doubt* is distinguishable on its facts – it was a contract case, and should have been decided without reaching the constitutional issues.  Activision entered into an agreement with the band No Doubt for its assistance in creating the game *Band Hero*, the right to use its songs in the game, and rights to use the band members' names and likenesses for contractually-specified purposes.  No Doubt expressly retained the right to approve Activision's use of names and likenesses.  Activision ignored this contractual guarantee and used the names and likenesses in unapproved ways.  No Doubt sued Activision for breach of contract, fraud and unauthorized use of the likenesses.  The equitable concerns that drove the *No Doubt* decision do not exist here.  Here, there is no relationship, let alone agreement, between EA and Plaintiffs; EA made no promises to Plaintiffs; Plaintiffs have no approval rights over EA's works, and Plaintiffs did not provide their cooperation in exchange for an agreement by EA to use their names and likenesses in a specific manner.

1   whether the First Amendment protects expressive works against Lanham Act claims. *Mattel Inc.*

2   *v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002); *E.S.S.*, 547 F.3d at 1099; *see also*

3   *Capcom Co. v. MKR Group, Inc.* No. C. 08-0904 RS, 2008 WL 4661479 at *13 (N.D. Cal. Oct.

4   20, 2008); *Stewarts Surfboards, Inc. v. Disney Book Group*, Case No. CV 10-2982, Slip Op. at 4-

5   7 (C.D. Cal. May 11, 2011) (attached at Lauridsen Decl., Ex. C). In *Rogers*, Ginger Rogers

6   brought Lanham Act, right-of-publicity and other claims against the producers of the film *Ginger*

7   *and Fred*—a title that alluded to Rogers' collaboration with Fred Astaire. 875 F.2d at 996-97.

8   The film was not about the iconic American performers, but about two fictional Italian cabaret

9   singers who once earned their livings by imitating the real Ginger and Fred. *See id.*

10       Addressing the Lanham Act claim first, the *Rogers* court reasoned that "[t]itles, like the

11   artistic works they identify, are of a hybrid nature, combining artistic expression and commercial

12   promotion." *Id.* at 998. Consumers of artistic works therefore "have a duel interest" in "not

13   being misled" and in "enjoying the results of the author's freedom of expression." *Id.*

14   Accordingly, "the expressive element of titles requires more protection than the labeling of

15   ordinary commercial products." *Id.* The court concluded that, "[b]ecause overextension of

16   Lanham Act restrictions in the area of titles might intrude on First Amendment values, we must

17   construe the Act narrowly to avoid such a conflict," and allow Lanham Act claims to proceed

18   "only where the public interest in avoiding consumer confusion outweighs the public interest in

19   free expression." *Id.* at 998-99. That balance, the court held, must favor the First Amendment

20   "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some

21   artistic relevance, unless the title explicitly misleads as to the source or the content of the work."

22   *Id.* at 999. Applying that two-part test, the court dismissed Rogers' Lanham Act claim. *Id.* at

23   1001-02.

24       Turning next to Rogers' right-of-publicity claim, the court cautioned that such claims

25   pose even greater dangers to free speech. "Because the right of publicity, unlike the Lanham

26   Act, has no likelihood of confusion requirement," the court warned that "it is potentially more

27   expansive than the Lanham Act." *Id.* at 1004. "Perhaps for that reason, courts delineating the

28   right of publicity, more frequently than in applying the Lanham Act, have recognized the need to

limit the right to accommodate First Amendment concerns." *Id.* Borrowing heavily from its Lanham Act analysis, the court predicted that state law would not "permit the right of publicity to bar the use of a celebrity's name in a movie title unless the title was 'wholly unrelated' to the movie or was 'simply a disguised commercial advertisement for the sale of goods or services.'" *Id.* at 1004 (emphases added; citation omitted). Applying that test, the court held that Rogers' right-of-publicity claim also was barred by the First Amendment. *Id.* at 1004-05.

In applying the *Rogers* test to Jim Brown's Lanham Act claim, the court in *Brown v. Electronic Arts* held the claim to be barred on First Amendment grounds. Slip Op. at 7-9 (attached at Lauridsen Decl., Ex. B). As an initial matter, the Brown court found that

> [t]he Madden games contain numerous creative elements. Although the games seek to realistically replicate NFL football, they use creative means to achieve that goal. The games contain virtual stadiums, athletes, coaches, fans, sound effects, music and commentary, all of which are created or compiled by the games' designers. By manipulating virtual athletes and franchises as they wish, video game players interact with the designers' creative interpretation of real-world NFL game play. The football season can itself become a storyline in *Madden NFL*, as game players navigate their chosen athletes and franchises towards victory.

