**\*\*E-filed 3/29/12\*\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MICHAEL E. DAVIS, aka TONY DAVIS, VINCE FERGAMMO, and BILLY JOE DUPREE, on behalf of themselves and all other similarly situated,<br><br>Plaintiffs,<br>v.<br><br>ELECTRONIC ARTS INC.,<br><br>Defendant. | No. 10-03328 RS<br><br>**ORDER DENYING DEFENDANT'S MOTIONS TO DISMISS AND TO STRIKE UNDER CCP § 425.16** |

## I. INTRODUCTION

Former National Football League ("NFL") players Michael Davis, Vince Ferragamo, and Billy Joe Dupree bring this putative class action against videogame developer Electronic Arts Inc. ("EA"), alleging their likenesses were used without authorization in the EA video game, *Madden NFL*. Defendants move to dismiss the first amended complaint ("FAC") under Federal Rule of Civil Procedure 12(b)(6) and, separately, move to strike the complaint pursuant to California's Anti-SLAPP law. Upon consideration of the briefs, oral argument, and for the reasons explained below, both of defendant's motions must be denied.

## II. FACTUAL & PROCEDURAL BACKGROUND

1    EA is a leading developer and publisher of video games.  Plaintiffs, three retired NFL
players, contend EA used their likenesses in its video game *Madden NFL*.  According to plaintiffs,
EA's *Madden NFL* franchise is the best-selling sports video game of all time, with sales of more
than 85 million copies and revenues in excess of $4 billion.  The company has released a new
version of *Madden NFL* each year for approximately twenty years, including editions tailored to
different gaming systems.  The FAC alleges that at least five editions of *Madden NFL*, designed for
distinct gaming consoles, and released over a number of years, use plaintiffs' likenesses without
authorization.[1]  FAC ¶ 75.

*Madden NFL* permits users to simulate an NFL football game.  The game is elaborate and
entails many creative and expressive features, including extensive audiovisual effects.  EA itself
represents *Madden NFL* as highly realistic.  It features depictions of actual stadiums, as well as
current teams, with accurate rosters, colors, logos, and uniforms.  FAC ¶ 25-27.  According to the
FAC, many of these game elements are covered by licensing deals.  For example, EA has licensed
the rights to use active players' likenesses and biographical information, and holds similar licenses
covering coaches, announcers, and select retired players.  According to the FAC, it was publicly
reported that EA paid the licensing division of the NFL Players Association approximately $35
million for the use of active players' likenesses.

Significantly, for purposes of this action, those playing *Madden NFL* may select specific
teams to compete against each other.  Plaintiffs allege that some recent versions of the game even
permit gamers to choose famous "historical" teams, with rosters populated by players closely
resembling NFL retirees, including plaintiffs Davis, Ferragammo, and Dupree.  At least in the most
recent versions of the game, the avatars allegedly representing former players are not identified by
name or jersey number.[2]  According to the FAC, however, the representative avatars are

---

[1] According to EA, only the editions designed for the Sony Playstation 2 and the Microsoft Xbox gaming consoles feature the "historic" players at issue in this action.  For purposes of defendant's motion to dismiss, however, the Court must accept plaintiffs' allegations as true.  *See* also *infra* note 4 (addressing cross-motions for judicial notice).

[2] According to plaintiffs, in older versions of *Madden NFL*, EA accurately listed most retired players' jersey numbers.  It stopped that practice in 2004, listed different numbers, and added functionality permitting gamers to change the historic players' numbers themselves.  Players' names may now also be edited.  *See* Henri Decl. in Supp. of Pls.' Opp'n, Ex. 7 (*Madden NFL* official guide

preprogrammed by EA to reflect accurately a variety of individual, physical and biographical characteristics that precisely correspond to the plaintiffs' own profiles as active players – including height, weight, skin tone, position, team, years in the league, and athletic ability (speed, agility, etc.). Notably, for purposes of its present motions, EA accepts plaintiffs' allegations that it used some protectable element of plaintiffs' likenesses in *Madden NFL*.

