1   KEKER, VAN NEST & PETERS LLP
    R. JAMES SLAUGHTER - #192813
2   rslaughter@keker.com
    R. ADAM LAURIDSEN - #243780
3   alauridsen@keker.com
    NICHOLAS D. MARAIS - #277846
4   nmarais@keker.com
    CHESSIE THACHER - #296767
5   cthacher@keker.com
    633 Battery Street
6   San Francisco, CA 94111-1809
    Telephone:    415 391 5400
7   Facsimile:    415 397 7188

8   Attorneys for Defendant
    ELECTRONIC ARTS INC.

9
                    UNITED STATES DISTRICT COURT
10
                   NORTHERN DISTRICT OF CALIFORNIA
11
                      SAN FRANCISCO DIVISION
12

13  MICHAEL E. DAVIS, aka TONY DAVIS,        Case No. 10-CV-3328-RS (DMR)
    VINCE FERRAGAMO, and BILLY JOE
    DUPREE, on behalf of themselves and all   **DEFENDANT ELECTRONIC ARTS**
14  others similarly situated,                **INC.'S NOTICE OF MOTION AND**
                                              **MOTION FOR SUMMARY JUDGMENT**
15                Plaintiffs,
                                              Date:      April 19, 2018
16         v.                                 Time:      1:30 p.m.
                                              Dept.:     Courtroom 3, 17th Floor
17  ELECTRONIC ARTS INC.,                     Judge:     Hon. Richard Seeborg

18                Defendant.                  Date Filed:  July 29, 2010

19                                            Trial Date:  TBD

20

21

22

23

24

25

26

27

28

1231292

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................1

II.   FACTUAL BACKGROUND .............................................................................2

    A.    Plaintiffs Target *Madden NFL*'s "Historic Teams" .................................2

    B.    Historic-team Avatars Contain Numerous Elements Created by EA's Designers.................................................................................................3

III.  PROCEDURAL HISTORY................................................................................4

IV.  ARGUMENT ....................................................................................................5

    A.    The Avatars In *Madden NFL* Are Not Identifiable As Plaintiffs............6

    B.    Plaintiffs' Claims Are Barred By The First Amendment .......................10

          1.    Plaintiffs' claims are subject to strict scrutiny and presumptively barred by the First Amendment. ..................................................11

          2.    The First Amendment protects the inclusion of real-life elements in expressive works.......................................................................13

          3.    The avatars on *Madden NFL's* historical teams are transformative. .........15

    C.    Plaintiffs' Claims Are Preempted By The Copyright Act ......................18

    D.    Plaintiffs' Ancillary Claims Fail As A Matter Of Law...........................19

          1.    Plaintiffs are not entitled to any relief under the UCL.............................19

          2.    Plaintiffs' conversion and trespass claims fail as a matter of law. ............21

                a.    Plaintiffs cannot demonstrate that the information EA allegedly used is "property" for conversion and trespass to chattels claims.................................................................21

                b.    EA did not dispossess or substantially interfere with Plaintiffs' property.........................................................22

          3.    EA is entitled to summary judgment on Plaintiffs' unjust enrichment claim.............................................................................23

    E.    Only *Madden NFL 09* Falls Within The Statutes of Limitations...........................24

V.   CONCLUSION..............................................................................................24

1231292

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alberghetti v. Corbis Corp.*
713 F. Supp. 2d 971 (C.D. Cal. 2010) ...................................................................... 24

*Atari Games Corp. v. Oman*
979 F.2d 242 (D.C. Cir. 1992) .................................................................................. 19

*Brown v. Entm't Merchs. Ass'n*
564 U.S. 786 (2011)............................................................................................. 10, 11

*CBC Distribution and Marketing, Inc. v. Major League Baseball Advanced Media*
505 F.3d 818 (8th Cir. 2007) ......................................................................... 13, 14, 15

*CBS Interactive Inc. v. Nat'l Football League Players Ass'n, Inc.*
259 F.R.D. 398 (2009) .............................................................................................. 14

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986)............................................................................................... 5, 10

*DocMagic, Inc. v. Ellie Mae, Inc.*
No. 3:09–CV–4017–MHP, 2011 WL 871480 (N.D. Cal. Mar. 11, 2011) .............................. 23

*EchoStar Satellite Corp. v. NDS Grp. PLC*
No. SA CV03-0950-DOC, 2008 WL 4596644 (C.D. Cal. Oct. 15, 2008) ............................. 20

*ETW Corp. v. Jireh Publ'g, Inc.*
332 F.3d 915 (6th Cir. 2003) ................................................................................... 17

*Groupon, LLC v. Groupon, Inc.*
859 F. Supp. 2d 1067 (N.D. Cal. 2012) ............................................................... 20, 21

*Henderson v. ZeniMax Media, Inc.*
No. CV–12–0418–TUC–BGM, 2013 WL 308765 (D. Ariz. Jan. 25, 2013)........................... 10

*Henley v. Dillard Dep't Stores*
46 F. Supp. 2d 587 (N.D. Tex. 1999) ........................................................................ 6

*In re First All. Mortg. Co.*
471 F.3d 977 (9th Cir. 2006) ............................................................................... 19, 20

*In re iPhone Application Litig.*
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ............................................................ 19, 22, 23

*In re NCAA Student-Athlete Name & Licensing Litig.*
724 F.3d 1268 (9th Cir. 2013) ........................................................................ 12, 14, 16

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.*
828 F.2d 1482 (10th Cir. 1987) ................................................................................ 8

*Joseph Burstyn, Inc. v. Wilson*
343 U.S. 495 (1952).................................................................................................. 14

1231292

*Kimball v. Flagstar Bank F.S.B.*
881 F. Supp. 2d 1209 (S.D. Cal. 2012) ................................................................... 19

*Kremen v. Cohen*
337 F.3d 1024 (9th Cir. 2003) ....................................................................... 21, 22

*Low v. LinkedIn Corp.*
900 F. Supp. 2d 1010 (N.D. Cal. 2012) ................................................................. 22

*Mai Sys. Corp. v. UIPS*
856 F. Supp. 538 (N.D. Cal. 1994) ...................................................................... 20

*Maloney v. T3Media, Inc.*
853 F.3d 1004 (9th Cir. 2017) .......................................................................... 19

*Micro Star v. Formgen Inc.*
154 F. 3d 1107 (9th Cir. 1998) ......................................................................... 19

*Midway Mfg. Co. v. Drikschneider*
543 F. Supp. 466 (D. Neb. 1981) ....................................................................... 18

*Mil-Spec Monkey, Inc. v. Activision Blizzard, Inc.*
74 F. Supp. 3d 1134 (N.D. Cal. 2014) .................................................................... 5

*Monet v. Chase Home Fin., LLC*
No. C 10-0135 RS, 2010 WL 2486376 (N.D. Cal. June 16, 2010) ........................................ 23

*Moore v. Weinstein Co. LLC*
545 F. App'x 405 (6th Cir. 2013) ........................................................................ 7

*Motschenbacher v. R.J. Reynolds Tobacco Co.*
498 F.2d 821 (9th Cir. 1974) ............................................................................ 6

*Newcombe v. Adolf Coors Co.*
157 F.3d 686 (9th Cir. 1998) ............................................................................ 6

*Orr v. Bank of Am., NT & SA*
285 F.3d 764 (9th Cir. 2002) ............................................................................ 5

*Pesina v. Midway Manufacturing Co.*
948 F. Supp. 40 (N.D. Ill. 1996) ........................................................................ 7

*Reed v. Town of Gilbert*
135 S. Ct. 2218 (2015) ................................................................................. 11

*Roberts v. McAfee, Inc.*
660 F.3d 1156 (9th Cir. 2011) .......................................................................... 24

*Sarver v. Chartier*
813 F.3d 891 (9th Cir. 2016) ........................................................................... 11

*Stern Elecs., Inc. v. Kaufman*
669 F.2d 852 (2d Cir. 1982) ............................................................................ 18

*THOIP v. Walt Disney Co.*
690 F. Supp. 2d 218 (S.D.N.Y. 2010) .................................................................. 8, 9

iii

1231292

*United States v. Alvarez*
    567 U.S. 709 (2012) ............................................................................................ 11

*United States v. Stevens*
    559 U.S. 460 (2010) ............................................................................................ 11

*Waits v. Frito-Lay, Inc.*
    978 F.2d 1093 (9th Cir. 1992) ........................................................................ 6, 21

*Williams Electronics, Inc. v. Arctic International, Inc.*
    685 F.2d 870 (3d Cir. 1982) .......................................................................... 18, 19

*Winters v. New York*
    333 U.S. 507 (1948) ........................................................................................ 13, 14

*Yunker v. Pandora Media, Inc.*
    No. 11-CV-03113 JSW, 2013 WL 1282980 (N.D. Cal. Mar. 26, 2013) ................................. 22