*Id.* at 7. For the first prong of the *Rogers* test, the *Brown* court found that even assuming that EA had used Brown's likeness as a virtual player on one of the teams in the game, the "[u]se of a legendary NFL player's likeness in a game about NFL football is clearly relevant." *Id.* at 8.[10] For the second *Rogers* prong, the court held that the "[m]ere use of [Brown's] likeness, without more, is insufficient to make the use explicitly misleading." *Id.* "[I]t would require a leap of logic to conclude that the anonymous, mis-numbered player's presence in the games equates to Brown's endorsement of the games. Moreover, the virtual player's mere presence in *Madden NFL* does not constitute an *explicit* attempt to convince consumers the [sic] Brown endorsed the games." *Id.* at 9. The *Brown* court's logic applies equally here.

---

[10] To be artistically relevant, a work need not be "about" a mark or likeness at issue, and the mark or likeness need not be "necessary" for the work's expression. For example, in *Stewart*, the court held that the use of plaintiff's surfboard mark on the cover of defendant's book *Hannah Montana: Rock the Waves* was artistically relevant even though the book was not about plaintiff's brand and use of the mark was not necessary for the story. Slip Op. at 8-9 (attached at Lauridsen Decl., Ex. C).

The Court should apply the *Rogers* test for right-of-publicity claims and reach the same outcome here as in *Brown*. First, since Plaintiffs played football for NFL teams, EA's alleged inclusion of their likenesses is not "wholly unrelated" to the content of *Madden NFL*, a game that allows users to experience NFL football in an interactive virtual environment. The *Rogers* test already has been applied in an analogous context—to bar right-of-publicity claims arising from the alleged use of a band's "distinctive sound" in the band-simulation game *Guitar Hero*. *Romantics*, 574 F. Supp. 2d at 766. "Given that the purpose of the Game is to allow [users] to pretend they are in a rock band," the court concluded that "the Song is not wholly unrelated to the content of the work." *Id.* Here, the strong relationship between the alleged likenesses of former professional football players and the *Madden NFL* game—a game that allows users to pretend they are professional football players—is beyond dispute.

Second, Plaintiffs rightly do not claim that EA's alleged use of their likenesses is "simply a disguised commercial advertisement" for the sale of EA's games or some other product. Applying the *Rogers* test to dismiss the Lanham Act claim in *Mattel*, the Ninth Circuit noted that "[t]he *only* indication that Mattel might be associated with the song is the use of Barbie in the title; if this were enough to satisfy this prong of the *Rogers* test, it would render *Rogers* a nullity." 296 F.3d at 902. Discussing application of the test to a trademark claim in *E.S.S.*, the Ninth Circuit again observed that "a trademark infringement claim presupposes use of the mark. If that necessary element in every trademark case vitiated a First Amendment defense, the First Amendment would provide no defense at all." 547 F.3d at 1099. Here, the only indication that Plaintiffs might be associated with EA's videogame is the alleged use of their likenesses within the game (not even in the title). FAC ¶ 34. That use alone, as a matter of law, does not suffice to satisfy the second prong of the *Rogers* test in right-of-publicity cases either.

The Court should strike Plaintiffs' claims pursuant to the California anti-SLAPP statute.

### c.    The public-interest test.

Courts in California and elsewhere have held that the public's interest in information about sports and athletes justifies full First Amendment protection for expressive works that incorporate athletes' names, statistics, and other biographical information. This constitutional

19

NOTICE OF MOTION AND MOTION TO STRIKE PURSUANT TO C.C.P. §425.16; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 10-CV-3328-RS

550618.03

1   public-interest defense is yet another barrier to Plaintiffs' right-of-publicity claims.

2   In *Gionfriddo*, 94 Cal. App. 4th 400, (2001), for example, the defendant used baseball

3   players' names, photographs, and biographical information, as well as video clips of their on-the-

4   field performances, in game programs, videos, and online features, all without the players'

5   permission. *Id.* at 410. Dismissing the players' right-of-publicity claim, the court held that

6   "[t]he recitation and discussion of factual data concerning the athletic performance of these

7   plaintiffs commands a substantial public interest, and, therefore, [are] a form of expression due

8   substantial constitutional protection." *Id.* at 411. The court concluded that "the public interest

9   favoring the free dissemination of information regarding baseball's history far outweighs any

10  proprietary interests at stake," and that the plaintiffs' right-of-publicity claim thus failed as a

11  matter of law. *Id.* at 415.