Plaintiffs filed this putative class action on behalf of themselves and approximately 6,000 other former NFL players whose likenesses, they claim, appear in certain editions of *Madden NFL*. The FAC advances five claims for relief: (1) violations of California's statutory right of publicity, California Civil Code § 3344, (2) violations of California's common law right of publicity, (3) conversion, (4) trespass to chattels, and (5) unjust enrichment. Discovery is ongoing. Defendants now move to dismiss with prejudice, and separately, to strike under California's Anti-SLAPP law[3] which plaintiffs oppose.[4]

---

for the 2007 to 2008 versions noted, with respect to historical players, "[t]he players do not have their actual names but you can edit them if you want optimum realism.").

[3] In support of its motions, EA requests judicial notice of: (1) the content of the Playstation 2 and Xbox editions of *Madden NFL*, (2) ¶¶ 7-13 of the Frazier Declaration, (3) and district court orders disposing of motions to dismiss in *Kent v. Universal Studios, Inc., et al.*, No. C08-2704, *Brown v. Elec. Arts Inc.*, No. C09-1598, and *Stewart Surfboards, Inc. v. Disney Book group*, No. C10-2982. Although the Court is ordinarily limited to considering the pleadings and any attached exhibits upon a motion to dismiss, here, taking judicial notice of *Madden NFL*'s content is appropriate because the authenticity of the material submitted by EA is not subject to dispute. *Keller v. Electronic Arts, Inc.*, 2010 WL 530108, at *5 n.2. The Court may also take judicial notice of the district court opinions, since they are matters of public record. *See* Fed. R. Evid. 201(b), *and Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). The Frazier Declaration simply describes *Madden NFL* in terms favorable to EA. Plaintiffs oppose judicial notice of the Frazier Declaration because it also contains statements that the FAC specifically contradicts. Having reviewed *Madden NFL*, there is no reason to take judicial notice of the contents of the Frazier Declaration, and EA's request is denied to that extent.

[4] Plaintiffs have also filed a motion requesting judicial notice of: (1) briefs, declarations, and expert reports and testimony offered by EA in a number of other cases, (2) two licensing agreements between EA and NFL-related entities, (3) official media guides from several NFL teams, (4) numerous screen shots from *Madden NFL*, (5) various printouts from EA's website, and (6) the official EA user guides for *Madden NFL* from 2001 to 2009. EA opposes notice of all but the screen shots, which are hereby noticed by the Court because their authenticity is not disputed. The court filings plaintiffs submit are all matters of public record and are therefore also amenable to judicial notice. Fed. R. Evid. 201(b). The FAC alleges, and the Court accepts for purposes of the instant motions, that EA has entered into various licensing agreements with the NFL Players Association and other NFL entities. It is not necessary to take notice of their contents. The same is true for the NFL team media guides; plaintiffs have alleged, and it is undisputed for purposes of this motion, that *Madden NFL* misappropriated plaintiffs' likenesses. While accepting statements by EA alleged in the complaint, the Court need not take judicial notice of other statements made on EA's website or in the game user guides to resolve the instant motions because how the *Madden NFL* was

### III. LEGAL STANDARD

A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 U.S. at 570. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555) ("threadbare recitals of the elements of the claim for relief, supported by mere conclusory statements," are not taken as true). In dismissing a complaint, leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995). When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

### IV. DISCUSSION

A. Motion to Dismiss

    1. California Rights of Publicity

The FAC's first and second claims for relief articulate violations of plaintiffs' California statutory and common law rights of publicity. To state a right of publicity claim under California common law, plaintiffs must allege: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Hilton v. Hallmark Cards,* 580 F.3d 874, 889 (9th Cir. 2009) (quoting *Downing v. Abercrombie & Fitch,* 265 F.3d 994, 1001 (9th Cir. 2001)). The statutory right is created by Civil Code § 3344(a), which provides, in relevant part:

---

marketed is legally irrelevant. *See Winter v. DC Comics*, 30 Cal. 4th 881, 891 (2003). As for these materials, the motion is denied.

> Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent ... shall be liable for any damages sustained by the person or persons injured as a result thereof.

To establish the statutory right, plaintiff must show, in addition to the common law elements, a knowing use of the plaintiff's name or likeness. *Kirby*, 144 Cal. App. 4th at 55. For purposes of these motions, however, neither party argues that there is any material distinction between plaintiffs' statutory and common law claims, and as a result, they rise or fall together. Rather than challenge the sufficiency of the pleadings, EA contends that plaintiffs' claims must fail as a matter of law because they are barred by the First Amendment.[5] Alternatively, EA contends plaintiff's claims are barred by California's public interest exception or by the public affairs exception to California's statutory right of publicity.