**State Cases**

*Christoff v. Nestle USA, INC.*
    47 Cal. 4th 468 (2009) ........................................................................................ 24

*Clark v. Super. Ct.*
    50 Cal. 4th 605 (2010) ........................................................................................ 19

*Colgan v. Leatherman Tool Grp., Inc.*
    135 Cal. App. 4th 663 (2006) ................................................................................ 20

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*
    25 Cal. 4th 387 (2001) ............................................................................ 15, 16, 18

*Eastwood v. Super. Ct.*
    149 Cal. App. 3d 409 (1983) .................................................................................. 6

*Gionfriddo v. Major League Baseball*
    94 Cal. App. 4th 400 (2001) .................................................................................. 14

*Guglielmi v. Spelling-Goldberg Prods*
    25 Cal. 3d 860 (1979) ................................................................ 12, 13, 14, 15

*Hensler v. City of Glendale*
    8 Cal. 4th 1 (1994) ............................................................................................ 24

*Intel Corp. v. Hamidi*
    30 Cal. 4th 1342 (2003) ...................................................................................... 21

*Kirby v. Sega of Am., Inc.*
    144 Cal. App. 4th 47 (2006) ............................................................................ 10, 17

*Korea Supply Co. v. Lockheed Martin Corp.*
    29 Cal. 4th 1134 (2003) ...................................................................................... 20

*Lazar v. Hertz Corp.*
    69 Cal. App. 4th 1494 (1999) .............................................................................. 19

iv

1231292

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Lee v. Hanley*
  61 Cal. 4th 1225 (2015) ........................................................................... 22

*No Doubt v. Activision Publishing, Inc.*
  192 Cal. App. 4th 1018 (2011) ................................................................. 18

*Ross v. Roberts*
  222 Cal. App. 4th 677 (2013) ................................................................... 17

*Winter v. DC Comics*
  30 Cal. 4th 881 (2003) .............................................................................. 17

*Zaslow v. Kroenert*
  29 Cal. 2d 541 (1946) ............................................................................... 22

**State Statutes**

Cal. Bus. & Prof. Code § 17200 ...................................................... 5, 19

Cal. Code Civ. Proc. § 339 ............................................................... 24

**Federal Rules**

Fed. R. Civ. P. 56 ................................................................................ 5

**Treatises**

Restatement (Second) of Torts § 218 ............................................... 21

Restatement (Third) of Unfair Competition § 46 cmt. d (1995) ..... 6

Restatement of Restitution § 1 (1936) ............................................. 23

**Constitutional Provisions**

First Amendment ................................................................. *passim*

**Other Authorities**

J. Thomas McCarthy, *The Rights of Publicity & Privacy* (2017 ed.) ........................... 6, 7, 8, 9, 10

1231292

## NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT

PLEASE TAKE NOTICE that, on April 19, 2018, at 1:30 p.m., or at such other time as the Court may direct, before the Honorable Richard Seeborg, United States District Court, 450 Golden Gate Avenue, Courtroom 3 – 17th Floor, San Francisco, California, 94102, Defendant Electronic Arts Inc. will, and hereby does, move the Court for entry of summary judgment.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities below, the Declarations of R. James Slaughter, Ryan Ferwerda, Donny Moore, Jeremy Strauser, Timothy Cowan, and E. Deborah Jay filed herewith (or previously), and such other and further papers, evidence, and argument as may be submitted to the Court in connection with the hearing on this Motion.

1231292

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

A complaint is a promise.  It tells the court, "trust me, I can prove what I allege." Plaintiffs here have told the Court to trust that their identities appear in *Madden NFL* and to trust that NFL team media guides contain information "consistently identical" to information about historic-team avatars in *Madden NFL*.  The time for trust has passed, discovery has closed, and the record is set.  And the evidence proves that Plaintiffs cannot live up to their promises and that EA is entitled to summary judgment on all of Plaintiffs' claims.

Identifiability is the lynchpin of a right of publicity claim.  Each Plaintiff here must prove that more than a *de minimis* number of people identify a specific avatar as him, and yet no Plaintiff has adduced *any* evidence to show that anyone identifies the at-issue avatars in *Madden NFL* as Plaintiffs.  EA is entitled to summary judgment because Plaintiffs cannot prove they are identifiable in *Madden NFL*.

Plaintiffs' claims also are barred by the First Amendment.  Recent Ninth Circuit law confirms that Plaintiffs' right of publicity claim, as applied to EA's expressive work, is a presumptively invalid content-based restriction on speech.  The Court need not reach the transformative-use test to hold that *Madden NFL* is protected by the First Amendment.  But even if it did, the full factual record proves that EA's alleged use is transformative.

Plaintiffs' claims also are preempted by the Copyright Act.  The Court denied EA's motion to dismiss Plaintiffs' Second Amended Complaint ("SAC") on copyright preemption grounds because the Court ruled that Plaintiffs' likenesses were not "fixed" in a tangible medium of expression as required for protection by the Copyright Act.  In fact, courts consistently have held that the audiovisual elements in a video game are "fixed" under the Act.

Finally, Plaintiffs' ancillary claims for conversion, trespass, unfair competition, and unjust enrichment derive from, and depend upon, Plaintiffs' right of publicity claim, and they therefore fall when that claim falls.  The claims also fail for myriad independent reasons as detailed below.

The Court should enter judgment for EA on all of Plaintiffs' claims.

1231292

## II.     FACTUAL BACKGROUND

EA is a leading developer and publisher of interactive videogames.  For more than 25 years, EA has published *Madden NFL*, a game that allows users to experience the excitement and challenge of NFL football by combining advanced software and creative audiovisual elements.[1] *See* Decl. of R. James Slaughter in Supp. of Mot. for Summ. J. ("Slaughter Decl."), Ex. A (Decl. of Ryan Ferwerda previously filed at ECF No. 178 ("Ferwerda Decl.")) ¶ 6.

### A.     Plaintiffs Target *Madden NFL*'s "Historic Teams"

The core of the *Madden NFL* game experience is a simulation of the then-current season's actual NFL teams.  *See* Ferwerda Decl. ¶ 10.  Those "current teams" are comprised of players from the upcoming NFL season—in the case of *Madden NFL 09*,[2] players who played on NFL teams in the 2008-09 season—and those current players are identified by their real names, photos, jersey numbers, and accurate characteristics.  *Id.*

Plaintiffs' claims focus not on these current teams, but instead on the avatars in so-called "historic teams," a separate feature that previously was available on certain platform editions of *Madden NFL*.[3]  *Id.* ¶ 11.  EA discontinued the historic-team feature entirely after *Madden NFL 09*.  *See id.*; Moore Decl. ¶¶ 6, 10.  The historic-teams feature allowed users to control certain teams from NFL history, ranging from the 1950s to the early 2000s.  Ferwerda Decl. ¶ 12.  Like the current teams, these historic-teams featured team names, logos, and jerseys, all licensed from the NFL.  *Id.* ¶ 17.  But the similarities ended there, and the avatars on the historic-teams are fundamentally different from the current teams in material ways:

- The historic-team avatars do not include names or likenesses (visual images) of real players.

- The historic-team avatars' jersey numbers do not match numbers worn by real

---

[1] EA previously lodged with the Court versions of *Madden NFL 09* for the PlayStation 2 and Xbox, as well as a Sony PlayStation 2 console, an Xbox console, and corresponding controllers. *See* ECF Nos.178-1 & 178-2 (Notices of Manual Filing).  EA incorporates by reference those filings here.

[2] *Madden NFL 09* is the only edition that falls within the statute of limitations.  *See* section IV.E *infra*.

[3] Historic-teams were included only in the PlayStation 2, Xbox, Wii, PSP, and Nintendo DS versions of *Madden NFL 09*.  *See* Slaughter Decl., Ex. B (Decl. of Donny Moore previously filed at ECF No. 179 ("Moore Decl.")) ¶ 6; *see also* Ferwerda Decl. ¶ 11.

1231292

players playing in the same position on real historic teams.

- The historic-team avatars share a limited number of generic faces that were never custom-designed for any historic player.

- The historic-team avatars have generic features, such that numerous avatars share identical heads, bodies, hair color, and skin tone.

*See generally* Ferwerda Decl. ¶¶ 10–15.  Scores of other avatars are identical to the avatars that Plaintiffs claim depict them—sharing the same generic face, height, weight, age, and years played.  *Id.* ¶ 15.