12  Similarly, in *C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media,*

13  *L.P.*, 505 F.3d 818 (8th Cir. 2007), the plaintiff marketed fantasy online baseball games that

14  incorporated the actual names, statistics, and other biographical data of Major League Baseball

15  players. *Id.* at 823. The plaintiff initially licensed this information from the Major League

16  Baseball Players' Association. But when the association declined to renew the license, the

17  plaintiff sought a judicial declaration of its First Amendment right to use the players' information

18  without a license. *See id.* at 821. The Eighth Circuit agreed that the First Amendment protected

19  the plaintiff's use of the athletes' names and other information. As the court explained, "the

20  information used in [the plaintiff's] fantasy baseball games is all readily available in the public

21  domain, and it would be strange law that a person would not have a first amendment right to use

22  information that is available to everyone." *Id.* at 823.[11]

23  As in *Gionfriddo*, *C.B.C.*, and these other cases, the Court should find that the First

24  Amendment protects EA's alleged use in its games of Plaintiffs' likenesses. Plaintiffs'

25  _____

26  [11]   *See also CBS Interactive v. Nat'l Football League Players Ass'n*, 259 F.R.D. 398, 417-18 (D. Minn. 2009) (same; First Amendment protects use of players' names, statistics, and other information in fantasy football game); *Montana*, 34 Cal. App. 4th at 795 (dismissing NFL

27  quarterback's right-of-publicity claims based on sale of posters featuring his likeness; posters were "a form of public interest presentation to which protection must be extended").

28

20

550618.03

1   complaint recognizes the vast popularity of NFL football and historic NFL teams.  FAC ¶ 3.

2   Plaintiffs' complaint further recognizes that all the information allegedly used by EA is publicly

3   available.  *See* FAC ¶ 39 (citing NFL team media guides).  This factual, public-domain

4   information about former NFL players commands a substantial public interest, as courts have

5   repeatedly recognized.  *See C.B.C.*, 505 F.3d at 823-24; *CBS Interactive*, 259 F.R.D. at 417-18;

6   *Gionfriddo*, 94 Cal. App. 4th at 411; *Montana*, 34 Cal. App. 4th at 794-96.  The First

7   Amendment protection extended to entertainment websites (*Gionfriddo*), fantasy sports games

8   (*C.B.C.* & *CBS Interactive*) and commemorative posters (*Montana*) is not based on the

9   protection of strict "news" reporting.  "Speech that entertains, like speech that informs, is

10  protected by the First Amendment because '[t]he line between the informing and the entertaining

11  is too elusive for the protection of that basic right.'"  *C.B.C.* 505 F.3d at 823 (citation omitted).

12          Based on the public's interest in information about sports, EA's alleged use of Plaintiffs'

13  likenesses (and other publicly available information) is entitled to First Amendment protection.

14  The Court, therefore, should strike Plaintiffs' claims pursuant to the California anti-SLAPP

15  statute.

16                  **d.      Meritorious misappropriation claims target advertisements.**

17          In contrast to the allegations here, successful misappropriation claims generally arise

18  from the use of the plaintiff's name or likeness in advertising or merchandising of non-

19  transformative works.[12]  The line of authority restricting the use of a celebrity's likeness in

20  commercial advertising "concerns only the market which exists in our society for the

21  exploitation of celebrity to sell products ... ."  *White*, 971 F.2d at 1401 n.3.  This is not the case

22  here.  *Madden NFL* is not commercial speech—i.e. "speech that does 'no more than propose a

23  commercial transaction.'"  *Virginia State Bd. of Pharmacy v. Va. Citizens Consumer Counsel,*

24  _____

25  [12]      *See, e.g., Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 691 (9th Cir. 1998) (use of
     pitcher's image in beer advertisement); *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 809 (9th Cir.
26   1997) (use of animatronic figures of television characters in airport bars); *Abdul-Jabbar v. Gen.
     Motors Corp.*, 85 F.3d 407, 409 (9th Cir. 1996) (use of basketball star's former name in
27   television car commercial); *White*, 971 F.2d at 1396 (use of game-show hostess's identity in
     advertisements for electronic products); *Midler*, 849 F.2d at 461-62 (use of sound-alike of
28   famous singer in car commercial featuring singer's hit song); *Motschenbacher*, 498 F.2d at 822
     (use of famous race car driver's distinctive car in cigarette commercial).

*Inc.*, 425 U.S. 748, 772 n. 24 (1976); *see also Restatement (Third) Of Unfair Competition* § 47, comment c.  Here, Plaintiffs rightly do not claim that EA's alleged use of their likenesses is in an advertisement or an endorsement to promote an unrelated product.  EA's works, therefore, are entitled to the full protection of the First Amendment as recognized by the tests discussed above.