### a. Transformative Use Test

Faced with a right of publicity claim based on an expressive work, EA raises the "affirmative defense that the work is protected by the First Amendment inasmuch as it contains significant transformative elements or that the value of the work does not derive primarily from the celebrity's fame." *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 407 (2001). The California Supreme Court first articulated the "transformative" use test in *Comedy III*. As the Court explained, under applicable California law, this "transformative" use test "is essentially a balancing test between the First Amendment and the right of publicity based on whether the work in question adds significant creative elements so as to be transformed into something more than a mere celebrity likeness or imitation." *Id.* at 391.

In *Comedy III*, the Court recognized that because "celebrities take on personal meanings to many individuals in the society, the creative appropriation of celebrity images can be an important avenue of individual expression." *Id.* at 397. For example, a fictional film based on the life of a celebrity is afforded First Amendment protection, as against the subject's right of publicity claim. *See Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 868 (1979) (barring publicity claims

---

[5] Although reaching a constitutional issue or argument is generally disfavored, it is appropriate to consider the question where, as here, defendant contends that merely proceeding with this litigation would chill its speech rights. *Winter v. D.C. Comics*, 30 Cal. 4th 881, 891 (2003).

brought by putative heirs of Rudolph Valentino based on fictionalized film portraying Valentino's life). Nonetheless, the Court in *Comedy III* went on to hold, "depictions of celebrities amounting to little more than the appropriation of the celebrity's economic value are not protected expression under the First Amendment." *Id.* at 400. It further explained, "when an artist's skill and talent is manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to commercially exploit his or her fame, then the artist's right of free expression is outweighed by the right of publicity." *Id.* at 408. In such cases, "[t]he right-of-publicity holder [may still] enforce the right to monopolize the production of conventional, more or less fungible, images of the celebrity." *Id.* at 405; *see also id.* at 402 ("[The] strongest case for a 'right of publicity'" claim arises where plaintiff's work constitutes "the appropriation of the very activity by which the entertainer acquired his reputation in the first place" (citation omitted)).

The essence of the "transformative" use test is: "An artist depicting a celebrity must contribute something more than a merely trivial variation, but create something recognizably his own, in order to qualify for legal protection." *Id.* at 408. Although courts consistently require some transformation to confer First Amendment protection, the case law makes clear the analysis does not turn on the quality of the accused work, or the message conveyed. *Id.* at 407 ("[I]n determining whether the work is transformative, courts are not to be concerned with the quality of the artistic contribution – vulgar forms of expression fully qualify for First Amendment protection."). Protected transformations of celebrity likenesses "are not confined to parody and can take many forms, from factual reporting to fictionalized portrayal, from heavy-handed lampooning to subtle social criticism." *Id.* at 406 (citations omitted).

Consistent with this rubric, in *Comedy III*, the Court permitted the Three Stooges to proceed with claims against defendant for selling lithographs and t-shirts which bore "literal, conventional depictions" of the famous comedians, drawn in charcoal. Although defendant maintained that his portraiture necessarily involved some creative decisions, and thus could not be considered a literal reproduction of plaintiffs' likenesses, the Court rejected that categorical position. *Id.* at 408-409. Purportedly without judging the quality of the work, it found that defendant was engaged in merely merchandising plaintiffs' images, and distinguished the works from more expressive reproductions

of celebrity portraits, such as Andy Warhol's silkscreen portraits of celebrities. *Id.* Noting that the value of the accused works in *Comedy III* derived primarily from plaintiffs' fame, and appeared to be merely "conventional celebrity images," the Court perceived no other transformative element, and as a result, permitted plaintiffs to proceed on their claims. *Id.* at 409-410.