## B. Historic-team Avatars Contain Numerous Elements Created by EA's Designers

The historic-team avatars contain several graphic and data components.  Graphically, each avatar has a generic face and body and team indicia (logos and uniforms) licensed from third parties.  *See* Slaughter Decl., Ex. C (Decl. of Jeremy Strauser previously filed at ECF No. 21 ("Strauser Decl.")) ¶¶ 8-10; Ferwerda Decl. ¶¶ 15, 17.  For data, EA designers assigned each avatar player ratings values for a variety of subjective physical and skill characteristics.  Slaughter Decl., Ex. D ("Moore Dep.") at 48:15-19 ("[E]arly versions of Madden had . . . 10 or 15 different ratings that made a player.  Current versions are upwards of . . . 75 or 100 different data points that comprise the player.").  The player ratings were a product of the judgment and imagination of EA's game designers, who adjusted the avatars' ratings so that a given historic-team would reflect the overall, general playing style of its actual team counterpart.  *Id.* at 116:16-18 ("We wanted to make sure that the team was … rated generally wherever they were good or bad."); Ferwerda Decl. ¶ 14.

For example, a high-powered passing offense would have had a quarterback and wide receivers with high rankings, while a stingy defense might have had a strong and quick defensive line.  Moore Dep. at 116:9-117:8; *see also* Slaughter Decl., Ex. E ("Ferwerda Dep.") at 47:12-14 ("[I]t's about team strength, so if a team passes a lot then the quarterback would have naturally higher passing attributes."); *id.*, Ex. F ("Carty Dep.") at 102:20-103:2 ("I remember adjusting some ratings so the overall positional groups on teams would better reflect what the team was . . . .  We would increase the ratings of the defense players so it would look closer to what the

actual team was."). These ratings were a form of commentary—evaluations by EA's game designers about the comparative strengths and weaknesses of historic-teams. *See* Moore Dep. at 117:1-3 ("[H]istoric teams' pass defenses are normally 90 or 95, we will make [a historic-team's pass defense ratings] 80 or 85 because they weren't good."). Avatars also were assigned certain specific, objective characteristics—height, weight, age, and years played. *Id*. at 98:19-99:5. Collectively, these myriad subjective and objective characteristics assigned to each historic-team avatar in *Madden NFL 09,* together with a game-player's skill in controlling them, determined the outcome of the fictitious games within *Madden NFL. Id*. at 215:19-20; *see also* Ferwerda Dep. at 17:17-22.

## III.   PROCEDURAL HISTORY

Plaintiffs Michael E. Davis, Vince Ferragamo, and Billy Joe Dupree are retired football players who filed this action in 2010 alleging violations of their statutory and common publicity rights, as well as derivative state law claims. *See* ECF No. 1, 11.

In 2011, EA filed motions to dismiss and strike the First Amended Complaint, which the parties briefed for this Court and the Ninth Circuit. For the purposes of those motions, EA assumed the truth of Plaintiffs' allegation that EA had used their likenesses in *Madden NFL 09*. *See* ECF Nos. 62 at 1; 63 at 1; 110 at 3.

Upon return from the Ninth Circuit, the Court denied Plaintiffs' motion for class certification in February 2017. ECF No. 204. The Court found that Plaintiffs could not certify a nationwide class based on California right of publicity law. *Id*. at 1, 7. Because it denied Plaintiffs' motion on choice of law grounds, the Court did not reach EA's other arguments.

On August 4, 2017, this Court granted EA's motion for partial summary judgment on Plaintiffs' statutory right of publicity claim. ECF No. 263 ("PSJ Order"). The Court concluded that EA was entitled to judgment on this claim because none "of the avatars in the *Madden* games could be 'readily identified' as corresponding to any specific plaintiff based on the appearance of the avatar alone." *Id*. at 4.[4]

---

[4] *See also* PSJ Order at 3 ("[T]here is no dispute that *Madden* games do not include the names, voices, signatures or photographs of the named plaintiffs or any putative class members."); ECF No. 316 ("PSJ Recons. Order") at 6 ("[N]o reasonable fact-finder could conclude that a particular avatar is identifiable as a particular player based solely on the appearance of the image.").

Also on August 4, 2017, the Court granted Plaintiffs leave to file their SAC, though the Court specifically noted that its order did not revive Plaintiffs' statutory right of publicity claim and that discovery remained closed. *See* ECF No. 264. Thus, there are only five operative claims in the SAC: common law right of publicity, conversion, trespass to chattels, unjust enrichment, and California Business & Professions Code Section 17200.

Discovery closed on July 14, 2017. *See* Slaughter Decl. ¶ 3. In January 2018, Magistrate Judge Ryu granted EA's motion for sanctions related to Plaintiffs' discovery misconduct. *Id*. Among other evidentiary sanctions, Judge Ryu held that Plaintiffs were precluded, absent substantial justification, from relying on documents that they have not yet produced. *Id*. Judge Ryu also indicated her intent to order Plaintiffs to pay monetary sanctions to EA. *Id*.[5]

## IV.   ARGUMENT

A motion for summary judgment shall be granted "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." PSJ Order at 2 (citing Fed. R. Civ. P. 56(c)).

Where, as here, the moving party does not bear the burden of proof at trial, it need only point out that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also* Fed. R. Civ. P. 56(c)(1)(B). It is then the nonmoving party's burden to go beyond the pleadings and adduce competent, admissible evidence that "set[s] forth specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 322; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002); Fed. R. Civ. P. 56(c)(1)(B), (c)(4). "[T]he non-moving party must bring forth material facts, *i.e.*, 'facts that might affect the outcome of the suit under the governing law." PSJ Order at 2 (citation omitted). "A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. This requires evidence, not speculation." *Mil-Spec Monkey, Inc. v. Activision Blizzard, Inc.*, 74 F. Supp. 3d 1134, 1139 (N.D. Cal. 2014) (citation omitted).

---

[5] As of the date of the filing of this Motion, Judge Ryu has not issued her final order.

## A.        The Avatars In *Madden NFL* Are Not Identifiable As Plaintiffs

"Identifiability . . . is a central element of a right of publicity claim."  *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1102 (9th Cir. 1992).[6]  To meet this identifiability burden, a plaintiff must prove that his identity "was actually used"[7] by adducing admissible evidence that his identity is "readily identifiable" as him—that is, "one who views the [image] with the naked eye can reasonably determine that the person depicted in [it] is the same person who is complaining of the unauthorized use."  *Newcombe*, 157 F.3d at 692; PSJ Order at 4 (same); *see also* PSJ Recons. Order at 6 ("[N]o reasonable fact-finder could conclude that a particular avatar is identifiable as a particular player based solely on the appearance of the image.").

This standard requires a plaintiff to present evidence that he is identifiable by people *other than himself*.  Some courts, including the Ninth Circuit, have held that the allegedly misappropriated image must be widely understood and publically known as the plaintiff.  *See, e.g.*, *Waits*, 978 F.2d at 1102 ("The court instructed the jury: 'A professional singer's voice is widely known if it is known to a *large number* of people throughout a *relatively large* geographic area.'") (emphasis in original).  At a minimum, a plaintiff must present admissible evidence that he is recognized by more than a *de minimis* number of people other than himself.  *See, e.g.*, *Henley v. Dillard Dep't Stores*, 46 F. Supp. 2d 587, 595 (N.D. Tex. 1999) ("[F]ifteen percent of those asked believed Don Henley was a spokesman for or endorser of the ad, and thus, necessarily identified him from the ad.  The results of this survey clearly prove that Don Henley was reasonably identifiable in Defendant's ad to more than a *de minimis* number of persons.").[8]  "Otherwise, non-celebrities who see some vague resemblance between themselves and a

---

[6] *See also Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F.2d 821, 826-27 (9th Cir. 1974) ("[I]f the district court correctly determined as a matter of law that plaintiff is not identifiable in the commercial, then in no sense has plaintiff's identity been misappropriated."); Restatement (Third) of Unfair Competition § 46 cmt. d (1995) ("The use must therefore be sufficient to identify the person whose identity the defendant is alleged to have appropriated.").

[7] *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998); *see also Eastwood v. Super. Ct.*, 149 Cal. App. 3d 409, 416 (1983).

[8] *See also* J. Thomas McCarthy, *The Rights of Publicity & Privacy* (2017 ed.) ("McCarthy") § 3:12 ("There must be some 'de minimis' rule to filter or screen out the frivolous cases where only the plaintiff and a few sympathetic relatives and friends can see any connection between the defendant's use and plaintiff.").

1231292

professional model in an advertisement would have a claim.  Similarly, celebrities may be overly sensitive to only vague resemblances between a professional model or computer-generated character and themselves."  *McCarthy* § 3:12.