      **2.**     **Section 3344(d)'s public-affairs exception bars Plaintiffs' statutory claim.**

      California Civil Code Section 3344(d) exempts from liability the "use of a name … or likeness in connection with any … public affairs, or sports broadcast or account."  This exemption affords even broader protection against statutory misappropriation claims than the First Amendment does.  As the Ninth Circuit recognized, "the section 3344(d) defense is not coextensive with the First Amendment.  Rather, it is designed to avoid First Amendment questions in the area of misappropriation by providing extra breathing space for the use of a person's name in connection with matters of public interest."  *New Kids on the Block v. News Am. Publ'g Inc.*, 971 F.2d 302, 310 n.10 (9th Cir. 1992).  Laws regulating speech must be "authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression."  *Gooding v. Wilson*, 405 U.S. 518, 522 (1972).  In other words, courts must err on the side of free expression when construing legislation that purports to regulate speech.

      Here, this principle dictates a narrow construction of the liability-creating parts of Section 3344 and a broad construction of its public-affairs exemption.  Courts have applied the "public affairs" exception broadly to protect a variety of sports-related expressive works.  In *Dora v. Frontline Video, Inc.*, the exempt work was a surfing documentary, 15 Cal. App. 4th 536, 545-46 (1993); in *Gionfriddo*, the exempt works included baseball websites and programs, 94 Cal. App. 4th at 410-11; and in *Montana*, the exempt work was a poster about NFL football, 34 Cal. App. 4th at 792.  If those works were exempt under Section 3344(d), then so too are EA's games about NFL football.

      The Court, therefore, should strike under California's anti-SLAPP statute Plaintiffs' statutory right-of-publicity claim.

3.     **Plaintiffs' ancillary claims also must be stricken.**

Because Plaintiffs cannot demonstrate a probability of overcoming any of the defenses to their statutory and common-law right-of-publicity claims, Plaintiffs' ancillary conversion, trespass to chattels and unjust enrichment claims also must be stricken.  Each of these other claims challenges EA's alleged use of Plaintiffs' likenesses in its videogames, and is subject to the same defenses as the right-of-publicity claims.  *See, e.g., E.S.S.*, 547 F.3d at 1101; *see also Gionfriddo*, 94 Cal. App. 4th at 407.

Plaintiffs' third cause of action for conversion and fourth cause of action for trespass to chattel also fail because Plaintiffs do not allege that EA dispossessed them of their interests in tangible personal property.  *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1565 (1996) ("Courts have traditionally refused to recognize as conversion the unauthorized taking of intangible interests that are not merged with, or reflected in, something tangible."); *GNI Waterman LLC v. A/M Valve Co. LLC*, No. CV F 07-0863, 2007 WL 2669503, at *11 (E.D. Cal. Sept. 7, 2007) (holding that allegations of interference with the "ownership right to the proprietary forms, designs and patterns" does not state a claim for trespass to chattels).  Here, because publicity rights are intangible property and not merged with or reflected in something tangible taken by EA (for example, a stock certificate), Plaintiffs fail to state a claim for conversion or trespass to chattels.  *See also Beilstein-Institut Zur Forderung Der Chemischen Wissenschaften et al. v. MDL Information Sys., Inc.*, No. C. 04-5368 SI, 2006 WL 3218719, at *3-4 (N.D. Cal. Nov. 7, 2006).

Plaintiffs' fifth cause of action for unjust enrichment is not recognized under California law absent independent grounds for imposing an implied contract or constructive trust on the defendant.  "There is no cause of action for unjust enrichment.  Rather, unjust enrichment is a basis for obtaining restitution based on quasi-contract or imposition of a constructive trust." *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1490 (2006); *accord Roots Ready Made Garments v. Gap Inc.*, No. C. 07-3363 CRB, 2008 WL 239254, at *8 (N.D. Cal. Jan. 28, 2008) (dismissing unjust enrichment claim with prejudice).  Plaintiffs have neither alleged that an implied contract exists between the parties nor that a constructive trust would be appropriate.

23

1    Thus, Plaintiffs fail to state a claim for unjust enrichment because California law does not

2    recognize such a claim based on bare allegations that a defendant has unjustly benefitted.

3                                    **IV.    CONCLUSION**

4            For these reasons, EA respectfully requests that the Court strike Plaintiffs' complaint

5    pursuant to California Code of Civil Procedure § 425.16.

6

7    Dated:  June 9, 2011                                KEKER & VAN NEST LLP

8

9

                                              By:  */s/ R. James Slaughter*
10                                                 R. JAMES SLAUGHTER
                                                   R. ADAM LAURIDSEN
11                                                 Attorneys for Defendant
                                                   ELECTRONIC ARTS INC.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                             24

550618.03