On the other hand, in *Winter*, the Supreme Court barred claims brought by country musicians Johnny and Edgar Winter against DC Comics for sale of a comic book featuring "brothers Johnny and Edgar Autumn, depicted as villainous half-worm, half-human offspring born from the rape of their mother by a supernatural worm creature that had escaped from a hole in the ground." *Winter v. DC Comics*, 30 Cal. 4th 881, 886 (2003). According to plaintiffs, they were represented as "vile, depraved, stupid, cowardly, subhuman individuals who engage in wanton acts of violence, murder and bestiality for pleasure and who should be killed." *Id.* The Court easily found that these depictions, though "less than subtle evocations" of the plaintiffs, did not depict them literally and instead were "distorted" caricatures appearing "in a larger story, which is itself quite expressive." *Id.* at 890. While noting that the comic would not impair plaintiffs' ability to market their likenesses, the Court also held it irrelevant that "defendants were trading on plaintiffs' likenesses and reputations to generate interest in the comic book series and increase sales." *Id.* at 891.

While the facts in the instant action present a closer case than does either *Comedy III* or *Winter*, a growing number of authorities have now addressed the issue in the context of video games, in circumstances that are materially indistinguishable from the case at bar. In a recent case also before the Northern District of California, the quarterback of Arizona State University sued EA for using his likeness in its *NCAA Football* videogame. *Keller v. Elec. Arts, Inc.*, No. 09-1967, 2010 WL 530108, at *5 (N.D. Cal. Feb. 8, 2010). There, as here, plaintiff was represented realistically by EA in both physical and biographical respects. *Id.* As the court noted, "EA does not depict Plaintiff in a different form; he is represented as what he was: the starting quarterback for Arizona State University." *Id.* In addition, "the game's setting is identical to where the public found Plaintiff

during his collegiate career: on the football field." EA has not attempted to explain how that case differs from this one, and instead merely notes that the *Keller* decision is on appeal.[6]

EA argues here, as it did in *Keller*, that the videogame, taken as a whole, contains transformative elements. Relying heavily on *Comedy III*, EA characterizes plaintiffs' likenesses merely as the "raw materials" from which *Madden NFL* is fashioned. While there is no question that video games qualify for First Amendment protection, *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 958 (9th Cir. 2009), and *Madden NFL* certainly encompasses significant expressive elements, this basic proposition does not end the inquiry. *Id.* at 408-09. A review of the applicable authority indicates that the "transformative" use test focuses on the reproduction of plaintiff's likenesses, rather than on a canvassing of the larger work. *See Winter*, 30 Cal. 4th at 886, *and Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47, 59 (2006) (plaintiff's likeness was adequately transformed by dissimilar physique, different costumes, and portrayal as a space-age news reporter in the 25th century). It would make little sense for the rule to be otherwise: if, as EA urges, any expressive elements within the larger work were somehow to "transform" an otherwise conventional use of a celebrity's likeness, the right of publicity would effectively be eviscerated. This conclusion is not inconsistent with judicial decisions protecting fictionalized portrayals of celebrities' life stories in film or other media. *See, e.g., Guglielmi*, 25 Cal. 3d at 868. In *Guglielmi*, for example, Rudolph Valentino's likeness was not used within the film for conventional merchandising purposes, but only for the transformative purpose of representing a fictionalized version of Valentino's storied life.

It follows that the weight of authority rests with plaintiffs. As in *Keller*, plaintiffs here appear in *Madden NFL* in their conventional role as football players, playing football. If there is any expressive significance inhering in EA's depiction of plaintiffs, defendant has failed to articulate it. Although EA appears to claim that its mere projection of plaintiffs' likenesses into avatar figures, capable of manipulation by gamers, is sufficient to confer constitutional protection,

---

[6] EA's appeal was argued and submitted to the Ninth Circuit in February of 2011. A decision by the governing Circuit Court in that case will no doubt provide important guidance for the pending action and, indeed, perhaps for this motion in particular. That said, it would not be fair to the litigants in this case to defer a determination on the pending motions indefinitely.