*Pesina v. Midway Manufacturing Co.*, 948 F. Supp. 40 (N.D. Ill. 1996), is instructive.  There, the plaintiff alleged that his image had appeared in the defendants' video game.  *Id.* at 42.  The court granted summary judgment because "defendants present[ed] convincing evidence that the public does not recognize [plaintiff] in the home version of Mortal Kombat and Mortal Kombat II and the related products."  *Id.*  Although it was undisputed that defendants had filmed plaintiff's movements for inclusion in their games, the court found the alleged likeness unidentifiable because the plaintiff's "movements were extensively altered prior to being incorporated into the game" and "after comparing [plaintiff] and the game character . . . who allegedly resemble[d] the plaintiff, only 6% of 306 Mortal Kombat users identified [plaintiff] as the model."  *Id.*; *see also McCarthy* § 3:10 ("If a character in an expressive work, such as a motion picture or video game, does not bear plaintiff's name and has attributes that bear only a vague similarity to plaintiff, identifiability is not established.").[9]

Here, Plaintiffs have no evidence that the public identifies the avatars in *Madden NFL* as Plaintiffs.  In fact, the only admissible, and undisputed, evidence proves the opposite—the videogame-playing public does *not* identify the avatars in *Madden NFL* as Plaintiffs.  EA surveyed a random selection of 1,253 adults who played football video games and who fit squarely within EA's target market in 2008 when *Madden NFL 09* was published.[10]  Participants were shown screenshots from *Madden NFL 09* that featured pictures of the avatars (including those avatars that Plaintiffs claim depict them) alongside the information that Plaintiffs allege constitutes their identity.  The results do not even meet a *de minimis* threshold:

- **Davis.** Fewer than 1% identified Tony Davis as the avatar he claims depicted him.  In fact, 5% identified the avatar as a real player *other than* Davis, and 94% could

---

[9] *See also Moore v. Weinstein Co. LLC*, 545 F. App'x 405, 408-09 (6th Cir. 2013) (affirming summary judgment against plaintiff who claimed that a movie had infringed his publicity right where trial court found that the movie character did not use plaintiff's likeness and only had some superficial similarities to plaintiff).

[10] *See generally* Decl. of E. Deborah Jay, Ex. C (Jay Report) at 6-8, Table 1.

DEFENDANT EA'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
Case No. 3:10-cv-3328-RS (DMR)

1231292

not identify any player.

- **Ferragamo.** Fewer than 2% identified Plaintiff Vince Ferragamo as the avatar he claims depicted him. In fact, 10% identified that avatar as a real player *other than* Ferragamo, and 88% could not identify any real player at all.

- **DuPree.** Fewer than 1% identified Billy Joe DuPree as the avatar he claims depicted him. In fact, 3% linked that avatar with other retired players, and 96% did not, or could not, link that avatar to any player at all.[11]

These results are not surprising. In deposition, Plaintiffs could not identify themselves,[12] their teammates,[13] their fellow class representatives,[14] or other retired players.[15] In sum, the only record evidence establishes that the avatars Plaintiffs claim depict them are not readily identifiable as them.[16]

Plaintiffs' identifiability argument has even less evidentiary support when considered as a

---

[11] The Court previously asked whether Dr. Jay had surveyed the correct universe of people. *See* Sept. 22, 2016 Hr'g Tr. at 36:19-23. The answer to that question is undeniably: "Yes." The proper universe of people for this type of survey consists of persons who are likely to buy the product the defendant offers. *See* Jay Decl. ¶¶ 5-6 ; *see also* McCarthy § 3:12 (making clear that the "relevant universe" for a right of publicity survey is the likely "purchasers of defendant's product or service"). Nor would it be appropriate, as Plaintiffs have suggested, to provide survey respondents information about Plaintiffs before respondents were shown the at-issue *Madden NFL* avatars. In order to appropriately measure identifiability, "it is essential to test how products are actually seen in the marketplace." Jay Decl. ¶¶ 7-8. To do otherwise—such as through back-to-back or sequential presentation of images—"would create artificial, top-of-mind awareness of plaintiff." *Id.*; *see also Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1488 (10th Cir. 1987) (discounting results of "side-by-side" comparison trademark survey); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 236-37 (S.D.N.Y. 2010) (excluding survey using a sequential display of marks because it did not sufficiently approximate the manner in which consumers encountered the parties' products in the marketplace: "THOIP has not shown a reasonable likelihood that consumers would have proximately encountered the specific pairs of shirts tested").

[12] Slaughter Decl., Ex. G ("Ferragamo Dep.") at 103:10–14.

[13] Slaughter Decl., Ex. H ("Davis Dep.") at 84:17–24; *id.* at 89:15–18 (explaining that he could not identify avatars from his team because "[t]hat 1979 Buccaneers team had linebackers and running backs that you would walk into the room and you wouldn't be able to tell one from the other"); *see also id.*, Ex. I ("DuPree Dep.") at 38:20–41:21.

[14] Davis Dep. at 73:17–74:20 (incorrectly identifying an avatar as Plaintiff DuPree because of the avatar's "size" and "physical appearance" before deciding that the avatar had "*some* of Billy's similarities" and "it could or could not" be him).

[15] Davis Dep. at 64:21–65:9; 66:10–16; *see also* DuPree Dep. at 20:11–15; 22:5–18; 23:15–19; 24:14–19.

[16] *Madden NFL* does not include Plaintiffs' names. *See* Slaughter Decl., Ex. J (Decl. of Timothy Cowan previously filed at ECF No. 205-12) ¶ 8; *see also id.*, Ex. K (Decl. of Timothy Cowan previously filed at ECF No. 250-2) ¶ 7; PSJ Order at 3.

1231292

putative class.  Plaintiffs' argument rests entirely on the SAC's allegation that Plaintiffs can rely on "official" "team media guides," which purportedly contain player information that is "consistently identical" to avatar information on the corresponding historic-team in *Madden NFL*. *See* SAC ¶¶ 31-32.  That argument falls short for several reasons:

- **No media guides.**  The record does not include media guides for the majority of teams in *Madden NFL*.  *See* Slaughter Decl. ¶ 5.  This means that the roster information—the supposed lynchpin of Plaintiffs' proof—simply does not exist for more than half of the historic-teams in *Madden NFL*.

- **Media guides do not match *Madden NFL*.**  The player information from the media guides that are actually in the record does not match the avatar information in *Madden NFL*.  An analysis of 20 randomly selected historic teams showed that only 11% of the avatars shared the same position, height, weight, age, and years of experience as real players from the same historic-team.[17]  Even when only position, height, and weight were considered, fewer than half of the avatars "matched" real players.[18]  It is more likely than not that any historic-team avatar will *not* share these basic characteristics with a real player on a given team.

- **Media guides are not complete sources.**  The media guides in the record often do not have information on all the players, necessitating reference to other, arbitrary sources.  For instance, the declaration by Brian Henri in support of Plaintiffs' original motion for class certification lists 47 members of the 1979 Rams, five of which do not appear in the media guide.  *See* ECF No. 173-3 (Decl. of Brian Henri in Supp. of First Mot. for Class Certification ("Henri Decl.")), Ex. 9.  For those five, Plaintiffs rely on other sources of information, such as the ESPN Pro Football Encyclopedia.

- **Duplicate avatars.**  In many cases, real-world players share the same characteristics as several different avatars on the same team.  For instance, according to Plaintiffs, the *Madden NFL 09* 1979 Buccaneers team included two defensive backs who were both 5'11", both 190 pounds, and both 24 years old.  *See* SAC, Ex. A.  This is no isolated example.  A review of 20 of the 145 historic-teams in *Madden NFL 09* found that 64 real-world players shared the same characteristics as two or more different in-game avatars on the corresponding team.  NERA Report ¶ 16.  For instance, George Koonce played for the 1998 Green Bay Packers and was listed as a 6'1", 245-pound linebacker.  *Id.*  In *Madden NFL 09*, the 1998 Packers historic-team had three linebackers with those

---

[17] Slaughter Decl., Ex. L (Decl. of Garrett Glasgow previously filed at ECF No. 177-7 ("NERA Report")) ¶ 15.

[18] *Id.* ¶ 16.  NERA's analysis of 20 historic-teams took over 150 hours.  NERA Report ¶ 3.  If a similar comparison were conducted for all 145 historic-teams in *Madden NFL 09*, it would take over 800 hours.  *Id.*

1231292

exact statistics. *Id.* No reasonable jury could identify one from the other.[19]

- **Conflicting data.** The information regarding an avatar, including height or weight, often differs among different sources: the game, the team media guide, and an encyclopedia that Plaintiffs rely on. For instance, Plaintiffs contend that "H#40" on the 1979 historical Rams team is Elvis Peacock. *See* Henri Decl., Ex. 9. *Madden NFL 09* describes this avatar as weighing 208 pounds. The 1979 Rams Media Guide describes Peacock as weighing 220 pounds. Ex. M at 74. And the ESPN Pro Football Encyclopedia (upon which Plaintiffs selectively relied in Ex. 9) lists Peacock at 212 pounds. Ex. N. The finder of fact would have no basis upon which to know which of these is right and whether the avatar depicted in *Madden NFL*, if any, was actually Mr. Peacock.