another way to see this supposed transformation is as a relatively literal, if skilled, translation of plaintiffs' conventional images into the medium of the video game. In this sense, EA's use of plaintiffs' likenesses, though highly sophisticated, is the digital equivalent of transferring the Three Stooges' images onto a t-shirt. *See generally Comedy III*, 25 Cal. 4th at 408-10. *Guglielmi* does not compel a different result. 25 Cal. 3d at 868. There, the accused work was a fictionalized film account of Valentino's life story. Although the opinion does not expressly state as much, had the film at issue instead been an "appropriation of the very activity by which the entertainer acquired his reputation in the first place," such as an uninflected reproduction of some of Valentino's famous performances on screen, there likely would have been a stronger case for plaintiff's publicity claims. *Cf. Comedy III*, 25 Cal. 4th at 402 (quoting *Estate of Presley v. Russen* 513 F. Supp. 1339, 1361 (D. N.J. 1981)). Here, as noted, plaintiffs' likenesses are shown engaged in the activity—playing football—which earned them fame. Although it is true that plaintiffs' likenesses, as they appear in *Madden NFL*, may be controlled by gamers playing the video game, this fact, without more, does not change the analysis.

Prior cases agree. As the California Court of Appeal recently explained, addressing the use of celebrity likenesses in the popular video game *Band Hero*:

> That the avatars can be manipulated to perform at fanciful venues including outer space or to sing songs the real band would object to singing, or that the avatars appear in the context of a videogame that contains many other creative elements, does not transform the avatars into anything other than exact depictions of [band] members doing exactly what they do as celebrities.

*No Doubt v. Activision Pub., Inc.*, 192 Cal. App. 4th 1018, 1034 (2011). The holding in *No Doubt* thus went well beyond what is required here. There, the court deemed even fairly significant "distortions" to plaintiffs' likenesses to be non-transformative. In *Madden NFL*, the depiction of plaintiffs is not altered to nearly the same degree, and in fact, the realistic depiction of plaintiffs achieved by EA appears to be restricted chiefly by the inherent limitations of the medium. The logic of *No Doubt* applies easily and squarely to the facts at bar. EA's claim that its alleged use of plaintiffs' likeness is transformative, and thus protected, fails.

b. *Rogers* Test

Alternatively, EA invites adoption of the Second Circuit's *Rogers* test.[7] *Rogers v. Grimaldi*, 875 F.2d 994, 996-97 (2d Cir. 1989). Under *Rogers*, the first step is to determine whether the use of plaintiffs' image is minimally relevant to the underlying work. *Id.* at 1100. If so, the use is permitted so long as it poses no risk of confusion to consumers. *Id.* As the substance of the *Rogers* test makes clear, it was primarily formulated in the context of evaluating a Lanham Act claim, and only secondarily, for application to the right of publicity. Although EA invokes several California federal district court cases that have applied *Rogers*' analysis to the use of trademarks, s*ee, e.g., Brown v. Elec. Arts, Inc.*, No. 09-1598 (E.D. Cal. Sept. 23, 2009) (slip op.), no California federal courts have extended its application to California's statutory right of publicity. It would be fairly extraordinary to do so here. EA's invitation must be declined.

### c. Public Interest Test

Unable to meet the transformative use or *Rogers* tests, defendant argues that its use of plaintiffs' likenesses in *Madden NFL* is protected because it concerns a matter of public interest. "Under California law, 'no cause of action will lie for the publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it.'" *Hilton,* 580 F.3d at 892 (quoting *Montana v. San Jose Mercury News, Inc.,* 34 Cal. App. 4th 790, 793 (1995)).

It is true that the reporting and discussion of factual information about professional sports implicates the public interest. In *Gionfriddio v. Major League Baseball*, a declaratory action brought by four former professional baseball players against the league itself, the court considered plaintiff's right of publicity claims, as applied to the league's website, which "provides historical information about major league baseball including rosters, box scores, game summaries, lists of award winners, and video clips of historic moments from past games." 94 Cal. App. 4th 400, 405 (2001). The *Gionfriddio* court held that "[t]he recitation and discussion of factual data concerning the athletic performance of these plaintiffs commands a substantial public interest, and therefore [are] a form of expression due substantial constitutional protection." *Id.* at 411 (citation omitted).

---

[7] EA notes that the Ninth Circuit has expressly reserved the question of whether First Amendment protection may be broader than the California Supreme Court recognized in *Comedy III*. *Hilton*, 599 F.3d at 909 n.11.

*See also Montana*, 34 Cal. App. 4th at 796 (discussing a poster of the front page of a newspaper which featured the Superbowl-winning quarterback).