- **No evidence the media guides are accurate.** Plaintiffs have candidly testified there is no reliable way to determine whether media guides accurately reported their weight, which regularly fluctuated during the course of a NFL season.[20]

In sum, (1) Plaintiffs have not adduced any admissible evidence that anyone in the public—let alone more than a *de minimis* number of people—identifies them in *Madden NFL*; (2) survey evidence shows the opposite—the public does not identify the avatars as Plaintiffs; (3) the record does not contain rosters for the majority of teams in *Madden NFL*; (4) the rosters that are in the record have information that does not match the information in *Madden NFL* and are incomplete; and (5) many avatars in *Madden NFL* contain identical characteristics, making individual identifiability based on those characteristics impossible. It is therefore unsurprising that Plaintiff DuPree acknowledged that *Madden NFL* "scrambled the [retired players] into anonymity."[21]

Because there is "an absence of evidence" to prove that the historic-team avatars are identifiable as Plaintiffs, EA is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

### B.     Plaintiffs' Claims Are Barred By The First Amendment

"[V]ideo games qualify for First Amendment protection." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011); *see also Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47, 58

---

[19] *See Henderson v. ZeniMax Media, Inc.*, No. CV–12–0418–TUC–BGM, 2013 WL 308765, at *3 (D. Ariz. Jan. 25, 2013) (dismissing right of publicity claim alleging that a character in a video game used plaintiff's identity where the similarities were shared by many other people).

[20] Davis Dep. at 21:16-22:10; 24:15-24; 25:1-3; Ferragamo Dep. at 44:25-47:9; 51:11-17.

[21] Slaughter Decl., Ex. O ("The Unbroken Line") at 222.

DEFENDANT EA'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT
Case No. 3:10-cv-3328-RS (DMR)

1231292

(2006) ("Video games are expressive works entitled to as much First Amendment protection as the most profound literature.").  "Whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears."  *Brown*, 564 U.S. at 790 (quotation and citation omitted).

> **1.**      **Plaintiffs' claims are subject to strict scrutiny and presumptively barred by the First Amendment.**

The Ninth Circuit recently held that California's right of publicity laws, when applied against an expressive work like *Madden NFL*, are content-based restrictions on speech, and therefore presumptively unconstitutional.  *See Sarver v. Chartier*, 813 F.3d 891, 903 (9th Cir. 2016) ("By its terms, California's right of publicity law clearly restricts speech based upon its content."); *see also Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.").[22]

*Sarver*, which post-dates the Ninth Circuit's decision in this case, applies here and compels judgment in EA's favor.  In *Sarver*, the Ninth Circuit held that California's right of publicity laws, as applied against defendant's expressive work, were "presumptively unconstitutional, and cannot stand unless [the plaintiff] can show a compelling state interest in preventing the defendants' speech."  813 F.3d at 906.  Because the plaintiff could present no compelling state interest, the Ninth Circuit dismissed plaintiff's claims on First Amendment grounds without addressing the California Supreme Court's transformative-use test.  *Id*. at 904 n.6 ("We need not and do not reach the question of whether such defense applies in this case.").

Here, the content of the *Madden NFL* expressive work falls squarely within this well-recognized category of broad First Amendment protection:  the incorporation of alleged elements of a person's identity into a larger fictional expressive work.  There is no compelling state interest

---

[22] The Supreme Court has recognized a few, specific exceptions to this speech-protective rule: obscenity, defamation, fraud, fighting words, and true threats; and the Court steadfastly has refused to expand that list.  *See United States v. Alvarez*, 567 U.S. 709, 717-18 (2012); *United States v. Stevens*, 559 U.S. 460, 482 (2010).

1231292

in barring "fictionalized portrayal[s]" of individuals' lives. *Id.* at 906 n.9 (citing *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 861 (1979)).  The First Amendment "safeguards the storytellers and artists who take the raw materials of life—including the stories of real individuals, ordinary or extraordinary—and transform them into art, be it articles, books, movies or plays." *Id.* at 905.

The Ninth Circuit's earlier opinions in *In re NCAA Student-Athlete Name & Licensing Litig.* ("*Keller*"), 724 F.3d 1268 (9th Cir. 2013) and *Davis*, 775 F.3d 1172 (9th Cir. 2015), do not compel a different result.  *Keller* presented materially different facts from those in this record.  There, the Ninth Circuit stated that EA sought "to replicate each school's entire team as accurately as possible," that the *NCAA Football* in-game avatars wore the actual jersey numbers of real players and had the same "facial features" as them, that EA sought "to match any unique, highly identifiable playing behaviors by sending detailed questionnaires to team equipment managers," and that EA allegedly allowed game players to compete as *current* college athletes, simulating the *current* college season.  *See Keller*, 724 F.3d at 1268, 1271-72.  *Keller*, thus, turned on the assumption that the avatars in *NCAA Football* looked and behaved exactly like their alleged real-life counterparts, and were intended to simulate a current football season.[23]  *Cf. id.*  Similarly, in this case, the Ninth Circuit also assumed that the *Madden NFL* historic-team avatars had used Plaintiffs' "likenesses." *See Davis*, 775 F.3d at 1177 n.2 ("EA does not seek to distinguish this case from *Keller*").

The factual record in this case is now fully developed, and it is materially different from the assumed facts in *Keller* and *Davis*.  The factual record here establishes that the *Madden NFL* historic-team avatars lack the literal realism assumed in *Keller*—they do not share numbers, facial features, or unique playing behaviors, and they are not portrayed in an accurate setting, or in the current season featuring their current opponents.  *See, e.g.*, PSJ Order at 4 (none "of the avatars in the *Madden* games could be 'readily identified' as corresponding to any specific plaintiff based on the appearance of the avatar alone").  The *Madden NFL* historic-team avatars cannot be used to recreate Plaintiffs' actual seasons, careers, or performances—they allow game-players to create fictionalized match-ups between teams from different eras.  *See, e.g.*, Strauser Decl. ¶ 10.  On this

---

[23] As with the initial motions here, EA assumed the truth of Plaintiffs' allegations in *Keller*.

1231292

record, Plaintiffs cannot overcome the constitutional presumption against right of publicity claims targeting expressive works.  EA is entitled to summary judgment on First Amendment grounds.

### 2. The First Amendment protects the inclusion of real-life elements in expressive works.

Separately, the First Amendment protects the use of real-life elements in expressive works.  Again, the fully developed factual record now establishes that the *Madden NFL* historic-team avatars are not exact replicas of their real-life counterparts, but rather EA's own graphic and programming expressions that allegedly share a limited number of characteristics with real-life persons.  The First Amendment has long shielded such expressive works, mixing fact and fiction, from right of publicity claims.

The California Supreme Court has made clear that, "[w]hether the publication involved was factual and biographical or fictional, the right of publicity has not been held to outweigh the value of free expression . . . . [T]he creation of historical novels and other works inspired by actual events and people would be off limits to the fictional author."  *Guglielmi*, 25 Cal. 3d at 872.  In *Guglielmi*, the court extended First Amendment protection to a filmmaker's use of Rudolph Valentino's "name, likeness and personality" in a "fictionalized version" of the actor's life.  *Id.* at 862.  The court did not distinguish between the First Amendment protection provided to "fictional and factual accounts of Valentino's life.  Respondents' election of the former as the mode for their views does not diminish the constitutional protection afforded speech."  *Id.* at 868.  And it made no difference that the use of Valentino's name, likeness, or personality was for entertaining, rather than traditional reporting.  *Cf. id.* at 867 ("[E]ntertainment is entitled to the same constitutional protection as the exposition of ideas."); *see also Winters v. New York*, 333 U.S. 507, 510 (1948) ("The line between the informing and the entertaining is too elusive for protection of the basic right . . . . What is one man's amusement, teaches another's doctrine.").

More recently, courts have applied similar First Amendment protections to the use of athletes' names, likenesses, and biographical data in fantasy sports games—works of entertainment that, like "docudramas," intermingle fact and fiction.  In *CBC Distribution and Marketing, Inc. v. Major League Baseball Advanced Media*, 505 F.3d 818 (8th Cir. 2007), the court held that CBC's use of "names, nicknames, likenesses, signatures, pictures, playing records,

and/or biographical data of each player in an interactive form in connection with its fantasy baseball products" to be protected by the First Amendment.  *Id.* at 823 (quotations omitted).  In explaining why the fantasy sports games are expressive works entitled to First Amendment protection, the court specifically analogized the games to video games.  *See id.*  It further held that the factual "information used in CBC's fantasy baseball games is all readily available in the public domain, and it would be strange law that a person would not have a first amendment right to use information that is available to everyone."  *Id.*; *see also CBS Interactive Inc. v. Nat'l Football League Players Ass'n, Inc.*, 259 F.R.D. 398, 417 (2009) ("[L]ike in *C.B.C. Distribution*, the package of information used here comes within the ambit of the First Amendment.").