Here, *Madden NFL* indeed includes some historical facts concerning plaintiffs' biographical information and performance statistics. The alleged use of plaintiffs' likenesses in the game, however, goes well beyond simply reporting or republishing "statements of historical fact, descriptions of these facts or video depictions of them," and there is very little in the game that resembles any kind of traditional reporting. *Gionfriddio*, 94 Cal. App. 4th at 415. Notably, this is not necessarily fatal, even though some courts have assumed the public interest doctrine applies only to reporting. *See, e.g., Hilton*, 599 F.3d at 912 (public interest defense is limited to "publication of newsworthy items"); *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 543 (applying exemption to surf documentary). Defendant accurately states that *Gionfriddio* and other courts have recognized "[e]ntertainment features receive the same constitutional protection as factual news reports." 94 Cal. App. 4th at 410. *See also Zacchini v. Scropps-Howard Broad. Co.*, 433 U.S. 562, 578 (1977) (applying public interest analysis to circus performer). It is not difficult to conclude that the free speech protections encompass entertainment, and EA argues, persuasively, that videogames are interactive "entertainment." Yet, "these protections are not absolute" and *Madden NFL* simply does not appear to fulfill the traditional informative role recognized as deserving protection by the court. *Keller*, 2010 WL 530108, at *6; *see generally Dora*, 15 Cal. App. 4th at 543, ("[M]atters in the public interest are not 'restricted to current events; magazines and books, radio and television may legitimately inform and entertain the public with the reproduction of past events, travelogues and biographies.'").

While EA's publication of plaintiffs' biographical facts and performance statistics might warrant protection under the reporting criterion, the game play of *Madden NFL*, for all its realism, does not "report," or even recreate, recent or historical games. Rather, as EA itself emphasizes, each game in *Madden NFL* lies within the gamers' control, and is unique and new. When a gamer selects one of *Madden NFL*'s "historic teams," the only historical aspect of the game that ensues are plaintiffs' likenesses. Everything else is simply play.

In an attempt to address this reality, EA invokes *C.B.C. Distributing & Marketing, Inc. v. Major League Baseball Advanced Media L.P.*, in which the Eighth Circuit held that defendants' "fantasy" league products were protected under Missouri law. In fantasy leagues, sports enthusiasts, acting as owners, assemble rosters of professional players and then compete statistically "on paper," based on their players' actual performances. The accused fantasy system employed the real names, statistics, and other biographical information, of professional baseball players to facilitate competition. 505 F.3d 818, 823-24 (8th Cir. 2007).

Although there are some compelling similarities between fantasy league products and *Madden NFL*, unlike the latter, competition in fantasy leagues actually turns on the players' reported performance, and for this reason much more easily fits as a kind of discourse concerning statistical facts. In addition, as the *C.B.C.* court held:

> … the facts in this case barely, if at all, implicate the interests that states typically intend to vindicate by providing rights of publicity to individuals. Economic interests that states seek to promote include the right of an individual to reap the rewards of his or her endeavors and an individual's right to earn a living. … major league baseball players are rewarded, and handsomely, too, for their participation in games and can earn additional large sums from endorsements and sponsorship arrangements.

505 F.3d at 824. Here, by contrast, EA's decision to use plaintiffs' likenesses in *Madden NFL* clearly implicates recognized economic interests, as evidenced by the case law discussing the use of celebrities in video games, and EA's other licensing agreements that cover the game. *Keller*, which is again directly on point, comes to the same conclusion: *Madden NFL* does not pass the public interest test under California courts' jurisprudence. *Keller*, 2010 WL 530108, at *5-6 (distinguishing *C.B.C.* because the video game did not "depend on updated report of the real-life players' progress during the college football season").