Including an athlete's height, weight, age, and years played within an expressive work like *Madden NFL* is indistinguishable from including the same factual information in other expressive works such as docudramas and fantasy sports games.  In *Keller*, the Ninth Circuit distinguished *CBC* by noting that the fantasy sports products "merely incorporated the names along with performance and biographical data of actual major league baseball players."  724 F.3d at 1283 n.12.  The court continued that "*NCAA Football*, on the other hand, uses virtual likenesses of actual college football players."  *Id.*  Whether or not that distinction has merit, it doesn't apply here:  it is undisputed that *Madden NFL* does not use Plaintiffs' "virtual likenesses."  *See* PSJ Order at 4; PSJ Recons. Order at 6.  Under the Ninth Circuit's own distinction, EA's alleged use of Plaintiffs' "performance and biographical data" is analogous to the First Amendment-protected uses in CBC's fantasy sports games.

This outcome makes sense.  Plaintiffs contend that EA drew the height, weight, age, and years played experience from publicly available sources already protected by the First Amendment, such as media guides or sports websites.  Whether EA's own expressive work is characterized as fact or fiction, or a mix thereof, or as reporting or entertaining, or a mix thereof, is irrelevant.  *See Guglielmi*, 25 Cal. 3d at 867-68.  "The line between the informing and the entertaining is too elusive for the protection of that basic right."  *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) (holding movies to be protected by the First Amendment) (*quoting Winters*, 333 U.S. 507 at 510).  For example, in *Gionfriddo v. Major League Baseball*, 94 Cal.

App. 4th 400 (2001), the court held that use of baseball players' biographical information and statistics on defendant's website were protected under the First Amendment regardless of whether they were classified as factual reporting or entertainment.  *Id.* at 410.  "Entertainment features receive the same constitutional protection as factual news reports."  *Id.*  First Amendment protection does not depend on whether viewers of the work use it as a source of factual information, entertainment, or both.

Courts must treat expressive works equally under the First Amendment.  If a filmmaker cast generic-looking actors as unnamed characters that shared Plaintiffs' height, weight, age, and years of experience in a docudrama about historic NFL teams, there would be little doubt that the First Amendment would protect the filmmaker from Plaintiffs' right of publicity claim.  *See Guglielmi*, 25 Cal. 3d at 872; *see also CBC Distrib.*, 505 F.3d at 823 (holding that the First Amendment protects a fantasy sports website's use of athletes' "names, nicknames, likenesses, signatures, pictures, playing records, and/or biographical data").  *Madden NFL* cannot be treated differently.

### 3.    The avatars on *Madden NFL's* historical teams are transformative.

Now that the record is fully developed, the actual facts are materially different from those assumed when the Court and the Ninth Circuit originally considered EA's First Amendment defense and, specifically, the transformative-use defense.

To determine whether the First Amendment bars a right of publicity claim under the transformative-use test, "the inquiry is whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question."  *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 406 (2001).  In *Comedy III*, the California Supreme Court expressly recognized that the "fictionalized portrayal" of an individual is sufficiently transformative to "require First Amendment protection."  *Id.*  On the other hand, "literal, conventional" depictions of celebrities are not.  *Id*. at 409.  With this distinction in mind, the *Comedy III* court held that a t-shirt featuring only a photo-realistic drawing of the Three Stooges was a non-transformative use of celebrity likenesses.  *See id.*

1231292

Here, the Court previously assumed the truth of Plaintiffs' allegations and concluded that "EA's use of plaintiffs' likenesses, though highly sophisticated, is the digital equivalent of transferring the Three Stooges' images onto a t-shirt."  ECF No. 110 at 9 (citing *Comedy III*, 25 Cal. 4th at 408-10).  The Ninth Circuit similarly assumed, based on Plaintiffs' allegations, that "the individual players' likenesses" were not "transformed more in *Madden NFL* than they were in *NCAA Football*."  *Davis*, 775 F.3d at 1178.

The fully developed factual record, however, no longer supports these assumptions.  EA's historic-team avatars are not literal, conventional depictions of Plaintiffs.  EA's historic-team avatars do not depict Plaintiffs' visual images or likenesses.  "[N]o reasonable fact-finder could conclude that a particular avatar is identifiable as a particular player based solely on the appearance of the image."  PSJ Reconsideration Order at 6; *see also* PSJ Order at 4 ("[P]laintiffs have made no attempt to show … that *any* of the avatars in the Madden games could be 'readily identified' as corresponding to any specific plaintiff based on the appearance of the avatar alone.") (emphasis in original).  Instead, the avatars use generic faces—created by EA—that are shared among hundreds of avatars and do not depict Plaintiffs' individual features.  The historic-team avatars also do not use Plaintiffs' names or numbers.  At nearly all points in the game, a game-player would see only EA's own creative content (faces, bodies, names and numbers) or elements licensed from third parties (jerseys and logos)—not the four select, limited elements (height, weight, age, years played) that Plaintiffs claim as their property.

These four characteristics that Plaintiffs allege are shared by the historic-team avatars are only "raw materials from which an original work is synthesized."  *Comedy III*, 25 Cal. 4th at 406. They are only a few of thousands of graphic and data elements that comprise the historic-team avatars.  *See* Moore Dep. at 342:13-18 ("[Y]ou are cherry-picking in a way with just a handful of the data points and then disregarding the other data points that show that this is [a] Joe Average kind of guy—especially when we look … at the pictures of them.").  Plaintiffs have no interest in the subjective player ratings created by EA's designers (like speed, strength, agility, passing accuracy) that were based on a given historic-team's strengths and weaknesses.  *Id.* at 116:16-18; *see also* Carty Dep. at 102:20-103:2.  These subjective ratings greatly outnumber the four

1   characteristics listed by Plaintiffs and dramatically outweigh them in terms of game-play

2   importance.  *See* Moore Dep. at 314:22-24 ("[W]e can go over the height and the weight thing.

3   But . . . again, that is 4 items out of 100 that make up a player.").

4          The in-game situations in which the avatars appear are also fictional.  Unlike *NCAA*

5   *Football's* and *Madden NFL's* primary gameplay mode—which involve then-current teams,

6   simulating a then-current season—the historic-team feature is counter-factual, pitting teams from

7   different eras against each other.  The results of *Madden NFL* historic-team games are out-of-time

8   historical fictions—professional football versions of *A Connecticut Yankee in King Arthur's*

9   *Court* or *Back to the Future*.  The historic-team feature is not focused on recreating teams' actual

10  games, but rather on creating fantasy match-ups, and, as such, are protected under the First

11  Amendment.  *See ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 936 (6th Cir. 2003) (protecting

12  under the First Amendment a literal depiction of Tiger Woods because the work "includes not

13  only images of Woods and the two caddies, but also carefully crafted likenesses of six past

14  winners of the Masters Tournament").

15         Ultimately, the *Madden NFL* historic-team avatars are akin to the characters in video games

16  and other expressive works that evoke real individuals, but are not literal depictions of them.  For

17  example, in *Kirby v. Sega of America, Inc.*, 144 Cal. App. 4th 47 (2006), the court held that "any

18  imitation of [Kirby's] likeness or identity in Ulala is not the sum and substance of that character."  *Id.*

19  at 61.  "Rather, the imitation is part of the raw material from which the Ulala character, and SC[5],

20  were synthesized."  *Id.*  Likewise, in *Winter v. DC Comics*, 30 Cal. 4th 881 (2003), the California

21  Supreme Court held that "[a]lthough the fictional characters Johnny and Edgar Autumn are less-than-

22  subtle evocations of Johnny and Edgar Winter, the books do not depict plaintiffs literally.  Instead,

23  plaintiffs are merely part of the raw materials from which the comic books were synthesized."  *Id.* at

24  890.[24]  Because the record here now undisputedly establishes that the *Madden NFL* historic-team

25  avatars are created from many "raw materials"—not simply the height, weight, age, and years

26

27  ───────────────────

[24] *See also Ross v. Roberts*, 222 Cal. App. 4th 677, 689 (2013) ("Robert's music may be

28  analogized to a work of fiction in which the protagonist bears some resemblance to the original
    Rick Ross.  The resemblance is only one 'raw material' upon which the story is based, but it is
    merely a minor detail when viewed in the context of the larger story.").

1231292

1    played—summary judgment is appropriate.  *Comedy III*, 25 Cal. 4th at 406.[25]

2           **C.     Plaintiffs' Claims Are Preempted By The Copyright Act**

3           EA incorporates by reference the arguments it advanced in moving to dismiss Plaintiffs'

4    SAC on copyright preemption grounds.  *See* ECF No. 268 at 4-10.  In denying EA's motion to

5    dismiss, the Court held that EA's alleged use of Plaintiffs' identities in *Madden NFL* was not

6    protected under the Copyright Act because it "is not fixed in a tangible medium of expression"

7    where the "game play in the *Madden* games is dynamic, interactive, variable, and in the hands of

8    the consumer."  ECF No. 317 at 4.