### d. Section 3344(d)

Finally, EA contends that its use of plaintiffs' likenesses is exempt from liability under California Civil Code § 3344(d). That section provides immunity for the "use of a name … or likeness in connection with any news, public affairs, or sports broadcast or account…." Cal. Civ. Code § 3344(d). The Ninth Circuit has suggested that § 3344(d) immunity is intended to sweep more broadly than the First Amendment. *New Kids on the Block v. News Am. Pub., Inc.,* 971 F.2d

302, 310 n. 10 (9th Cir. 1992) (citing *Eastwood v. Superior Court,* 149 Cal. App. 3d 409, 421 (1983)) ("[The provision] is designed to avoid First Amendment questions in the area of misappropriation by providing extra breathing space for the use of a person's name in connection with matters of public interest"). Again, there is little room for debate as to whether the use of photographs and videos of professional athletes, as well as statistics summarizing their performance, concern "public affairs" within the meaning of § 3344(d). *See Gionfriddo*, 94 Cal. App. 4th at 319; *Dora,* 15 Cal. App. 4th at 545 ("'public affairs' was intended to mean something less important than news"); *accord Keller*, 2010 WL 530108, at *7 (college athletics, including NCAA football, qualify as "public affairs"). Plaintiffs, however, contend § 3344(d) immunizes only reporting on, or informative uses of, celebrity likenesses, as under the First Amendment's public interest test.[8]

In *Dora*, the California Court of Appeal held that although the term "public affairs" reaches matters less significant than the news, nonetheless, "[p]ublic affairs must be related to real-life occurrences. As has been established in the cases involving common law privacy and appropriation, the public is interested in and constitutionally entitled to know about things, people, and events that affect it." Cal. App. 4th at 545-46. Although EA argues *Madden NFL* relates to "public affairs," broadly understood, under *Dora*'s logic it is difficult to see how EA can prevail under § 3344(d). Other than a minimal amount of preprogrammed statistical information concerning each player, game play does not report or relate "real-life occurrences." It is, rather, entirely fictional. In *Keller*, this Court reached the same conclusion: "Although NCAA Football is based on subject matter considered 'public affairs,' EA is not entitled to the statutory defense because its use of Plaintiff's image and likeness extends beyond reporting information about him." 2010 WL 530108, at *7. As a result, EA's motion to dismiss must be denied on this reasoning as well.

2. Conversion & Trespass to Chattels

Given that plaintiffs' first two claims survive, EA's only remaining challenge to the third and fourth claims, for conversion and trespass to chattels, respectively, is that plaintiffs have failed to plead that EA dispossessed them of an interest in tangible personal property. Such an allegation

---

[8] Section 3344(d) remains distinct from the public interest doctrine because the former specifically enumerates certain immunized activities for particular contexts. *New Kids on the Block*, 971 F.2d at 310 n.10.

is required, EA claims, to satisfy the merger requirement, which mandates that the intermeddled interest be merged with some tangible property. *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1565 (1996) ("Courts have traditionally refused to recognize as conversion the unauthorized taking of intangible interests that are not merged with, or reflected in, something tangible"). As plaintiffs properly point out, however, California courts no longer apply the merger requirement, and have instead indicated a willingness to entertain conversion and trespass to chattels claims, even where the alleged interference is to an intangible interest. For example, in *Kremen v. Cohen*, plaintiff asserted a conversion claim with respect to his intangible interest in a domain name. 337 F.3d 1024, 1034 (9th Cir. 2003). Reversing the district court's dismissal based on the absence of a showing of merger, the Ninth Circuit held: "We conclude that California does not follow the *Restatement*'s strict merger requirement. Indeed, the leading California Supreme Court case rejects the tangibility requirement altogether." *Id.* (citing *Payne v. Elliot*, 54 Cal. 339 (1880)); *see also A&M Records, Inc. v. Heilman*, 75 Cal. App. 3d 554, 570 (1977) (holding, without applying merger rule, that "misappropriation and sale of the intangible property of another without authority from the owner is conversion"). Accordingly, the merger requirement does not provide a basis to dismiss plaintiffs' ancillary claims.

### 3. Unjust Enrichment

Finally, EA contends that plaintiffs' fifth claim for relief for unjust enrichment is not recognized under California law absent independent grounds for imposing a constructive trust. Importantly, plaintiffs' FAC does allege that "EA is an involuntary trustee holding all such sums in its possession under a constructive trust for the benefit of Plaintiffs and the Class …." FAC ¶ 82. Thus, EA's contention that plaintiffs have not alleged the propriety of a constructive trust is simply incorrect. EA further argues the unjust enrichment claim must be dismissed because California courts do not recognize a standalone cause of action for unjust enrichment without an independent basis for relief. Here, however, plaintiffs have adequately pled an independent basis in stating that EA was unjustly enriched by virtue of its unauthorized use of their likenesses. *See generally Monet v. Chase Home Fin., LLC*, No. C 10-0135 RS, 2010 WL 2486376, at *3 (N.D. Cal. June 16, 2010) (quoting *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 213 (2002) and justifying a

1 standalone unjust enrichment claim where property "identified as belonging in good conscience to
2 the plaintiff could clearly be traced to particular funds or property in the defendants' possession");
3 *Keller*, 2010 WL 530108, at *7. Accordingly, EA's motion to dismiss the fifth claim for relief must
4 be denied.