9           In fact, courts consistently have held that the audiovisual elements in a video game are

10   "fixed" as that term is interpreted under the Act.  For instance, in *Williams Electronics, Inc. v.*

11   *Arctic International, Inc.*, 685 F.2d 870 (3d Cir. 1982), the court rejected the contention that the

12   audiovisual output of a videogame generated during gameplay is "transient, and cannot be

13   'fixed.'"  *Id.* at 874.  Rather, the court held that the "audiovisual work is permanently embodied

14   in a material object, the memory devices, from which it can be perceived with the aid of the other

15   components of the game."  *Id.* (citing *Stern Elecs., Inc. v. Kaufman*, 669 F.2d 852, 855-56 (2d

16   Cir. 1982) and *Midway Mfg. Co. v. Drikschneider*, 543 F. Supp. 466, 479-480 (D. Neb. 1981)).

17   The court further held that "although there is player interaction with the game during the play

18   mode that may cause the audiovisual presentation to change in some respects from one game to

19   the next in response to the player's varying participation, there is always a repetitive sequence of

20   a substantial portion of the sights and sounds of the game, and many aspects of the display remain

21

22

23

24   ───────────────────

25   [25] These facts distinguish this case from *No Doubt v. Activision Publishing, Inc.*, 192 Cal. App.
     4th 1018 (2011).  In *No Doubt*, the defendant did "not dispute that the avatars of No Doubt are

26   computer-generated recreations of the real band members, painstakingly designed to mimic their
     likeness."  *Id.* at 1033.  Defendant went so far as to require No Doubt to pose for "motion-capture

27   photography to enable [defendant] to reproduce their likenesses, movements, and sounds with
     precision."  *Id.*  Here, the record establishes that the historic-team avatars are generic in
     appearance, not—as in *No Doubt*—"immutable images of the real celebrity [players]."  *Id.*

28

1231292

1   constant from game to game regardless of how the player operates the controls." *Id.*[26]

2   The same is true here: the audiovisual features of *Madden NFL* were fixed on a memory

3   device on which the game was distributed and, during game play, those elements were simply

4   repeated over and over. *See* Decl. of Timothy Cowan in Supp. of Mot. for Summ. J. ¶¶ 4-5.

5   Therefore, for the reasons articulated in EA's motion to dismiss the SAC, *Maloney v. T3Media,*

6   *Inc.*, 853 F.3d 1004 (9th Cir. 2017), dictates that the Court grant judgment for EA on copyright

7   preemption grounds. *See id.* at 1019-20.

8       **D.**    **Plaintiffs' Ancillary Claims Fail As A Matter Of Law**

9   Plaintiffs' ancillary claims (conversion, trespass to chattels, unjust enrichment, and UCL)

10   derive and depend on their right of publicity claim. *See* SAC ¶ 96-97, 106-107, 112, 117. These

11   claims fall if Plaintiffs' right of publicity claim falls. *See Kimball v. Flagstar Bank F.S.B.*, 881 F.

12   Supp. 2d 1209, 1224 (S.D. Cal. 2012); *Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1505 (1999);

13   *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1075 (N.D. Cal. 2012).

14   EA is entitled to judgment on them for the following separate and independent reasons.

15       **1.**    **Plaintiffs are not entitled to any relief under the UCL.**

16   EA is entitled to judgment on Plaintiffs' UCL claim because Plaintiffs are not entitled to

17   any relief under the UCL. California's UCL permits only two forms of relief: restitution and

18   injunctive relief. *See Clark v. Super. Ct.*, 50 Cal. 4th 605, 608-09 (2010). Where a plaintiff

19   cannot recover either form of relief, the UCL claim fails as a matter of law. *See In re First All.*

20   *Mortg. Co.*, 471 F.3d 977, 996 (9th Cir. 2006) (granting summary judgment because, even if

21   defendant's conduct violated the UCL, plaintiffs were not eligible for Section 17200's remedies).

22   The *sole* remedy Plaintiffs seek under the UCL is disgorgement of EA's profits. SAC

23   ¶ 118. But that remedy seeks neither appropriate injunctive relief nor restitution—*i.e.,* that the

24   profits sought from EA were either obtained directly from any Plaintiff or that any Plaintiff

---

25   [26] *See also Micro Star v. Formgen Inc.*, 154 F. 3d 1107, 1111-12 (9th Cir. 1998) (audiovisual

26   displays created by the defendant's map files met the fixation requirement); *Atari Games Corp. v.*
    *Oman*, 979 F.2d 242, 245 (D.C. Cir. 1992) (Ginsburg, J.) (rejecting Copyright Office's

27   suggestion that a video game does not meet the standard of fixation because the visual output
    during videogame play is made by the player and not by the author of the video game and ruling

28   instead that the "hallmark of a video game is the expression found in the entire effect of the game
    as it appears and sounds") (internal quotations and citation omitted).

1    otherwise had an ownership interest in the profits.[27]  To meet this ownership requirement,

2    Plaintiffs must show that their property can "clearly be traced to *particular funds or property* in

3    the defendant's possession."  *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 699

4    (2006) (UCL restitution is available only where the sum at issue can be traced).  Plaintiffs have

5    not offered *any* evidence to establish that EA has funds or property traceable to them.[28]  Just as in

6    *Korea Supply*, Plaintiffs are not entitled to restitution because they do not have an ownership

7    interest in EA's profits.  *Cf.* 29 Cal. 4th at 1150.  None of Plaintiffs' property can "clearly be

8    traced to *particular funds or property* in the defendant's possession."  *Colgan*, 135 Cal. App. 4th

9    at 699 (emphasis added).  Plaintiffs never purchased *Madden NFL* nor transmitted monies or

10   property to EA.  *See* Slaughter Decl., Ex. P (Pls.' Am. Resps. to EA's Sec. Set of Interrogs.) at

11   No. 12.

12          Plaintiffs attempt to backdoor "actual damages under the guise of restitution" by alleging

13   that EA "took" the "economic value intrinsic in [their] indentit[ies], and/or likeness[es]."

14   Slaughter Decl., Ex. Q (Pls.' Resps. to EA's Sec. Set of Interrogs.) at Nos. 13-14.  This tactic has

15   long been rejected.  *See*, *e.g.*, *Mai Sys. Corp. v. UIPS*, 856 F. Supp. 538, 542 (N.D. Cal. 1994)

16   (rejecting UCL claim based on "a lost business opportunity" because compensation for such an

17   injury is "a measure of damages and not restitution" and therefore "barred by the rule limiting

18   recovery under Section 17203 to restitution and injunctive relief").[29]

19   [27] *See Groupon, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1083 (N.D. Cal. 2012) (granting
     summary judgment on a UCL claim because plaintiff "ha[d] not submitted any evidence, or . . .
20   argument, to show that [defendant] obtained money from [plaintiff] or that [plaintiff] otherwise
     ha[d] any ownership interest of any of [defendant's] profits"); *In re First All. Mortg*, 471 F.3d at
21   996 (same); *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150 (2003)
     (disgorgement of profits "where the[] profits are neither money taken from a plaintiff nor funds in
22   which the plaintiff has an ownership interest . . . is not an authorized remedy in an individual
     action under the UCL").

23   [28] Recognizing their problems under the UCL, Plaintiffs try to characterize their remedy as
24   "*injunctive relief* that EA disgorge all its profits . . . ."  SAC ¶ 118.  But changing the label does
     not change the remedy.  *See, e.g., Korea Supply*, 29 Cal. 4th at 1148-49 (noting that, although
25   "plaintiff describes its requested remedy as 'restitution,'" that "term does not accurately describe
     the relief sought by plaintiff")

26   [29] *See also EchoStar Satellite Corp. v. NDS Grp. PLC*, No. SA CV03-0950-DOC, 2008 WL
     4596644, at *9 (C.D. Cal. Oct. 15, 2008) (in rejecting argument that defendant had violated UCL
27   by taking "value" of secure smart card and publicly posting instructions on how to hack plaintiff's
     smart card, court noted that relief sought "would eviscerate the distinction between restitution and
28   damages" because "[a]ny plaintiff who suffered injury to property could claim restitution because
     the defendant 'took away' the value of the property").

20

1231292

Because Plaintiffs are not entitled to restitution or injunctive relief, their UCL claim should be dismissed.  *See Groupon*, 859 F. Supp. 2d at 1083.

### 2.     Plaintiffs' conversion and trespass claims fail as a matter of law.

Plaintiffs' conversion claim requires that they adduce competent evidence of: "(1) ownership or right to possession of property, (2) wrongful disposition of the property right and (3) damages."  *Kremen v. Cohen*, 337 F.3d 1024, 1029 (9th Cir. 2003).  Plaintiffs' trespass to chattels claim requires proof of the same underlying elements, except that they need only prove that EA substantially interfered with, not dispossessed, their property rights.  *See Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1357 (2003) (quoting Restatement (Second) of Torts § 218).   Both causes of action fail because Plaintiffs have not shown that (1) the information allegedly used by EA constitutes a cognizable "property;" or (2) EA substantially interfered with or dispossessed them of that cognizable property.

### a.     Plaintiffs cannot demonstrate that the information EA allegedly used is "property" for conversion and trespass to chattels claims.

Conversion and trespass to chattels both require cognizable "property" owned by the plaintiff.  *See Kremen*, 337 F.3d at 1029; *Hamidi*, 30 Cal. 4th at 1357.  Plaintiffs have identified *no* property with which EA allegedly interfered.  EA asked Plaintiffs to identify what "property" they claim EA took or damaged.  Slaughter Decl., Ex. Q (Pls.' Resps. to EA's Second Set of Interrogs.) at Nos. 13 and 14.  Plaintiffs responded to EA's discovery by narrowing EA's interrogatories to *exclude* property: "assuming this interrogatory seeks to inquire as the 'economic rights' of Plaintiff taken by EA and not 'property."  Of course, EA did not ask about "economic rights," but property itself.  EA is entitled to judgment on Plaintiffs' conversion and trespass claims because Plaintiffs have not identified any cognizable "property" with which EA interfered.[30]

Even so, "economic rights" are not the type of interest that supports a conversion or trespass claim.  In order to maintain a conversion or trespass claim "where the alleged

---

[30] Plaintiffs' evasiveness is notable because courts have uniformly held that the right of publicity is a property right.  *See*, *e.g.*, *Waits*, 978 F.2d at 1100.

1231292

interference is to an intangible interest," ECF No. 110 at 14, the plaintiff must prove that the intangible property (1) is capable of precise definition; (2) is capable of exclusive possession and control, and (3) the owner must have established a legitimate claim to exclusivity. *Kremen*, 337 F.3d at 1030. Courts consistently have found that personal information (such as a person's height and weight) is not capable of precise definition or exclusive control and does not pass the *Kremen* test. *See, e.g.*, *In re iPhone Application*, 844 F. Supp. 2d at 1075 (dismissing conversion claim because plaintiff could not establish cognizable property interest in personal information, including "location, zip code, device identifier, and other data"); *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1029 (N.D. Cal. 2012); *see also Yunker v. Pandora Media, Inc.*, No. 11-CV-03113 JSW, 2013 WL 1282980, at *17 (N.D. Cal. Mar. 26, 2013) (dismissing conversion claim based on conversion of personal information, such as "age, gender, location and the UUID [unique device identifier] on [a] mobile device" because the information was not capable of exclusive control). Just so here.

### b. EA did not dispossess or substantially interfere with Plaintiffs' property.

To succeed on a conversion claim, a plaintiff has the burden to prove that the defendant "substantially" interfered with his or her property. *See* CACI No. 2100; *see also Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015). Likewise, under a claim for trespass, a plaintiff must prove that his or her property was "impaired as to its condition, quality, or value, or the possessor is deprived of the use of the chattel for a substantial time." *In re iPhone Application*, 844 F. Supp. 2d at 1069 (quotations and citation omitted). Plaintiffs have no evidence that EA dispossessed them of, or substantially interfered with, any cognizable property.

In *In re iPhone Application*, the plaintiffs alleged a trespass claim on the basis that Apple had installed location software that consumed memory, bandwidth, and storage on their phones. *See id.* The court dismissed this claim, explaining that, although the allegations "conceivably constitute a harm, they do not plausibly establish a significant reduction in service constituting an *interference* with the intended functioning of the system, which is necessary to establish a cause of action for trespass." *Id.* (emphasis added). A plaintiff's burden in a conversion claim is even higher: defendant's conduct must amount to "substantial interference." *Zaslow v. Kroenert*, 29

22

Cal. 2d 541, 551 (1946); *DocMagic, Inc. v. Ellie Mae, Inc.*, No. 3:09–CV–4017–MHP, 2011 WL 871480, at *11 (N.D. Cal. Mar. 11, 2011) (rejecting conversion claim where owners of uploaded loan information could not prove "the loss of *full* dominion over" personal data compiled by defendant) (emphasis added).

Here, there is no evidence that EA substantially interfered with Plaintiffs personal information.  Rather, Plaintiffs merely assert that EA took from them "the right to control the commercial exploitation of [their] names, images, identities and/or likenesses."  Slaughter Decl., Ex. Q (Pls.' Resps. to Sec. Set of Interrogs.) at Nos. 13 and 14.  But this assertion is contradicted by Plaintiff Dupree's contemporaneous licensing of his image, which confirms that Plaintiffs retained their rights to control commercial exploitation of their image. *Id*. Ex. R (Pl. Dupree's Further Am. Resp. to Reqs. For Admissions) at No. 33.  Indeed, there is no actual evidence to support that assertion.  In short, EA did not prevent Plaintiffs from making use of their property for *any* period of time. *Cf. In re iPhone Application*, 844 F. Supp. 2d at 1069.

EA is entitled to judgment on Plaintiffs' conversion and trespass to chattel claims.

### 3.    EA is entitled to summary judgment on Plaintiffs' unjust enrichment claim.

EA previously moved to dismiss Plaintiffs' claim for unjust enrichment because unjust enrichment is not recognized under California law absent grounds for imposing a constructive trust. *See* ECF No. 63 at 122; *see also* ECF No. 110 at 14.  The Court denied that motion because Plaintiffs' First Amended Complaint had alleged that "EA is an involuntary trustee holding all such sums in its possession under a constructive trust . . . ."  ECF No. 110 at 14 (citing FAC ¶ 82).  The record is now fully developed, and there is no evidence to support the imposition of a constructive trust because EA is not holding any property belonging to Plaintiffs. *See supra* section IV.D.I.  Moreover, the Court held that a plaintiff can maintain a standalone claim for unjust enrichment *only* where the plaintiff is entitled to some form of restitution. *See* ECF No. 110 at 4; *see also Monet v. Chase Home Fin., LLC*, No. C 10-0135 RS, 2010 WL 2486376, at *3 (N.D. Cal. June 16, 2010); Restatement of Restitution § 1 (1936) ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other.").  As demonstrated above, Plaintiffs are not entitled to restitution and therefore could not succeed on

23

the claim even if it had been properly pled.

EA is entitled to judgment on Plaintiffs' unjust enrichment claim.

### E.    Only *Madden NFL 09* Falls Within The Statutes of Limitations

The statute of limitations for a right of publicity claim in California is two years.  *See* Cal.
Code Civ. Proc. § 339; *Christoff v. Nestle USA, INC.*, 47 Cal. 4th 468, 476 n.7 (2009); *Alberghetti
v. Corbis Corp.*, 713 F. Supp. 2d 971, 976 (C.D. Cal. 2010).[31]  Plaintiffs' conversion, trespass to
chattels, and unjust enrichment claims also are subject to the two-year statute because the claims'
gravamen is the same as Plaintiffs' right of publicity claims.  *See Hensler v. City of Glendale*, 8
Cal. 4th 1, 22-23 (1994); *Alberghetti*, 713 F. Supp. 2d at 983–84.  This case was filed on July 29,
2010, ECF No. 1, so only those *Madden NFL* games that include the historic-team feature
published on or after July 29, 2008 are within the statute of limitations.  Only *Madden NFL 09*,
released on August 12, 2008, falls within that period.[32]  Claims targeting earlier games are time-
barred.

## V.    CONCLUSION

For these reasons, EA respectfully requests that the Court enter judgment for EA on all of
Plaintiffs' claims.

Dated:  February 16, 2018                                       KEKER, VAN NEST & PETERS LLP


                                                        By:    */s/ R. James Slaughter*
                                                               R. JAMES SLAUGHTER
                                                               R. ADAM LAURIDSEN
                                                               NICHOLAS D. MARAIS
                                                               CHESSIE THACHER
                                                               Attorneys for Defendant
                                                               ELECTRONIC ARTS INC.

---

[31] While the statute of limitations for an UCL claim may be four years, because Plaintiffs cannot
state an UCL claim, a four-year statute does not apply.

[32] Pursuant to the single-publication rule, "a single cause of action . . . accrues upon the first
publication of the communication, thereby 'spar[ing] the courts from litigation 'of stale claims'
where a [work] is resold years later."  *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1166-67 (9th Cir.
2011).  Plaintiffs have suggested that EA "re-published" earlier versions of *Madden NFL* within
the statutory period by lowering the price of the game in order to target a new audience.  Not true.
The last time that EA lowered the price of any edition of *Madden NFL* that included historic-
teams was on May 2, 2008, which falls outside the statute of limitations.  *See* Ferwerda Decl. ¶ 7.

24

1231292