5 B. Anti-SLAPP

6 EA's Anti-SLAPP motion employs exactly the same analytical framework and arguments to
7 attack plaintiffs' various claims, albeit under a different legal standard. California's Anti-SLAPP
8 statute provides for early dismissal of any claims for relief that are primarily based on defendants'
9 activities taken in furtherance of their right to free speech or petition relating to an issue of public
10 concern. *Vess v. CIBA-GEIGY Corp. USA*, 317 F.3d 1097, 1109 (9th Cir. 2003). Specifically, the
11 law provides that a party may file a motion to strike a cause of action under § 425.16 if the
12 complaint "aris[es] from any act of that person in furtherance of the person's right of petition or free
13 speech under the United States Constitution or the California Constitution in connection with a
14 public issue." Cal. Code Civ. Proc. § 425.16(b)(1). The first step in evaluating an anti-SLAPP
15 motion is to determine whether the defendant has carried its burden in demonstrating that the
16 challenged cause of action is "arising from" activity taken "in furtherance" of the right to petition or
17 free speech. *Mindys*, 611 F.3d at 595-96. "In the anti-SLAPP context, the critical consideration is
18 whether the cause of action is *based on* the defendant's protected free speech or petitioning activity."
19 *Id.* at 597 (quoting *Navellier v. Sletten*, 29 Cal. 4th 82, 89 (2002)) (emphasis in original). The
20 statute expressly recognizes four categories of protected speech and petitioning activity, including,
21 in relevant part, any "conduct in furtherance of the exercise of the constitutional right of petition or
22 the constitutional right of free speech in connection with a public issue or an issue of public
23 interest." Cal. Code Civ. Proc. § 425.16(e).

24 If a defendant succeeds in making a *prima facie* showing, the burden then shifts to plaintiff
25 to demonstrate "a 'reasonable probability' of prevailing on the challenged claims." *Mindys*, 611
26 F.3d at 595. This "minimal merit" standard requires only that plaintiff "state and substantiate a
27 legally sufficient claim." *Id.* at 598-99, (quoting *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal. 4th
28 728 (2003)). This entails a "sufficient prima facie showing of facts to sustain a favorable judgment

if the evidence submitted by the plaintiff is credited." *Id.* at 599 (quoting *Wilson v. Parker, Covert & Chidester*, 28 Cal. 4th 811, 821 (2002)). In evaluating the parties' positions, the court is to consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." Cal. Code. Civ. Proc. § 425.16(b)(2).

As applied here, there is no question that "[v]ideo games are expressive works entitled to as much First Amendment as the most profound literature," *Kirby*, 144 Cal. App. 4th at 58, and although, as the foregoing discussion clearly indicates, there remain serious doubts as to whether EA's use of plaintiffs' likenesses is affirmatively immunized by the First Amendment, it may be assumed for purposes of this motion that the challenged conduct "aris[es] from" activity taken "in furtherance" of the right to petition or free speech," within the meaning of the statute. Cal. Code Civ. Proc. § 425.16(b)(1). Nonetheless, given that EA has conceded for purposes of these motions that *Madden NFL* uses plaintiffs' likenesses without authorization, and has not otherwise attacked the adequacy of the FAC's allegations, for the reasons explained above, plaintiffs have satisfied their burden under step two of the relevant analysis. The FAC, in conjunction with the evidence presented in the form of the game itself, is sufficient to "state and substantiate a legally sufficient claim." *Mindys*, 611 F.3d at 599-99. Accordingly, EA's motion to strike must be denied.

## V. CONCLUSION

For the reasons stated above, defendant's motion to dismiss and motion to strike under § 425.16 are denied.

IT IS SO ORDERED.

Dated: 3/29/12

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE